UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

_____
In re: WELDING FUME PRODUCTS )
LIABILITY LITIGATION )
) Case No. 1:08-CV-36-KMO-JMR
) (formerly 1:03-CV-17000 in NDOH)
)
 THIS DOCUMENT RELATES TO: ) MDL Docket No. 1535
)
*Robert E. Jowers, et al v. Arcos Industries,* ) JUDGE O'MALLEY
*L.L.C., et al.* )
)
_____)

**PLAINTIFFS' MOTION FOR SANCTIONS FOR DEFENDANT ESAB'S WILLFUL AND/OR RECKLESS VIOLATION OF THIS COURT'S ORDERS PROHIBITING <u>REFERENCES TO LAWYER ADVERTISING</u>**

NOW COME Plaintiffs Robert and Donna Jowers and would request that this Honorable Court award sanctions against Defendant ESAB, and/or their trial counsel for willful or reckless violation of this Court's orders *in limine*. In each of the MDL trials, this Honorable Court has prohibited the Defendants from introducing any evidence or lawyer argument referring to plaintiffs' attorneys' advertising for welding fumes clients, and the Court more generally prohibited the Defendants from suggesting that the welding fume epidemic or any claims in particular were created by lawyers. Just three months ago, the Defendants in *Tamraz* blatantly and repeatedly violated these orders (but were not sanctioned at that time)*,* and on the very first day of the *Jowers* trial, ESAB's representative Phil Plotica egregiously violated those same orders once again. Mr. Plotica and the defense attorneys cannot even agree as to whether he was warned about the Court's orders. By way of this motion, Plaintiffs request monetary and other sanctions in order to stop this pattern and practice of willfully ignoring the Court's orders.

1

Unless the Defendants are held to account for their continued disregard of the Court's authority, such misconduct will continue, just as it did throughout the *Tamraz* trial.

### I. FACTS

#### A. In *Tamraz*, ESAB and Other Defendants Blatantly Violated the Court's Orders, But Defense Attorneys Disagreed About Why.

Referencing the *Tamraz* trial, this Honorable Court correctly recalled that, "this is how we started the last trial, [with] blatant violations of motions *in limine*." Jowers Trial Tr., 450:7-8. The Court recollected that "there must have been ten or 15" such blatant violations in *Tamraz*. *Id.*, 451:4-5. Notably, these violations occurred just three months ago.

Indeed, in *Tamraz,* the Defendants' attorney Pat Gloor violated the Court's order *on this particular issue,* by "accidentally" playing a video clip regarding lawyer advertising. The transcript is telling, showing that the defense attorneys could not even agree about why this happened – whether through their negligence at trial or their willful ignorance of the ground rules.

```
                                    1692
              16   Q.  C-29, please.
              17            (Video played, as follows:)
              18            "Question:  Before you saw Dr. Siegel and
              19   before you saw the TV ad, did you know that welding fumes
              20   could be harmful?
              21            "Answer:  As far as what, for instance?
              22            "Question:  Harmful in any way?
              23            "Answer:  Yes.  I had seen ads that they
              24   could be harmful, yes.
              25            MR. GLOOR:  I apologize.  Take this down.
                                    1693
               1   C-30.  I apologize.
               2            MR. DAVIS:  May we approach?
               3            THE COURT:  Yes.
               4          (Discussion at side bar:)
               5            THE COURT:  Eric, you are standing in the
```

```
 6   middle of the circle.
 7            MR. DAVIS:  The Court ruled that the TV ad
 8   is not coming in.  It's the Internet research only.  And
 9   you just told this jury about the TV ad.
10            MR. KENNEDY:  I'm not going to say you are
11   right or wrong.  **I don't recall the ruling.**
12            MR. DAVIS:  It was very clear because you
13   wanted to address it, and she said no.  The only thing
14   that is coming in was the Internet ad that was provided
15   to the doctor.
16            MR. KENNEDY:  We had the factual issue going
17   on.
18            MR. DAVIS:  But the Court didn't buy it.  It
19   never came out in the testimony.  You never put the ad
20   before a doctor.
21            MR. SHELTON:  And Mr. Tamraz has been on the
22   stand, and now Dr. Cunitz is on the stand talking about
23   all kinds of stuff, and they play something about a TV
24   ad.
25            MR. CLIMACO:  Then he says it was the wrong
                                 1694
 1   one.  He knew what it was.
 2            THE COURT:  That was excluded, Mr. Gloor.
 3   Come on.  If this doesn't get clean, I'm telling you I'm
 4   going to correct you in front of the jury every single
 5   time.  Is that what you want me to have to do?
 6            MR. DAVIS:  I don't even know if we want
 7   this pointed out.
 8            MR. KENNEDY:  I have to look at what the
 9   rule is.  **I don't remember.**  I really don't.
10            MR. CLIMACO:  It's exactly what it was.  I
11   took all that.
12            THE COURT:  I let you talk about advertising
13   Dr. Nausieda, but I told you as it related to Mr. Tamraz,
14   the only advertising that would be discussed is the one
15   that was shown to the doctor, that the wife showed to the
16   doctor. We went through the advertising issue at some
17   great length.
18            MR. KENNEDY:  I know we did.  I just can't
19   say.  I don't -- I'm not saying wrong.
```

