03cv17000zbb-ord(In Camera Funding).wpd

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **IN RE: WELDING FUME PRODUCTS** : | |
| **LIABILITY LITIGATION** : | **Case No. 1:03-CV-17000** |
| : | **(MDL Docket No. 1535)** |
| : | |
| : | **JUDGE O'MALLEY** |
| : | |
| : | **MEMORANDUM AND ORDER** |
| : | |

For the reasons stated below, defendants' motion for reconsideration is **DENIED**.[1]

**I.   Background.**

On December 13, 2007, the Court entered an Order at master docket no. 2104 that clarified and added to the parties' obligations regarding production of various materials in discovery ("*Discovery Order*"). Among other concerns, the Court addressed a matter that has repeatedly become an issue during the life of this MDL: the parties' obligations regarding discovery and disclosure of their payments to authors of authoritative articles and studies used during trial. As the Court explained: "[d]uring the course of this litigation, the parties and their experts have frequently referred, both in motions and at trial, to

---

[1] As explained further below, on February 6, 2008, the defendants submitted *in camera* to Special Master David R. Cohen a privilege log chart listing certain payments made to consulting experts who are also the authors of various articles and studies, and asserting the information contained in the chart was protected from discovery by the attorney work-product doctrine. On February 13, 2008, during the course of the bellwether trial of *Jowers v. Airgas-Gulf States, Inc.*, case no. 08-CV-36 (S.D. Miss.), the Court ruled that the claim of privilege was not well-taken as to the information contained in rows 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15 of the chart, and directed the defendants to produce that information to plaintiffs. Defendants requested an opportunity to file a motion for reconsideration and the Court granted that request, which leads to this Order.

literally hundreds of articles and studies touching upon the medicine, science, and epidemiology of exposure to manganese and welding fumes. The parties' experts and attorneys cite and discuss these articles and studies at trial, and the experts rely upon them to form the opinions they express to the Court and the jury." *Id.* at 2-3. As discussed in more detail below, these articles and studies have taken on a central importance during the bellwether MDL trials over which this Court has presided.

In light of this central importance, both plaintiffs and defendants have sought discovery of the extent to which the authors of these articles and studies have received payments from the parties. The extent of any such payments, of course, is generally relevant to show author bias. Unfortunately, the parties' discovery efforts in this regard have frequently led to conflict. As the Court noted, it "has repeatedly been called upon to resolve discovery disputes related to the disclosure of whether any party (or any entity or group with an interest in this or related litigation, including cohorts of state-court attorneys) has supplied funding (directly or indirectly) to an author of these articles and studies." *Id.* at 3. Accordingly, in the *Discovery Order*, the Court ruled that "[a]ll parties to this litigation – both plaintiffs and defendants – must disclose the fact of, and the amounts of, payments they made, either directly or indirectly, to any entity (whether an individual or organization) that has authored or published any study, article, treatise, or other text upon which any expert in this MDL litigation relies, or has relied." *Id.* at 3 (footnote omitted). The Court concluded that this "funding discovery" directive was necessary because "the ends of justice are best served if the parties' level of disclosure regarding the sources of funding of these articles and studies is full and complete, regardless of whether evidence related to such funding is ultimately deemed admissible at trial." *Id.* at 3.

The Court issued its *Discovery Order* a few weeks before the scheduled start date for the trial of the MDL bellwether case known as *Jowers v. Airgas-Gulf States, Inc.*, case no. 08-CV-36 (S.D. Miss.).