Tamraz Trial Tr., 1692:16-1695:6.

3

Notably, the counsel for these defendants understood that what they did was wrong and Mr. Gloor apologized to the Court before Plaintiffs even objected. The immediate timing of this apology indicated to Plaintiffs that Mr. Gloor most likely knew that an apology to the Court would be necessary prior to the violation. The Defendants may have done this purposefully, but even if you take them at their word, they were extremely reckless. Plaintiffs are not sure which is worse – the defense attorneys' repeated recklessness in showing inadmissible and prejudicial evidence to the jury or their professed ignorance of this Court's orders. Notably, the Plaintiffs did not request and the Court did not award sanctions against the Defendants in *Tamraz*, but the Court merely instructed the jury to disregard the video.

At the pretrial conference in *Jowers*, Defense attorney Mike Ulmer acknowledged that he had read the *Tamraz* transcript. Jowers Pretrial Tr. 180:24. Apparently aware that in *Jowers* the Court would not countenance such calculated disregard for the Court's authority, throughout the pretrial hearing, Mr. Ulmer repeatedly promised that, "the last thing I want to do is run afoul of one of your *in limine* rulings." *Id.*, 72:17, 21, 80:9, 187:13, 189:17.

> B. **At The *Jowers* Pre-Trial Conference, The Court Again Ordered That There Shall Be No References to Lawyer Advertising and No Suggestion that Claims Are Lawyer-Made.**

As in previous cases, in advance of the *Jowers* trial, Plaintiffs moved *in limine* to exclude all references to lawyer advertising from the trial of this matter, whether made by lawyers or witnesses. This Honorable Court granted the Motion:

```
22   THE COURT:  Okay.  Next is [Docket Entry] 247, which we've
23   already addressed.  That's lawyer advertising.  That is
24   excluded.
25       In this case we don't even have the issue that
 1   Mr. Kennedy was so concerned about in the other cases, which
```

```
2   is this is not a question where he ever learned which
3   symptoms to complain about from lawyer advertising.  We
4   don't even have that kind of issue here.  So the motion is
5   granted in its entirety, and it is subject to the parties'
6   other agreements.
```

Pretrial Tr. 63:22-64:6.  Defense counsel made no objection to this order.  Rather attorney Mike Ulmer conceded that that such an order "made perfect sense."  Pretrial Tr. 27:5-6.  Mr. Ulmer said that, presumably, because he is fully aware that tort reform and lawyer advertising are political hot button issues in Mississippi, ones that are completely irrelevant to the merits of this case and grossly prejudicial.

The Court also granted a separate Plaintiffs' Motion *in Limine*, which covered the same issue in another way.  This Court explained:

```
14   Next is the plaintiffs want to exclude any suggestion
15   that the lawsuits are or claims are lawyer made or
16   generated.  The parties' agreement already deals with this,
17   as does the reference to lawyer advertising, so that's
18   granted as unopposed.
```

Pretrial Tr. 65:14-18 (referencing D.E. 248).  By these two orders, the Court prohibited any references to lawyer advertising or any suggestion that the claims are lawyer-made.  The orders could not have been clearer.