Thus, the parties agreed to first direct their "funding discovery" efforts toward producing information regarding payments to authors of articles and studies that appeared on the reliance lists of experts designated in *Jowers*. Pursuant to this agreement, on February 6, 2008, defendants produced to plaintiffs a detailed, 37-page chart containing "Information Concerning Payments to Authors and Affiliates Appearing on Reliance Lists of Selected Experts in *Jowers*." The chart listed 49 separate payees and payments totaling over $11.0 million. Simultaneously, plaintiffs produced to defendants a less-detailed, 2-page chart titled "Author Payments," listing 12 separate payees and payments totaling about $520,000.[2]

In addition to their $11.0 million chart, defendants produced to Special Master David R. Cohen a second chart for his *in camera* review. This second chart listed 16 payees and additional payments totaling over $1.7 million. The defendants explained they were not providing to plaintiffs the information contained in this second chart because they believed the payment amounts and the identity of the payees were protected from disclosure by the work-product doctrine.[3] On February 12 and 13, 2008, the Special Master conferred with the undersigned regarding the contents of this second chart, and the Court came to the conclusion that the defendants' invocation of the work-product doctrine was not a valid basis for non-production of most of the information the chart contained. Before the Court had an opportunity to hand down a written ruling to this effect, however, the issue came to a head during the course of the *Jowers* trial. Specifically, on February 13, 2008, defense counsel cross-examined Mr. Jowers' treating neurologist by referring to two articles written by Dr. Yangho Kim – one of the payees listed on defendants' second, *in camera* chart. Before plaintiffs began their redirect examination, the Court called counsel to sidebar and

---

[2] Payments by the parties were made both to authors directly and also to affiliated entities, such as corporations the authors control or educational institutions for which they work.

[3] Some of the 16 payees in the defendants' second chart were the same as the 49 payees listed in the first chart. In these instances, it was obviously the additional payments, and not the identity of the payee, that defendants believed were protected by the work-product doctrine.

announced its ruling that the information contained in the defendants' second chart regarding payments made to Dr. Kim was not protected by the work-product doctrine. The Court then gave this information to plaintiffs' counsel, so that he could use that information during his redirect examination. *See generally* trial tr. at 1120-28 (Feb. 13, 2008) (sidebar colloquy). Counsel for plaintiff asked one question during redirect based on this newly-received information, for the purpose of showing potential bias. *Id.* at 1120-28 ("were you aware that prior to the 2006 [Kim] article that Mr. Forman referenced [during cross-examination], the defendants had consulted with and paid Dr. Kim for consulting efforts?").

At the end of the trial day, the Court returned to the issue of the discoverability of the information contained in defendants' second chart, and ordered that the bulk of the information be disclosed. *See generally id.* at 1143-49 (ruling on the discoverability of the information in the second chart). The Court explained on the record that it did not believe the work-product doctrine protected from disclosure most of the payment information listed in the *in camera* chart. The Court indicated this was true either because the mere identities of non-testifying experts (as opposed to their opinions and related documents) did not come under the umbrella of the work-product doctrine, or because, even if the work-product doctrine did provide some protection generally, the shield was overcome by the need to disclose such critical information to the jury. Specifically, the Court noted that the jury was entitled to know all potential grounds for bias that might effect the reliability of the authoritative materials upon which the parties place such great reliance. Then, via email, the Court specifically ordered defendants to produce to plaintiffs the information contained in rows 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15 of the chart.[4]

Following this Order, the defendants contacted the Special Master by telephone and requested an

---

[4] The information pertinent to Dr. Kim, which the Court had already produced to plaintiffs during trial, was listed at row 8 of the chart. Defendants later amended their *in camera* chart and voluntarily disclosed the information contained in row 2.

opportunity to brief the work-product issues before making the required disclosure – essentially, defendants sought reconsideration of the Court's ruling. Defendants agreed not to use or refer to any articles or items listed in the second chart during cross-examination, pending this opportunity. The Court granted this request, set a briefing schedule, and promised to rule on this motion before defendants began their case in chief. This Order is the promised ruling, and the motion for reconsideration is denied.