**C.  On the First Day of Trial, The First Witness Blatantly Violated These Orders.**

On February 8, 2008, Plaintiffs called their first witness, the ESAB Group, Inc., to testify by and through its corporate representative, Mr. Phil Plotica.  In little more than an hour of testimony, Mr. Plotica made unsolicited statements regarding lawyer advertising and suggested that the welding fume epidemic was concocted by lawyers.

> 9   Q.  Why is it that ESAB started warning about manganese in
> 10  2003?
> 11  A.  2002.
> 12  Q.  2002.
> 13  A.  By that time, obviously there had been a lot of attention
> 14  paid to manganese.  **We were getting asked a lot of questions**
> 15  **because people were seeing ads on TV, and people were hearing**
> 16  **about litigation going on.**  Several of our competitors had
> 17  already put a notation on there, so we decided to do it as
> 18  well, but it wasn't because we came to the conclusion that
> 19  a-ha, we know manganese in fumes is going to cause neurological
> 20  damage.  We put it on because it was basically the convention
> 21  to do at that time.

Trial Tr. 423:9-21 (emphasis added).  At this point Mr. Shelton did not want to cause additional prejudice by drawing additional attention to Mr. Plotica's abuse.  As if that was not enough, Mr. Plotica then did it again and even more explicitly the second time.  In this instance, the question concerned **ESAB's 1978 MSDSs**, but nonetheless Mr. Plotica found a way to turn his answer towards a so-called lawyer-made epidemic thirty-years later:

> 10  Q.  So what you are telling the jury is that in 1978, this is
> 11  all ESAB knew about the health hazards of its welding
> 12  consumables?
> 13  A.  I think generally, at that time, it was not recognized
> 14  that there were many health hazards associated with welding
> 15  when it was done in the proper way, and, you know, as I think
> 16  was pointed out, welding for about a hundred years in this
> 17  country, and **not having mass reports of sick welders really**
> 18  **until this litigation started, with your mass media**
> 19  **advertising,** at that time we felt that was a fair statement.  I
> 20  didn't write that, obviously.  I was not involved in that
> 21  period at that time, but I would assume that whoever wrote that
> 22  felt that was a fair statement.

Trial Tr. 440:10-22 (emphasis added).  Notably, these comments were both gratuitous and unsolicited.  Mr. Shelton's questions did not at all open the door for Mr. Plotica to begin

discussing lawyer advertising. The Court rightfully recognized as much from the bench: "This was an aggressive violation of the Court's order. This witness went out of his way to violate the Court's order." Trial Tr., 448:7-9.

### D. The Defense Attorneys And Mr. Plotica Disagree About Whether He Was Instructed About The Court Orders.

After the jury was excused, the Court addressed the Parties on this problem. First the defense attorneys denied that Mr. Plotica intentionally violated the Court's orders, but in the very next breath the defense attorneys represented that they specifically warned him about the order and told him not to violate it. (One wonders how they knew it was unintentional if they also knew that they had told him not to do it.) In any case, Mr. Plotica then denied having received such a warning.

```
 7  THE COURT:  This was an aggressive violation of the
 8  Court's order.  This witness went out of his way to violate the
 9  Court's order.  How can you explain that?  Did you not prep
10  your witness and tell him there were very strict restrictions
11  about what people were permitted to say and not permitted to
12  say?
13        MR. BELL:  Your Honor, the witness was prepped.  He
14  was not coached.  It was not intentional in any way.
15        THE COURT:  So the witness knew in advance that he
16  was not allowed to go there, and he went there three or four
17  times?
18        MR. BELL:  Your Honor, it was not intentional, not
19  deliberate by him.  It was not.
20        THE COURT:  It was certainly deliberate by the
21  witness.  So you are telling me the witness knew that it was a
22  Court order that said he was not allowed to say that?  Because
23  you can't tell me it wasn't deliberate.  It was so obviously
24  deliberate, and every time he got a chance to bring it up, he
25  would bring it up.
                                   449
```

```
 1         MR. BELL:  They said he was coached, Your Honor.  He
 2   was not coached by us.  He was not, Your Honor.  We would not
 3   violate Your Honor's order.  We would not.  We did not elicit
 4   the question from him.  It was in the heat of
 5   cross-examination.  He was not prepped or coached to say that
 6   in any way, shape, or form.
 7         THE COURT:  So my question is, and I believe you, he
 8   was prepped not to say that.  Is that what you are telling me?
 9         MR. BELL:  Yes.
10         MR. ULMER:  **Your Honor, he was instructed about the
11   Court's ruling.**
12         MR. SHELTON:  Your Honor, I ask you to put the
13   witness on the stand and ask him under oath right now.
14         THE COURT:  Sir, are you going to dispute what your
15   counsel just told me, that you were prepped about the Court's
16   orders?
17         THE WITNESS:  Your Honor, I was not prepped to say
18   those things.  What I said was what I said in previous
19   depositions and testimony in previous cases.
20         **THE COURT:  But did they tell you there was a
21   specific Court order not to say that?
22         THE WITNESS:  I wasn't aware of that**.  They may have
23   told me.  I have been through a lot of prep sessions the past
24   few weeks.  I don't recall it, but I certainly wouldn't have
25   done it if I knew it was going to cause trouble like this.
```