## II.     Learned Treatises.

From the inception of this MDL, the parties have shined their brightest spotlights on the scientific, medical, and epidemiological evidence that addresses whether, and to what extent, exposure to welding fumes can cause neurological damage. For example, very early on, the Court held a multi-day *Daubert* hearing addressing, among other questions, whether "the sum of the epidemiological and other evidence proffered by the parties [is] sufficiently reliable to support the assertion that exposure to welding fumes can cause, contribute to, or accelerate a parkinsonian syndrome that some doctors will diagnose as [Parkinson's Disease]?" *In re Welding Fume Prods. Liab. Litig.*, 2006 WL 4507859 at *36 (N.D. Ohio Aug. 8, 2006). In addressing this question, "[t]he parties and their affiants . . . cited to literally hundreds of medical and scientific articles and treatises." *Id.* at *2 n.2. Similarly, during the course of every bellwether trial over which this Court has presided, plaintiffs and defendants have both repeatedly: (1) asked their own and the other parties' experts about their familiarity with these articles and studies, (2) quoted statements the articles and studies contain, and (3) asked whether the experts' opinions are supported or undermined by the conclusions the articles and studies reach. If there is a publication touching even tangentially on the question of general or specific causation of neurological injury by welding fumes, the parties in this MDL have probably asked each other's experts about it.

5

In a very real way, then, the authors of these articles and studies have a strong presence in the courtroom, providing "virtual testimony" through repeated quotation and citation by the parties' attorneys and experts. That the quoted out-of-court statements in these articles and studies are not made under oath or subjected to cross-examination, of course, suggests a hearsay concern. But Federal Rule of Evidence 803(18) addresses precisely this point:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> * * *
> (18) Learned Treatises. — To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

The basis for this "learned treatise exception" to the hearsay rule is that learned treatises usually have "sufficient assurances of trustworthiness to justify equating them with the live testimony of an expert. *First, authors of treatises have no bias in any particular case*. Second, they are acutely aware that their material will be read and evaluated by others in their field, and accordingly feel a strong pressure to be accurate." 2 McCormick on Evidence §321 (6th ed. 2006) (emphasis added).

As the case law notes, however, the assumption underlying the learned treatise exception that the author has "no bias in a particular case" is not always true. For example, in *O'Brien v. Angley*, 407 N.E.2d 490 (Ohio 1980), a medical malpractice action, the Ohio Supreme Court reversed a jury verdict for the defendant physicians because the trial court had allowed cross-examination of the plaintiff's expert with an editorial contained in a learned treatise written by a possibly-biased author. The court wrote: "[w]here . . . the author publishes an article with a view toward litigation . . . a probability of bias exists which undermines the logic supporting the admission of this material in evidence as an exception to the rule

6

against hearsay." *Id.* at 494. Similarly, in *Schneider v. Revici*, 817 F.2d 987 (2nd Cir. 1987), the appellate court ruled it was not error for the trial court to exclude a book written by the defendant doctor in a malpractice action, because "even if the text qualified as a learned treatise under Rule 803(18), its admission would remain subject to a balancing of probative value against danger of prejudice under [Rule] 403." *Id.* at 991. The very basis for the learned treatise exception, then – that the author has no bias in a particular case – is susceptible to challenge.

Indeed, there is little doubt that, as might any witness who testifies live in court, the author of a learned treatise whose statements are admissible in court under Rule 803(18) may also suffer prejudices or biases. The most obvious of these possible biases is receipt of money from one of the parties. Just as an expert who testifies live may reasonably be asked, for the purpose of revealing possible bias, whether and to what extent he has received remuneration from a party,[5] it is reasonable for a litigant to want to reveal to the jury any financial incentives supplied by another party to the author of a learned treatise introduced at trial. And, as this MDL reveals, the magnitude of the financial incentives in question can be substantial. For example, one of defendants' experts, Dr. Warren Olanow – who is a highly respected neurologist and researcher – received from defendants over $1.6 million between October of 1999 and March of 2006. During this same time period, Dr. Olanow published at least a dozen articles upon which various experts testifying in *Jowers* have relied to form their opinions. It is fair to say that the assumption underlying the admissibility of all these articles – that is, that Dr. Olanow's views regarding the medical issues central to this MDL are not subject to outside influence or bias – is susceptible to attack. And, as the *O'Brien* court concluded, since Dr. Olanow necessarily published his articles "with a view toward

---

[5] Indeed, because the possibility of financial bias is so clearly relevant, the Federal Rules of Civil Procedure *require* "a witness who is retained or specially employed to provide expert testimony in the case" to disclose "the compensation to be paid for the study and testimony." Fed. R. Civ. P. 26(a)(2)(B).

litigation," this Court could conceivably exclude them altogether.