Trial Tr. 448:7-449:25 (emphasis added). In short, Mr. Ulmer specifically represented to the Court that the trial attorneys *did* tell the witness about the Court's orders regarding lawyer advertising, but the witness explicitly denies this as being true, saying that "I wasn't aware of that." Mr. Plotica professed ignorance of the Court's orders. In reality, Mr. Plotica likely knew quite well that his behavior was prohibited, but simply did not know it would have consequences – he simply did not know that it would create "trouble like this."

## II. ARGUMENT

### A. The Court Has the Inherent Power to Sanction Violations of Its Orders.

As the Supreme Court has explained,

> it is firmly established that 'the power to punish for contempts is inherent in all courts.' This power reaches both conduct before the court and that beyond the court's confines, for 'the underlying concern that gave rise to the contempt power was not merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial.'

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991), quoting *Ex parte Robinson*, 19 Wall. 505, 510, 22 L.Ed. 205 (1874) and *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798, (1987) (citations omitted). Accordingly, when a Court's order has been violated, the Circuit courts have routinely affirmed sanctions ranging from a few hundred dollars to dismissal of the case. See *Campbell v. Keystone Aerial Surveys, Inc.,* 138 F.3d 996, 1005-06 (5th. Cir.,1998) (affirming a sanction of more than $15,000 for violation of an *in limine* ruling); *Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 853, (1st Cir. 1998) (affirming sanction for violating an *in limine* ruling); *Callip v. Harris County Child Welfare Dept.*, 757 F.2d 1513, 1518 (5th Cir., 1985) (affirming dismissal of case as a sanction, noting that the court has an "inherent power to dismiss or to impose lesser sanctions for violations of court orders and rules and for dilatory conduct in general.")

In addition to the inherent power to sanction disorderly and disobedient conduct, Federal Rule of Civil Procedure 16 provides that,

> If a party or party's attorney fails to obey a … pretrial order … the judge, upon motion or the judge's own initiative may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D).

Rule 16(f). The referenced sanctions provided by Rule 37 include:

>(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters into evidence;
>(C) An order striking out pleadings or parts thereof, or … rendering a judgment of default against the disobedient party;
>(D) In lieu of the foregoing orders or in addition thereto, an order treating as a contempt of court …

Rule 37(b)(2). It is indisputable that the Court has the power to sanction this conduct.[1]

### B. The Egregious Conduct Mandates Sanctions.

The Defendants have egregiously violated the Court's orders. This is more than a mere accident and it is far from harmless.

**First,** this conduct was proscribed by *two* different orders that were perfectly explicit and clear, one focusing on lawyer advertising in particular, and another prohibiting any suggestion that the epidemic is made by lawyers. There is no dispute that these orders proscribe the conduct in question.