The Court has chosen not to take this dramatic step, however, for two reasons. First, the plaintiffs and defendants in this MDL have consulted with – and paid – a "who's who" list of neurologists and epidemiologists. To exclude from evidence the articles and studies written by these experts would be to keep from the jury the great bulk of relevant medical information related to causation. Second, absent a showing of bias so extreme that exclusion is appropriate under *Daubert*, the Court believes that disclosure of possible financial bias coupled with cross-examination by the parties is a more appropriate and fine-tuned mechanism for arriving at the truth. *See* Leslie Boden & David Ozonoff, *Litigation-Generated Science: Why Should We Care?*, 116 Environmental Health Perspectives 117, 119 (Jan. 2008) (hereinafter, "*Litigation-Generated Science*") ("The antidote to [litigation-driven science] is not to use the litigation motive as a blunt instrument for exclusion but as a commonsense argument for expanded discovery and greater latitude for cross-examination by the parties."). It is for this reason that the Court, with its *Discovery Order*, imposed on the parties its "funding discovery directive" in the first place.

### III.  The Work Product Doctrine.

As noted above, in response to the Court's *Discovery Order*, the defendants produced to plaintiffs a chart listing dozens of authors who wrote articles relied upon by the experts in *Jowers* and who also received a total of over $11.0 million in payments from the defendants. The defendants' disclosure was not complete, however, because defendants withheld information regarding another 16 payees and $1.7 million in payments. The basis for defendants' non-production of this information is the work-product doctrine: defendants assert that disclosing even the mere identity of their consulting, non-testifying experts (which is what defendants assert these authors were) will serve to reveal, at least in part, their attorneys'

8

mental strategy and trial preparations.

The "work product privilege" was first recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495 (1947). The doctrine's rationale, as originally articulated, was to permit an attorney to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference," allowing him "to promote justice and to protect [his] clients' interests." *Id.* at 511. The current doctrine, as set forth in Federal Rule of Civil Procedure 26(b)(3), protects from discovery "documents and tangible things . . . prepared in anticipation of litigation or for trial" by or for a party or that party's representative. Rule 26(b)(3) instructs the court to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

Rule 26(b)(3) also states that it is "subject to the provisions of [Rule 26](b)(4)," and it is these provisions upon which defendants rely. Specifically, defendants assert that the identity of certain consulting, non-testifying expert witnesses is protected from disclosure by Fed. R. Civ. P. 26(b)(4)(B), which states:

> A party may . . . discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial only as provided in Rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

Notably, this rule explicitly protects from disclosure only "facts known or opinions held by" consulting, non-testifying experts, and not simple disclosure of their identities. There is case law standing for the proposition, however, that Rule 26(b)(4)(B) does extend further, so that "the identity, and other collateral information concerning an expert who is retained or specially employed in anticipation of litigation, but not expected to be called as a witness at trial, is [also] not discoverable except as 'provided in Rule 35(b)

9

or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.'" *Ager v. Stormont*, 622 F.2d 496, 503 (10th Cir. 1980) (quoting Rule 26(b)(4)(B)). Defendants insist that the *Ager* rule should apply in this case, and also that the plaintiffs are unable to show any "exceptional circumstances" justifying disclosure.