**Second**, these very same Defendants have blatantly violated these specific orders in the *Tamraz* trial. Moreover, the present defense attorneys were on notice that this was a particular problem, having read the *Tamraz* transcript and repeatedly promised to obey the Court's orders in the *Jowers* trial. At this point, the Court should only conclude that there is a willful pattern and practice of flouting the Court's orders. The Defendants apparently view violating court

---

[1] In addition to the inherent power and the power of the Federal Rules of Civil Procedure, Federal law provides that, A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as-- … (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.
18 U.S.C.A. § 401. Notably, however, criminal contempt sanctions require more elaborate due process considerations. *See Kleiner v First Nat. Bank,* 751 F2d 1193, 1209 (11th Cir., 1985) (Rejecting the contention that a $50,000 fine under the inherent power to sanction fixed the proceeding as one of criminal contempt, requiring the right to jury trial and analogous criminal procedural rights. "A trial judge possesses the inherent power to discipline counsel for misconduct, short of behavior giving rise to disbarment or criminal censure, without resort to the powers of civil or criminal contempt."), citing *Flaksa v. Little River Construction Co.*, 389 F.2d 885, 888 (5th Cir.1968).

orders the way basketball players view fouls. You get a certain number of fouls, and if you don't use them all, then you aren't playing the game right.

**Third,** Mr. Plotica was testifying in an official capacity as the representative of ESAB. It is not as if some innocent fact witness stumbled, or even an expert witness inadvertently transgressed the Court order. Rather, the Defendant did so itself and had every motive to do so.

**Fourth**, this was no slip of the tongue. Mr. Plotica went out of his way to make his points about lawyer advertising, going well beyond the scope of any question that was on the table. If the first statement was not blatant enough, Mr. Plotica proceeded to do it once again.

**Fifth,** the blatant violation was either willful or reckless. Between Mr. Plotica and the defense trial attorneys there is a disagreement about whether he was warned, and accordingly Plaintiffs would like the opportunity to put on the stand every single person that prepared Mr. Plotica as a witness to learn who if anyone informed Mr. Plotica of the Courts' Orders.

Nonetheless even if the Court does not hold such a hearing, the evidence already available strongly suggests that the violation was willful or reckless. If the Court believes the defense attorneys' representations that they specifically warned Mr. Plotica about the Court's orders when they prepared him as a witness, then the Court can only conclude that Mr. Plotica's violation was willful. He was told of the Court orders but violated nonetheless, apparently assuming that ESAB had much more to gain from such a violation than it stood to lose. On the other hand, if the Court believes Mr. Plotica's representation that he was *not* warned, then the defense counsel's failure to do so was either willful or reckless. Either way, the Court should be left with the firm conclusion that this violation was willful or reckless.

Of course, the Defendants will try to have their cake and eat it too, saying that the defense attorneys did in fact warn Mr. Plotica about the Court orders but he just forgot. This

theory is dubious. Initially, it is noteworthy that Mr. Plotica's testimony was full of all sorts of speculation, including details about George Barnes and Mario Amata from many years in the past. Mr. Plotica seems quite able to remember things when they are favorable to ESAB's case. Moreover, Mr. Plotica has testified in welding trials in the past (both within the MDL and in state courts), and thus he likely did not need much general preparation. Instead, he was most likely prepared in just the day or so before the trial, making his failure to remember any such warning quite dubious, if in fact one was given. Furthermore, when someone has been told something but later is reminded of that fact, they typically then recall the original statement. Mr. Plotica did not do so. Rather, even after they claimed to have warned him, he explicitly denied the same. On any reasonable review of the facts, the Court can only conclude that the violation of its orders was reckless or willful.

**Sixth**, the violation is particularly prejudicial here in Mississippi where "trial lawyers" have been excoriated in part for their advertising for clients. In 2002, the U.S. Chamber of Commerce targeted Mississippi for an expensive media campaign characterizing the jurisdiction as a "haven for excessive lawsuits."[2] As a result of the intense media campaign and public pressure, both the Mississippi Legislature and the Mississippi Supreme Court acted to clamp down on tort lawsuits and advertising in particular.[3] These sentiments are apparent in the views of the jury sitting in this Court. Indeed, of the present jurors, seven out of nine of them agreed on their juror questionnaires that "people are too ready to sue these days," and one of these

---

[2] See Tim Lenke, "Reforms urged in Mississippi; U.S. Chamber of Commerce calls on lawmakers to change the state's legal system" June 10, 2002 available at http://findarticles.com/p/articles/mi_m1571/is_21_18/ai_87460068.