Although some cases characterize *Ager* as setting out "the predominant view,"[6] it is clear that there is a split in authority. Many cases simply reject the ruling and reasoning set out in *Ager* and instead cite *Baki v. B.F. Diamond Constr. Co.*, 71 F.R.D. 179 (D. Md. 1976), which "conclude[d] that the names and addresses, and other identifying information, of experts, who have been retained or specially employed in anticipation of litigation or preparation for trial and who are not expected to be called as witnesses at trial, may be obtained through properly framed interrogatories without any special showing of exceptional circumstances in the absence of some indication that such information by reason of facts peculiar to the case at issue, is irrelevant, privileged, or for some other reason should not be disclosed." *Id.* at 182. Indeed, of the four district court opinions from the Fifth Circuit that address the issue of whether the identities of consulting, non-testifying experts may be discovered, two cases followed the rule set out in *Baki* and allowed discovery, two cases followed the rule in *Ager*, and one of these latter cases found that

---

[6] *Cooper v. Paul Revere Life Ins. Co.*, 1997 WL 289706 at *1 (E.D. La. May 28, 1997).

exceptional circumstances justified discovery of the identity of some of the experts.[7] Cases from other circuits also yield similar results – some find *Baki* persuasive, some find *Ager* persuasive, and some find that exceptional circumstances justify discovery regardless of which standard is used.[8] The most recent

---

[7] *See Cooper v. Paul Revere Life Ins. Co.*, 1997 WL 289706 at *1 (E.D. La. May 28, 1997) (adopting *Ager*); *Threlkeld v. Haskins Law Firm*, 1990 WL 124876 at *1 (E.D. La. Aug. 21, 1990) (summarily rejecting *Ager*); *Jesclard v. Babcock & Wilcox*, 1990 WL 124297 at *1 (E.D. La. Aug. 9, 1990) (finding *Baki* persuasive and noting that "the only reason either side could have for objecting to such a simple discovery obligation is a desire to thwart the full and candid discovery contemplated by the Federal Rules of Civil Procedure as delineated in *Hickman v. Taylor*"); *In re: Sinking of Barge "Ranger I" Casualty near Galveston, Texas*, 92 F.R.D. 486, 488 (S.D. Texas 1981) (an MDL Court examined the reasoning set out in *Baki* and *Ager* and stated it was "in substantial agreement with" *Ager*, but went on to order disclosure of the identities of two consulting witnesses; also citing several older cases not listed in this opinion).

[8] This Court's review of the case law seems to show that, if anything, it is the rule announced in *Baki*, not *Ager*, that seems to predominate. *See Convolve, Inc. v. Compaq Computer Corp.,* 2004 WL 1944834 at *1 (S.D.N.Y. Sept. 1, 2004) (citing cases and agreeing with the *Baki* rule that "the identity of nontestifying experts is not exempt from disclosure"); *Biovail Corp. Intl. v. Hoechst Aktiengesellschaft*, 1999 WL 33454801 at *7-8 (D. N.J. Nov. 12, 1999) (discussing and citing cases on both sides of the issue and finding (1) the *Baki* rule was better reasoned, and (2) in the alternative, exceptional circumstances justified disclosure); *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 145 (S.D.N.Y. 1997) (following *Ager* and further finding that exceptional circumstances justified disclosure); *Queen's University at Kingston v. Kinedyne Corp.*, 161 F.R.D. 443, 446 (D. Kan 1995) (following *Ager* and finding no exceptional circumstances to justify disclosure); *MacGillivray v. Consolidated Rail Corp.*, 1992 WL 57915 at *3 (E.D. Pa. Mar. 17, 1992) (following the *Baki* rule); *Cox v. Piper, Jaffray & Hopwood*, 848 F.2d 842, 845 (8th Cir. 1988) (Beam, J., dissenting) (disagreeing that appellate jurisdiction did not exist and agreeing with *Ager*); *Butler v. Harrah's Marina Hotel Casino*, 1987 WL 16691 at *2 (E.D. Pa. Sept. 8, 1987) (acknowledging the split in authority and agreeing with *Baki*); *Bove v. Worlco Data Sys., Inc.*, 1987 WL 5715, at *2-3 (E. D. Pa. Jan. 21, 1987) (discussing *Ager* and *Baki* and agreeing with the former); *In re Pizza Time Theatre Secs. Litig.*, 113 F.R.D. 94, 97-98 (N.D. Cal. 1986) (noting *Baki* but agreeing with *Ager*); *In re: Folding Carton Antitrust Litig.*, 83 F.R.D. 256, 259 (N.D. Ill. 1979) (acknowledging contrary authority, but following *Baki*); *ARCO Pipeline Co. v. S/S Trade Star*, 81 F.R.D. 416, 417 (E.D. Pa. 1978) (acknowledging contrary authority, but following *Baki*).