[3] *See e.g., In re Mississippi Rules of Professional Conduct*, Miss No. 89-R-99018-SCT, (5/29/03).

strongly agreed with this statement.[4] The defense attorneys and jury consultants knew quite well that they could get lots of mileage with the jury by suggesting that Mr. Jowers' case was tainted by billboard lawyers.

## C. A Monetary Sanction and a Prohibition on Additional Testimony From Mr. Plotica Are Necessary to Deter Future Violations.

As a sanction for ESAB's egregious conduct, the Court invited the Plaintiffs to consider making a request for a mistrial. Although the prejudice to the Plaintiffs could well justify a mistrial, such a remedy would only serve the Defendants. The Defendants would be quite happy if every single one of these cases ended in a mistrial, since after all, they are holding the money. For the Plaintiffs, a mistrial is no remedy for this misconduct. It would only add insult to injury, and moreover would be an undue burden on the Court and the jurors.

Plaintiffs are also not reassured by the prospect of the Court giving the jury additional admonitions regarding this issue. The bell cannot be un-rung, and Plaintiffs do not want the bell rung louder. Such admonitions would simply draw more attention to an issue that the Plaintiffs instead only hope will be forgotten by the time the jury renders a judgment. If the Court does address the jury again on this issue, it should tell the jury that it has severely sanctioned the Defendants (without disclosing the specific amount), so that the jury understands ESAB's wrongdoing was serious.

Instead, this Court should impose two sanctions that *do* matter to the Defendants. First, the Court should order that Mr. Plotica will be precluded from offering any more testimony at this trial. If ESAB wants to put on their other corporate witness, Mr. Ferree, they can do so, but Mr. Plotica should not be allowed to take the stand again, now that he has blatantly abused his

---

[4] This is question 60(q). Jurors #1, 3, 5, 6, 7, and 9 all agreed, and Juror #4 strongly agreed.

role as a witness. This sort of sanction is squarely in line with Rule 37(b)(2)(B) (adopted by Rule 16), which allows the Court to "prohibit[] [the disobedient] party from introducing designated matters into evidence." Given Mr. Plotica's performance as a witness, Plaintiffs do not believe that this sanction will significantly hinder ESAB's case, nor significantly help the Plaintiffs. Yet, it seems to be an obvious sanction that arises from Mr. Plotica's own behavior.

Second, the Court should order that either the defense attorneys or ESAB shall pay a sum of $100,000.[5] Although an exact accounting is admittedly impossible in these circumstances, at least $100,000 is required to deter future violations. Several million dollars are at stake in the *Jowers* case, and hundreds of times that amount is at stake in the MDL, in which this case is a bellwether. If the Defendants were free to violate court orders at the risk of paying a few hundred or a few thousand dollars each time, they would gladly pay it as a cost of doing business. Frankly, $100,000 is not a lot of money for ESAB, given that they have more than one billion dollars in sales annually (according to Mr. Plotica), and the Defendants are likely spending much more than that in defense costs *every week* of this trial. *See Kleiner v First Nat. Bank*, 751 F2d 1193, 1210 (11th Cir., 1985) (affirming $50,000 award of sanctions: "In view of counsel's arrogance and the millions of dollars that hung in the balance, the size of the fine assessed by the court was entirely commensurate with the willfulness and gravity of counsel's

---

[5] The Court can leave it to the defense attorneys and ESAB to determine which one of them must pay, since they alone know whether the attorneys did actually warn Mr. Plotica. Or, the Court can hold an evidentiary hearing to further explore that question. Presumably, there are other potential witnesses such as jury consultants and ESAB's outside counsel Ken Argenteri (who was in the courtroom at trial), who participated in all or part of Mr. Plotica's preparations. Indeed there may be documentary evidence of the instructions provided to Mr. Plotica by the defense attorneys. One might expect that given the number of the motions *in limine* granted in these cases, that the defense attorneys would convey the orders to Mr. Plotica in writing.

misconduct.")[6]  If the Defendants are given anything less than a hefty fine, they will walk away celebrating that their malfeasance paid off.

As the Court noted from the bench, a motion *in limine* should be "meaningful." Trial Tr., 450:9.  Aside from the underlying prejudice at trial that such motions seek to prevent, each such motion consumes many hours of the litigants' and courts' time in preparing and resolving such motions in advance.  All that time is wasted, and the movant is prejudiced, when the orders are nonetheless flouted at trial.