case this Court could find addressing the issue sided with *Baki*.[9]

Ultimately, the Court need not decide whether the rule set out in *Baki* or in *Ager* should control in this case, though it finds the rationale of the former to have greater general appeal. In this instance, the Court easily concludes, as it did when it first addressed this issue on the record, that, even if the rule announced in *Ager* adheres, exceptional circumstances exist in this case to support disclosure of much of the information contained in the *in camera* funding chart that defendants assert is work product. As noted above, the Court could well be justified in concluding that many of the learned treatises at issue should not be admitted *at all*, in light of the fact that they were written by authors who have, or had, "a view toward litigation."[10] Having decided to allow the defendants to use these articles at trial, simple fairness calls for allowing the plaintiffs to discover possible sources of bias. Indeed, it would be an extraordinary circumstance to allow admission of these learned treatises based on the premise that the authors "have no bias in any particular case," and then *not* allow plaintiffs to discover known evidence that could be used

---

[9] *See Eisai Co. Ltd. v. Teva Pharmaceuticals USA, Inc.*, 2007 WL 4443872 at *2 (D. N.J. Dec. 3, 2007) (comparing *Ager* and *Baki* and finding the reasoning of the latter more persuasive). *See generally* Douglas Emerick, Note, *Discovery of the Nontestifying Expert Witness' Identity under the Federal Rules of Civil Procedure: You Can't Tell the Players Without a Program*, 37 Hastings L. J. 201 (Sept. 1985) (arguing that the Federal Rules of Civil Procedure should be amended to follow *Baki*).

[10] Indeed, having a "view toward litigation" can be interpreted broadly. "Science can also be done with litigation in mind but not connected to a particular case, requirement, or licensing application. Large corporations often invest strategically in research agendas whose objective is to develop a body of scientific knowledge favorable to a particular economic interest or useful for defending against particular claims of legal liability." *Litigation-Generated Science* at 118. At worst, "[w]ell-financed industries have the resources to seed the literature with strategic science," and "doing science for the purpose of supporting one side or another in a legal proceeding would seem to have built-in incentives to 'paint the target around the arrow,' and there is little doubt this happens." *Id.* at 119, 118.

to suggest the contrary.[11]  To protect defendants' second, *in camera* chart from disclosure would be to preclude discovery of clearly relevant testimony.[12]

Further, earlier in this MDL, defendants have, in a related context, argued for discovery of the same sort of disclosures they now seek to shield.  One of the expert neurologist-researchers upon whose writings plaintiffs have relied is Dr. Brad Racette.  During the nascent stages of this MDL, plaintiffs' counsel had paid Dr. Racette to conduct assessments of a number of welders to determine whether they manifested the signs of a possible movement disorder and, if so, to refer those welders for further examination.  After this early work, Dr. Racette severed his ties with the plaintiffs and took no more payments from them.  He did, however, continue to examine the scientific questions posed by his earlier, paid work and ultimately authored an article (funded by sources unrelated to this litigation) upon which plaintiffs' experts have, at times, relied during this litigation.  Defendants undertook intensive and repeated efforts to discover the financial relationship between plaintiffs' counsel and Dr. Racette, and also to obtain a high level of detail regarding the data underlying Dr. Racette's studies of the degree to which welders suffer neurological injury.  This Court issued several opinions refereeing the discovery fight between Dr. Racette and defendants, ordering that Dr. Racette produce substantial materials relating to his articles, even though

---

[11] As one court noted, the premise underlying the *Ager* rule precluding discovery of the identity of consulting, non-testifying experts absent exceptional circumstances is that a party should not be allowed "to gain an unfair advantage" and "discover[] his or her opponent's trial strategy."  *Biovail Corp. Intl. v. Hoechst Aktiengesellschaft*, 1999 WL 33454801 at *7 (D. N.J. Nov. 12, 1999).  If there is an obvious other, legitimate reason why such discovery is appropriate, such as "to ensure the confidentiality of . . . information" that is governed by a protective order and given to consulting experts, the premise behind the *Ager* rule is inapplicable.  *Id.*  In this case, the obvious other, legitimate reason why such discovery is appropriate is to reveal possible bias of authors of learned treatises due to financial influence.