It must be noted that a $100,000 fine would not be appropriate for a one-off accidental violation of a Court order.  That is clearly not the case here – this violation was alone extremely blatant, aggressive, and intentional or reckless, but it was also simply the latest in long string of similar violations.  Plaintiffs do not take such a request for sanctions lightly, and have suffered through quite a number of violations before making this request, and we hope it will be consequential.  If the Court wants to stop these blatant and repeated violations, it is necessary to enter a monetary sanction that is sizeable enough to get the attention of ESAB and its attorneys. Otherwise, the Court can only expect this reckless conduct to recur continually, just as it did in *Tamraz*.

WHEREFORE PREMISES CONSIDERED, Plaintiffs respectfully request a sanction of $100,000 and a prohibition on further testimony from Mr. Plotica in this case, along with any other relief that the Court deems appropriate.

Respectfully submitted, this 10th day of February, 2008.

---

[6] Notably, the $50,000 sanction in 1985 dollars would be comparable to about $100,000 today.  *See* Bureau of Labor Statistics, Inflation Calculator, http://data.bls.gov/cgi-bin/cpicalc.pl.

Respectfully submitted,

 /s/ Scott O. Nelson
Scott O. Nelson, Esq.
**MAPLES & LOMAX, P.A.**
2502 Market Street
Post Office Box 1368
Pascagoula, MS 39568-1368
Phone: (228) 762-3161
Fax: (228) 762-5768
Email: mlscott@cableone.net
Liaison Counsel for Welding Rod
Plaintiffs

Don Barrett, Esq.
Richard R. Barrett, Esq.
**BARRETT LAW OFFICE, PA**
404 Court Square North
P.O. Box 987
Lexington, Ms 39095
Phone: (662) 834-2376
Fax: (662) 834-2628
Email: dbarrett@barrettlawoffice.com
Email: rrbarrett@barrettlawoffice.com

David Shelton, Esq.
**SCRUGGS LAW FIRM, P.A.**
120-A Courthouse Square
P.O. Box 1136
Oxford, Ms 38655
Phone: (662) 281-1212
Fax: (662) 281-1312
Email: davidshelton@scruggsfirm.com

Tom Rhoden, Esq.
Rick G. Davis, Esq.
**RHODEN, LACY, DOWNEY & COLBERT**
117 Park Circle Drive
P.O. Box 16845
Jackson, Ms 39236
Phone: (601) 932-1155
Fax: (601) 936-4221
Email: rdavis@rhodenlaw.com
**Counsel for Plaintiffs**

**CERTIFICATE OF SERVICE**

  I hereby certify that a true copy of the foregoing was served on February 10, 2008 via electronic mail to the parties set forth below. Notice of this service was sent to all parties by operation of the Court's electronic filing system. Parties may access the notice of service through the Court's CM/ECF system.

| Counsel | Email |
| --- | --- |
| Jessica Miller | jmiller@omm.com |
| John Beisner | jbeisner@omm.com |
| Steve Harburg | sharburg@omm.com |
| Brian Baggetta | bbaggetta@omm.com |
| Michael Ulmer | mulmer@watkinseager.com |
| James Crongeyer | jcrongeyer@watkinseager.com |
| Richard Forman | rforman@fpwk.com |
| Lewis Bell | lbell@watkinseager.com |
| David Kaufman | dkaufman@brunini.com |
| Patrick McDowell | pmcdowell@brunini.com |
| Scott Nelson | mlscott@cableone.net |
| Richard R. Barrett | rrbarrett@barrettlawoffice.com |
| David Shelton | davidshelton@scruggsfirm.com |
| Rick Davis | rdavis@rhodenlaw.com |

        Respectfully submitted,

        _/s/ Scott O. Nelson_
        Scott O. Nelson, Esq.
        **MAPLES & LOMAX, P.A.**
        2502 Market Street
        Post Office Box 1368
        Pascagoula, MS  39568-1368
        Phone:  (228) 762-3161
        Fax:  (228) 762-5768
        Email:  mlscott@cableone.net
        Liaison Counsel for Welding Rod
        Plaintiffs