[12] *See Schledwitz v. United States*, 169 F.3d 1003, 1015 (6th Cir. 1999) ("Bias is always relevant in assessing a witness's credibility.").  It is also notable that the Court's ruling goes only to discovery, not admissibility.  While the plaintiffs are entitled to discover much of the information contained in defendants' *in camera* chart, the Court may allow them to adduce only some of it in Court, pursuant to Fed. R. Evid. 611(a).

there was no doubt that the articles had not been funded by the plaintiffs and that there was no longer any financial relationship between plaintiffs' counsel and Dr. Racette.

This dispute ultimately spilled over onto the pages of the journal *Neurology*. *See* Brad Racette, Ann Bradley, Carrie Wrisberg, & Joel Perlmutter, *The Impact of Litigation on Neurologic Research*, 67(12) Neurology 2124 (Dec. 2006). Among other things, Dr. Racette complained about the amount of time that responding to discovery had taken away from his research.[13] In response to Dr. Racette's article, counsel for defendants wrote: "Basic norms of science favor openness and discourage secrecy in research. The scientific community has increasingly demanded transparency from investigators." Nathan A. Schachtman, *Response: the Impact of Litigation on Neurologic Research*, 69(5) Neurology 495 (April 2007). This transparency advocated by defense counsel certainly must include whether, and the extent to which, the author of a learned treatise who is being quoted in a courtroom received funding from one of the litigants. *See* Sheldon Krimsky, *The Funding Effect in Science and Its Implications for the Judiciary*, 13 J. of Law and Policy 43 (March 2005) ("Given the growing evidence that advocacy science has a potentially distorting effect on scientific objectivity, the funding effect in science should be no less relevant to trial judges than considerations of whether a scientific analysis has been peer reviewed, whether a meta-analysis of data is reliable, or whether a technique has a known error rate."). Defendants argued precisely this point during their discovery disputes with Dr. Racette.

As an additional argument, defendants assert that the information contained in the *in camera* chart does little to show actual bias because certain of the payments received from the defendants by the authors came after, although not long after, the authors wrote the articles being cited in Court. As plaintiffs note,

---

[13] Dr. Racette also observed that "[l]itigation and its peripheral effects may bias investigators, impede research efforts, and harm research participants, thereby undermining efforts to understand the cause of neurologic disease." *Id.* (abstract).

14

however, unless the distance in time is great, this goes more to weight than admissibility – much less discoverability. Certainly, plaintiffs should be permitted at least to argue that defendants manipulated the timing of the payment for the very purpose of undercutting any claim of bias. Further, as plaintiffs also note, payments made to an author after he has published his article or study "may be even more probative of bias. It is not inconceivable that the authors of these articles were told by the Defendants, or simply understood through other means, that they would receive lucrative consulting contracts only if they managed to put certain favorable opinions into print. In this way, the Defendants could have even more control over the substance of the publications than if they were to pay in advance." Response brief at 6. *See also Litigation-Generated Science* at 118 ("Often it is not just the lump sum involved with the professional fee or salary that is the economic incentive. Future business or continued employment may be even more powerful.")

Finally, defendants argue that some of the payments to authors were for relatively small dollar amounts. Defendants characterize these payments as de minimis and argue that the probative value of their disclosure is equally de minimis, and thus unnecessary. This argument, however, overlooks a critical point. It is not only the fact of payments that goes to the question of bias, but the fact that consultation has occurred.[14] This is true for a number of reasons. First, as noted above, authors may be of the impression that future payments could be forthcoming if the science they generate favors the position of the potential

---

[14] Regarding the issue of expert consultation, "[t]he Federal Rules of Civil Procedure create four classes of expert witnesses for purposes of defining the scope of permissible discovery: (1) experts a party expects to use as a witness at trial; (2) experts retained or specially employed in anticipation of litigation but not expected to testify at trial; (3) experts informally consulted in preparation for trial but not retained or specially employed; and (4) experts whose information was not acquired in preparation for trial." *Cox v. Piper, Jaffray & Hopwood*, 848 F.2d 842, 844-45 (8th Cir. 1988) (Beam, J., dissenting); *see Ager*, 622 F.2d at 500-01 (discussing four categories). By definition, the defendants' *in camera* chart lists only category-two experts, as all the listed authors received payments.

15

payors. Second, and more important, it is at least possible that the consultation would have the effect of coloring the views of the scientist, rendering the ultimate opinions less than objective. Indeed, one of the defendants' testifying experts in the *Jowers* proceeding conceded during deposition that his expert opinions were informed by the discussions he had with – and, to some extent, incorporated – the opinions expressed by defense counsel.[15] While not all experts or authors will be as candid, and not all may even recognize the impact that such consultations might have on their views, the fact that such a possibility exists cannot be denied.[16]

Defendants also note that, as to Dr. Olanow, plaintiffs are already aware that defendants paid him $1.6 million through March of 2006, during the time he was a testifying witness; defendants assert there is no additional value to plaintiffs in learning that they have, since then, paid Dr. Olanow an additional $1.1 million as a consulting witness. Simply, this Court disagrees. If possible bias is relevant, then so is

---

[15] One of defendants' experts in *Jowers* is neurologist Dr. Howard Hurtig, and he has authored five articles relied upon by other experts in *Jowers*. During his deposition, the following colloquy occurred:
Q: When did you first tell [defense counsel] Bonnie Semilof your opinions about the association between welding fumes and movement disorders?
A: Well, we had an ongoing conversation about the relationship, and I cannot tell you when I first spoke about it, but it was an evolving topic that developed over time the more I learned about it. And of course I must say we – Bonnie Semilof has her own opinions that I listened to, and I certainly incorporated all of that information into my own thinking.
Q: What opinions has Bonnie Semilof shared with you about the science in this case?
A: Well, based on her own reading and knowledge and interpretation of the literature, I think she feels like there – and I'm just generally telling you what I remember about our conversations, that welding fumes do not cause Parkinsonism.
Q: Are you aware of any medical background that Ms. Semilof has?
A: I am not.
Q: Is it your understanding that she doesn't have a medical background?
A: As far as I know, she is an attorney. She is not trained in any of the biological sciences.
*Jowers* trial tr. at 296-97 (Feb. 8, 2008).

[16] *See Litigation-Generated Science* at 118 ("Buttressing the economic dimension, the social relationship between funder and scientist can even affect the attitudes of scientists who seek to maintain a disinterested perspective. Moreover, this may occur without any consciousness of bias on the part of the expert.") (citation omitted).

16

the force of the possibly-biasing factors, particularly where Dr. Olanow continues to generate articles and studies upon which defendants and their experts rely in Court.[17]

When the Court earlier ordered disclosure of information contained in certain rows of the defendants' second, *in camera* chart, it excluded disclosure of those payments that were so far removed in time or relationship to the author that the payments appeared irrelevant. Having reviewed its earlier order, the Court remains of the view that all of the information ordered disclosed, and only that information, still should be. Accordingly, the motion for reconsideration is denied. The Court will forward to plaintiffs the information contained in rows 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15 of the defendants' in camera chart.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**: February 19, 2008

---

[17] It is certainly relevant that, unlike Dr. Racette, Dr. Olanow has not severed his financial ties with certain parties to this litigation as he continues to generate a body of work on which those same parties continue to rely. As noted above, while Dr. Olanow no longer appears live as a testifying witness in the MDL bellwether cases, he continues very much to "testify" in all of those cases where his work is cited and quoted.