07wf17010f(Post-Judgment-All).wpd

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **ROBERT & DONNA JOWERS,** | : | **Case No.  1:08-CV-0036** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BOC GROUP, INC.,** | : | |
| **ESAB GROUP, INC.,** | : | **Judge Kathleen M.  O'Malley** |
| **and** | : | |
| **LINCOLN ELECTRIC CO.,** | : | |
| | : | **MEMORANDUM & ORDER** |
| | : | |
| **Defendants** | : | |

This product liability action was brought by husband-and-wife plaintiffs Robert and Donna Jowers

against the following three defendants, each of which manufactured welding rods that Mr. Jowers used:

(1) BOC Group, Inc., (2) ESAB Group, Inc., and (3) Lincoln Electric Company.  The case was assigned

to the undersigned as related to the Multi-District Litigation known as *In re Welding Fumes Products*

*Liability Litigation*, MDL No. 1501, case no. 03-CV-17000.[1]  Trial of this matter began on February 7,

---

[1] The Jowerses originally filed their lawsuit in the Jackson County, Mississippi Circuit Court.  The defendants removed the action to the United States District Court for the Southern District of Mississippi, where it was assigned case no. 1:06-CV-1187-LG-JMR.  Pursuant to 28 U.S.C. §1407, the case was then transferred to the MDL court in the Northern District of Ohio and assigned a new case no. 1:07-WF-17010-KMO.  After the conclusion of pretrial proceedings, the MDL court remanded the action to the Southern District of Mississippi for trial, where, for various reasons, the case was again assigned a new case no. 1:08-CV-36-KMO-JMR.  Despite this peripatetic re-numbering, the electronic docket for the entire case is contained in the file designated by the last of these several case numbers.

2008 and culminated on March 6, 2008 with a jury verdict in favor of the plaintiffs.[2]  Specifically, the jury

found: (1) against all three defendants on Mr. Jowers' claim for failure to warn, and awarded him $1.2

million in compensatory damages; (2) in favor of all three defendants on Mrs. Jowers' claim for loss of

consortium; and (3) against all three defendants on Mr. Jowers' claim for punitive damages, and awarded

him a total of $1.7 million in punitive damages.   The jury further found, under comparative fault

principles, that Mr. Jowers' own negligence was 40% of the cause of his injuries.   On March 13, 2008, the

Court entered judgment consistent with this verdict.[3]

Twice during the course of trial – after the close of plaintiffs' case, and then after the close of their

own case – defendants moved for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(a).   The

Court granted the first motion in part, and denied the second motion.[4]  Defendants now renew their earlier

motions for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b), and also ask, in the alternative,

for a new trial.   The Court rules on these motions as follows:

- Defendants' Renewed Motion for Judgment as a Matter of Law on All Claims, or for New Trial (docket no. 441) is **DENIED**.

---

[2]  The undersigned normally sits in the Northern District of Ohio.  Pursuant to 28 U.S.C. §292(d), however, the Chief Justice of the Supreme Court temporarily designated the undersigned to the Southern District of Mississippi for the purpose of presiding over the trial of *Jowers* after remand.  *See* docket no. 136, exh. D (designation by Chief Justice Roberts).

[3]  *See* docket no. 440 (final judgment entry).  The Court's judgment awarded Mr. Jowers $720,000 in compensatory damages, equal to 60% of the $1.2 million total.  The jury also answered interrogatories specifically rejecting two of defendants' affirmative defenses: the sophisticated user defense and the government contractor defense.

[4]  *See* trial tr. at 1447-53 (Feb. 15, 2008) (addressing motions for directed verdict after close of plaintiffs' case); *id.* at 3024-32 (Mar. 2, 2008) (denying motions for directed verdict after close of defendants' case).  Regarding the first motion for directed verdict, the Court granted the motion as to Mr. Jowers' claim for conscious and negligent misrepresentation (Count III of the complaint; confirming an earlier oral summary judgment ruling) and also granted the motion as to his claim that defendants' welding machines had a design defect (Count VIII of the complaint).  The Court otherwise denied the motion.

2

- Defendants' Renewed Motion for Judgment as a Matter of Law on Punitive Damages (docket no. 445) is **DENIED**.

In addition, the Court rules as follows on the two post-judgment motions filed by plaintiffs:

- Plaintiffs' Motion to Amend the Judgment or for New Trial on the Loss of Consortium Claim (docket no. 442) is **DENIED**.

- Plaintiffs' Motion for Attorney Fees and Expenses (docket no. 447) is **GRANTED**.  As explained in section III.B.4 of this opinion below, defendants shall, on or before the date 28 days from the date of this Order, **file either a stipulation or a challenge** to the amount of Fees and Expenses claimed by the Jowerses.

## I.    Legal Standards – Rules 50 and 59.

Federal Rule of Civil Procedure 50(a) states that, "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," then the court may "grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  If, as did the undersigned in this case, the Court denies the Rule 50(a) motion made during trial, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."[5]  The movant may then "renew its request for judgment as a matter of law by filing a motion no later than 10 days after the entry of judgment."[6]  The defendants timely filed their motions for judgment or new trial pursuant to Rules 50(b) and 59(b).

After a verdict is returned, the Court may rule on a renewed Rule 50(b) motion by: (a) allowing

---

[5]  Fed. R. Civ. P. 50(b).

[6]  *Id.*  "The movant may alternatively request a new trial or join a motion for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).

the judgment to stand, (b) ordering a new trial, or (c) directing entry of judgment as a matter of law.[7]  The Court may properly choose the third option and "grant[] a motion for judgment as a matter of law only if the facts and inferences point so strongly in favor of one party that reasonable minds could not disagree."[8]  When examining a Rule 50 motion based on sufficiency of the evidence, the court must "consider all of the evidence – not just that evidence which supports the non-mov[ant's] case – but in the light and with all reasonable inferences most favorable to the [non-movant]."[9]  The trial judge cannot re-weigh the evidence, nor assess the credibility of witnesses, nor substitute its own judgment for that of the jury.[10]  When the evidence would permit reasonable minds to differ on the issues decided by the jury, a motion for judgment as a matter of law must be denied.[11]  If there is "substantial evidence in the record raising a relevant fact issue for determination by the jury, the decision of that issue may neither be taken from the jury nor its decision of that issue reversed by the trial judge."[12]  In short, every effort must be made to uphold the verdict, if reasonably possible; the Court must "show appropriate deference for the jury's

---

[7]  *Id.*

[8]  *Gomez v. St. Jude Medical Diag. Div., Inc.*, 442 F.3d 919, 937-38 (5th Cir. 2006); *see also Evans v. Ford Motor Co.* 484 F.3d 329, 334 (5th Cir. 2007) (A motion for judgment as a matter of law can be granted if "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.")

[9]  *Gomez*, 442 F.3d at 937-48.

[10]  *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008).

[11]  *See id.* ("A jury may draw reasonable inferences from the evidence, and those inferences may constitute sufficient proof to support a verdict.  On appeal we are bound to view the evidence and all reasonable inferences in the light most favorable to the jury's determination.  Even though we might have reached a different conclusion if we had been the trier of fact, we are not free to re-weigh the evidence or to re-evaluate credibility of witnesses.  We must not substitute for the jury's reasonable factual inferences other inferences that we may regard as more reasonable.")

[12]  *Eyre v. McDonough Power Equipment, Inc.*, 755 F.2d 416, 420 (5th Cir. 1985).

4

determination."[13]

As to Rule 59, "the rule governing new trial is less strict."[14]  A trial court "should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence."[15]  "In making this determination, the district court weighs all the evidence, but need not view it in the light most favorable to the nonmoving party.  While the court is to respect the jury's collective wisdom and must not simply substitute its opinion for the jury's, '[i]f the trial judge is not satisfied with the verdict of a jury, he has the right – and indeed the duty – to set the verdict aside and order a new trial.'"[16]

---

[13] *Foradori*, 523 F.3d at 485.

[14] *Id.*

[15] *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998) (internal quotation marks and citation omitted).

[16] *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (quoting Charles Wright, *Federal Courts* 634 (4th ed. 1983)).

II.     **Defendants' Motions.**

A.      **Causation.**

With their first post-judgment motion, defendants offer a single argument supporting their contention that the jury did not have a legally sufficient evidentiary basis to find in the Jowerses' favor.[17] Defendants note the evidence was undisputed that, in addition to suffering exposure to welding fumes given off by products manufactured by the three defendants in suit (Lincoln, BOC, and ESAB), Mr. Jowers was also exposed to welding fumes given off by at least two other manufacturers – Hobart and Select Arc.[18]  Defendants argue that "plaintiffs needed to prove that, if Mr. Jowers was overexposed, it was to fumes generated by welding consumables made *by the defendants*, rather than non-defendant manufacturers."[19]  Defendants argue that plaintiffs failed to so prove and therefore any jury verdict against them is based only on speculation.

The evidence adduced at trial pertinent to this issue is as follows.  Mr. Jowers worked at Ingalls Shipbuilding in Pascagoula, Mississippi from 1972 to 2005, with the exception of about a four-year gap between 1981-85.  During his roughly 30 years at Ingalls, Mr. Jowers worked as a shipfitter, shipfitter

---

[17]  Defendants do not, for example, premise their post-judgment motions on arguments that: (1) there was insufficient proof that Mr. Jowers would have behaved differently had he been given a better warning; (2) there was insufficient proof that Mr. Jowers was exposed to high-enough doses of manganese in welding fumes to have caused his alleged injury; (3) Mr. Jowers did not sufficiently identify precisely which warnings were allegedly inadequate; or (4) Mr. Jowers did not sufficiently identify which companies manufactured the welding products he used and was exposed to.  *Cf. Tamraz v. BOC Group, Inc.,* 2008 WL 2796726 (N.D. Ohio July 18, 2008) (in another *Welding Fume* MDL case tried to a plaintiffs' verdict before the undersigned, addressing all of these arguments in the context of resolving post-judgment motions).

[18]  Plaintiffs originally named Hobart and Select Arc as defendants, but later dismissed them from suit. *See* docket no. 385 (agreed Order dismissing Hobart), docket no. 220 (agreed Order dismissing Select Arc).

[19]  Motion at 7-8 (docket no. 441) (emphasis added).

supervisor, and shipfitter foreman.  One of the primary tasks of a shipfitter is cutting and joining steel with, respectively, a torch and a welding machine.[20]

The process of joining steel by welding generally involves the melting of a "welding consumable," which is used to fuse together two pieces of metal.  Welding consumables come in two categories: (1) stick electrodes, which are relatively short; and (2) wire, which comes on spools in longer lengths.  When using stick electrodes, the welder has to pause periodically to attach a new stick to his welding apparatus; when using wire, the welder pauses to "reload" much less frequently.  Both stick and wire consumables give off fumes that contain manganese, with wire consumables generally producing more copious fumes.  For the vast majority of his career, Mr. Jowers used stick electrodes.  Specifically, he worked on the "fillet weld machine," which used wire, for about 14 months; during the rest of his career he used stick electrodes. Mr. Jowers inhaled fumes given off by the consumables he used, as well as the consumables (both stick and wire) used by the other shipfitters and welders with whom he worked.[21]

The breakdown of the welding consumable products that Ingalls purchased during Mr. Jowers' career, and the subset of those products that Mr. Jowers actually used, may be summarized as follows.[22] When Mr. Jowers began welding for Ingalls in 1972, the vast majority of welding consumables Ingalls purchased were stick electrodes.  Beginning in the early 1980s, Ingalls began purchasing more wire consumables, and by the mid-1980s about 70% of the welding consumables that Ingalls purchased were

---

[20]  *See generally* trial tr. at 797-804 (Feb. 12, 2002) (direct examination of Robert Jowers).

[21]  *See id.* at 810-11, 821-22, 827-28, 843-49 (Feb. 12, 2008) (direct examination of Robert Jowers); *id.* at 908-09, 922-24 (cross-examination of Robert Jowers).

[22]  *See id.* at 1475 *et seq.*  (Feb. 19, 2008) (cross-examination of Winston Howell, a welding materials specialist for Ingalls Shipbuilding for 42 years); *id.* at 387 *et seq.* (Feb. 8, 2008) (cross-examination of ESAB corporate representative Phillip Plotica); *id.* at 597 *et seq.* (Feb. 11, 2008) (cross-examination of Lincoln corporate representative Carl Peters); *id.* at 698 *et seq.* (Feb. 12, 2008) (same).

spools of wire, with the remaining 30% being stick electrodes.  Those percentages have remained fairly constant ever since.

Of the wire consumables, during the 1980s, Hobart and ESAB each provided to Ingalls about half its total supply.  Subsequently, Hobart, ESAB, and Select Arc each supplied about one third of Ingalls' total supply.  Thus, during the latter part of Mr. Jowers' career, Hobart and Select Arc – who were not defendants at the time of trial – together supplied two thirds of the wire consumables purchased by Ingalls, and thus as much as half of the total amount of the welding consumables (wire and stick) purchased by Ingalls.  The wire consumable that Mr. Jowers used during his 14 months on the fillet welding machine could have been manufactured by ESAB, Hobart, or Select Arc.[23]  Mr. Jowers recalls using wire consumables manufactured by ESAB and Hobart.[24]

As to stick electrodes, when Mr. Jowers started welding, Ingalls purchased products manufactured by Airco (a BOC predecessor) almost exclusively.  Then, between 1975 and 1986, Ingalls purchased stick electrodes primarily from Airco and Alloy Rods (an ESAB predecessor), with smaller amounts purchased from Lincoln and Hobart.[25]  Thus, during the first 11 years of his welding career, virtually all of the stick electrodes that Mr. Jowers used were manufactured by the three defendants who were at trial, and he used them "every day."[26]  After 1986, the primary suppliers of stick electrodes to Ingalls were defendants Lincoln and ESAB and non-defendant Hobart.

---

[23] *Id.* at 1502-03 (Feb. 19, 2008) (direct examination of Winston Howell).

[24] *Id.* at 845 (Feb. 12, 2008) (direct examination of Robert Jowers); *id.* at 923 (Feb. 13, 2008).  Mr. Jowers testified he used Dual Shield (an ESAB product) and Tri-Mark (a Hobart product) while operating the fillet weld machine.

[25] *Id.* at 1523 (Feb. 19, 2008) (cross examination of Howell) and 1529-30 (re-direct examination of Howell).

[26] *Id.* at 950 (Feb. 13, 2008) (redirect examination of Robert Jowers).

With regard to Mr. Jowers' fume exposure levels, the evidence at trial was that, when he worked as a shipfitter, Mr. Jowers spent about three hours every day welding and breathing fumes given off by his own welding process.  He was in close quarters with other welders, however, and so was actually exposed to welding fumes – produced either by himself or others – for a total of about seven hours every day.[27] When he worked as a supervisor, Mr. Jowers spent only about two hours per week welding himself, but was again exposed to welding fumes produced by others about six hours every day.[28]  The vast majority of the fumes he produced himself came from welding rods, as opposed to welding wire; the fumes produced by other welders were from both types of consumable.[29]  Mr. Jowers was a shipfitter between one third and one half of his career, and a supervisor during the rest.[30]

Mr. Jowers was never required by his employer to wear a respirator during his entire career, and he never felt as though he needed a respirator, or was receiving inadequate ventilation.[31]  Although he was "generally satisfied" with the ventilation levels in the areas he worked, Mr. Jowers testified there was still always smoke in a "properly ventilated" room.[32]  Mr. Jowers, did see other welders using respirators in confined areas with no ventilation, and sometimes passed through such areas, but he never welded in a

---

[27] *Id.* at 807-11, 848 (Feb. 12, 2008) (direct examination of Robert Jowers); *id.* at 911-12 (Feb. 13, 2008) (cross examination of Robert Jowers).

[28]  *Id.* at 821-22 (Feb. 12, 2008) (direct examination of Robert Jowers); *id.* at 911-12 (Feb. 13, 2008) (cross examination of Robert Jowers).

[29]  *Id.* at 908-09 (Feb. 13, 2008) (cross examination of Robert Jowers).

[30]  *Id.* at 848 (Feb. 12, 2008) (direct examination of Robert Jowers); *id.* at 917-18  (Feb. 13, 2008) (cross examination of Robert Jowers).

[31]  *Id.* at 860-61 (Feb. 12, 2008)  (direct examination of Robert Jowers); *id.* at 902-05, 936-37 (Feb. 13, 2008) (cross examination of Robert Jowers).

[32]   *Id.* at 952 (Feb. 13, 2008) (redirect examination of Robert Jowers).

confined area with no ventilation himself.[33]  Certain areas where Mr. Jowers worked, such as the "Stacking Hull," tended to produce higher fume exposures because of the number of welders and the configuration of the work area; Mr. Jowers tried to avoid these areas once his neurologist told him his fume exposure was causing him injury.[34]  During his career, Mr. Jowers never observed any industrial hygienists engage in air monitoring or sampling to measure workers' fume exposure levels.[35]

To support their argument that they are entitled to judgment as a matter of law, defendants first asserted that "Mr. Jowers had only minimal exposure to [their] products regardless of whether they were wire or stick."[36]  But the record summarized above does not support this assertion.  As noted, of the roughly 30 years that Mr. Jowers worked at Ingalls, he used wire consumables for only about one year; the rest of the time, he used stick electrodes.  Further, for the first half of his career – through 1986 – virtually *every* electrode Mr. Jowers used was manufactured by the three defendants who were at trial: BOC, ESAB, and Lincoln.  And during the second half of his career, Ingalls continued to purchase stick electrodes from defendants Lincoln and ESAB, as well as from non-defendant Hobart.  This all translates not to "minimal exposure" to their products, but rather to Mr. Jowers' *substantial* exposure to welding consumables manufactured by defendants BOC, ESAB, and Lincoln over the entirety of his career.

It is true, as defendants point out, that, in addition to his exposure to the fumes produced by welding consumables he used *himself*, Mr. Jowers also suffered exposure to the fumes produced by welding consumables used by his *co-workers*.  Defendants seize on this fact and infer that, because these

---

[33]  *Id.* at 954-55 (Feb. 13, 2008) (redirect examination of Robert Jowers).

[34]  *Id.* at 860-61, 873-74 (Feb. 12, 2008).

[35]  *Id.* at 928 (Feb. 13, 2008).

[36]  Motion at 6 (docket no. 441).

10

co-workers may have been using more consumables manufactured by non-defendants – for example, these co-workers were, *in toto*, probably using more wire than stick, and thus more consumables manufactured by non-defendants Hobart and Select Arc than by defendants – Mr. Jowers' total fume exposure attributable to BOC, ESAB, and Lincoln is lower than suggested by an examination of only the brands of stick electrodes he used himself. Even accepting this inference, however, a reasonable juror could still conclude that Mr. Jowers suffered substantial exposure to fumes from welding consumables manufactured by defendants BOC, ESAB, and Lincoln over the course of his career. After all, through the mid-1980s, Mr. Jowers' co-workers were – like Mr. Jowers, himself – using stick electrodes manufactured almost exclusively by the three defendants who were at trial. And thereafter, BOC, ESAB, and Lincoln continued to supply a very large fraction of the stick and wire consumables purchased by Ingalls.

At best, defendants' "passive fume exposure" argument establishes that, later in his career, Mr. Jowers inhaled increasing amounts of fumes given off by welding consumables manufactured by non-defendants; but this is certainly not tantamount to a necessary conclusion that, over the course of his *entire* career, Mr. Jowers was exposed to insubstantial amounts of fumes given off by welding consumables manufactured by BOC, ESAB, and Lincoln. Put more succinctly, defendants are simply incorrect that Mr. Jowers adduced insufficient evidence of substantial exposure to their products. Considering all of the evidence in the light and with all reasonable inferences most favorable to Mr. Jowers, as the Court must, a reasonable jury could conclude there was sufficient evidence of exposure to defendants' products to support a verdict in Mr. Jowers' favor.[37]

In their reply brief, defendants change their focus somewhat and explain that, even if Mr. Jowers

---

[37] In fact, while defendants in their motion argue that Mr. Jowers "had only minimal exposure" to their products, defendants state elsewhere in the same motion that "the evidence showed substantial exposure to both defendants' and non-defendants' products." Motion at 6, 11 (docket no. 441).

proved he had substantial exposure to welding consumables manufactured by both defendants and non-defendants, he did not prove it was *defendants'* products that actually caused him harm.  Defendants explain:

> [E]ven if there is proof that exposure to welding fumes caused plaintiff's injury, there are several cause-in-fact scenarios, including but not limited to the following:
> - The one and only cause of plaintiff's injury was exposure to fumes generated by non-defendants' products;
> - The one and only cause of plaintiff's injury was exposure to fumes generated by defendants' products; or
> - There were several causes of plaintiff's injury, including his exposure to fumes generated by defendants' products and non-defendants' products.
> * * *  Mr. Jowers cannot hold [defendants] liable when it is entirely possible that the only liable parties were not joined, and plaintiffs have offered no evidence that would permit the jury to decide who is actually liable – defendants, non-defendants, or some combination.[38]

Essentially, defendants argue it is conceivable that Mr. Jowers' manganese-induced parkinsonism ("MIP") may have been caused by inhaling the manganese-containing fumes produced *only* by the stick electrodes and wire manufactured by *non-defendants*; therefore, the jury had to speculate impermissibly and the three defendants at trial cannot be held liable.

This refined argument has more force than defendants' initial "minimal exposure" argument.[39]  It is one, moreover, that requires a far more detailed analysis of the exposure evidence presented at trial, including the medical and scientific evidence regarding the mechanics of overexposure to manganese in the workplace and the nature of MIP.

In this case, viewing the evidence and inferences that may be drawn therefrom in a light most

---

[38] Reply brief at 6-7 (docket no. 452).

[39]  Interestingly, this argument, and the questions it raises about the quantity of plaintiffs' proofs, is one that largely could have been avoided by plaintiffs had they not chosen to dismiss their claims against Hobart on the eve of trial.  The Court was confused by plaintiffs' choice before trial and finds it even more perplexing given the product identification evidence actually adduced at trial.

favorable to Mr. Jowers, the jury was presented with the following evidence relevant to overexposure.[40]

Several governmental and professional entities have established various measures to define safe exposure limits to toxins, including manganese.  These measures include: (1) Threshold Limit Values ("TLVs"), which are promulgated by the American Conference of Governmental Industrial Hygienists ("ACGIH"); and (2) Permissible Exposure Limits ("PELs"), which are promulgated by the Occupational Safety and Health Agency ("OSHA").  The TLV is the maximum *average* amount to which, it is believed, a person may be safely exposed over an 8-hour time period.[41]  The PEL is the maximum *ceiling* amount to which a person may be safely exposed at any moment in time.  Thus, a welder may suffer momentary manganese fume exposures in excess of the PEL ceiling limit, but not suffer an average exposure over his workday in excess of the TLV; similarly, a welder may suffer average exposures in excess of the 8-hour limit

---

[40] *See generally* trial tr. at 1163 *et seq*. (Feb. 14, 2008) (testimony of plaintiffs' expert Industrial Hygienist, David Kahane).

[41]  The ACGIH describes a TLV as follows: "[TLVs] refer to airborne concentrations of chemical substances and represent conditions under which it is believed that nearly all workers may be repeatedly exposed, day after day, over a working lifetime, without adverse health effects. TLVs are developed to protect workers who are normal, healthy adults." *See* www.acgih.org/Products/tlv_bei_intro.htm. *See also In re Welding Fume Prods. Liab. Litig.*, 526 F.Supp.2d 775, 784 n.33 & 789-90 n.65 (N.D. Ohio 2007) (discussing the history and meaning of the TLVs and PELs for manganese).
    The ACGIH webpage cited above adds: "TLVs do not represent a fine line between a healthy versus an unhealthy work environment or the point at which material impairment of health will occur. TLVs will not adequately protect all workers.  Some individuals may experience discomfort or even more serious adverse health effects when exposed to a chemical substance at the TLV or even at concentrations below the TLV."

imposed by the TLV, but not momentary exposures in excess of the PEL absolute ceiling.[42]

Over time, the ACGIH has reduced the TLV for manganese exposure. In 1948, the TLV was an 8-hour time-weighted average of 6.0 mg/m³; in the late 1970s, shortly after Mr. Jowers started welding, the TLV was 5.0 mg/m³; and today, it is an 8-hour time-weighted average of 0.2 mg/m³. This decrease reflects the ACGIH's increasing concern over the toxicity of manganese exposure. OSHA's current PEL for manganese, which has been in effect since the early 1970s, is 5.0 mg/m³. OSHA's PEL incorporates concerns regarding the cost to businesses of compliance with exposure limits, while the ACGIH's TLVs are concerned exclusively with worker safety.[43]

Documents authored by the defendants, and by trade organizations to which the defendants belong, discuss manganese in welding fumes and the applicable PELs and TLVs – especially during times when the TLVs were lowered. One such document, circulated widely within the welding industry at about the time Mr. Jowers started welding, is known as the Battelle Survey; it was sponsored by the American Welding Society ("AWS") in 1972. The Survey stated:

---

[42] In addition to the PEL promulgated by OSHA, another federal agency – the National Institute for Occupational Safety and Health ("NIOSH") – also issues recommended exposure limits. NIOSH has promulgated a Recommended Exposure Limit ("REL") for manganese of 1.0 mg/m³ as a 10-hour time weighted average. NIOSH has further stated: "Recent studies indicate neurological and neurobehavioral deficits may occur when workers are exposed to low levels of manganese (<0.2 mg/m³) in welding fumes. These effects include changes in mood and short-term memory, altered reaction time, and reduced hand-eye coordination. Affected workers frequently show abnormal accumulations of manganese in a region of the brain known as the globus pallidus. The globus pallidus plays an important role in movement regulation. NIOSH is currently reviewing its Recommended Exposure Limit (REL) for manganese as a result of these studies." *See* www.cdc.gov/niosh/topics/welding.

[43] The ACGIH also promulgates a measure similar to OSHA's PEL, which it terms a "Threshold Limit Value-Ceiling" ("TLV-C"). Like OSHA's PEL, the TLV-C is a "concentration that should not be exceeded during any part of the working exposure." The ACGIH states that "under no circumstances should [the TLV-C] exceed 5 times the [time-weighted average TLV]." Thus, the position of the ACGIH is that welders should *never*, even momentarily, suffer manganese exposure above 1.0 mg/m³, which is five times the TLV of 0.2 mg/m³. *See* www.acgih.org/Products/tlv_bei_intro.htm.

> The fumes from manganese are highly toxic, and they can produce total disablement *even after exposures as short as a few months* to high-fume concentrations . . . .  Exposure to manganese dioxide may cause a neurological lesion involving the basal ganglia, the frontal cortex, and occasionally the pyramidal system.  Symptoms are similar to Parkinson's syndrome and include 'weakness of the legs,' difficulty in walking downhill, instability, and weakness while doing heavy work.[44]

 The Survey also stated that several welding rods "produced manganese and vanadium fumes that exceeded recommended TLVs," which were 5.0 mg/m$^3$ at the time.[45]

Regarding these TLVs, documents produced by defendant Lincoln Electric concede that "early limits are outdated and insufficiently protective of worker health."[46]  More specifically, AWS meeting minutes written in 1981 state: "some cases of manganism have been documented at levels below five milligrams per cubic meter, and that this was the reason that the current threshold limit value was lowered to one milligram per  cubic meter."[47]  Further, defense witnesses admitted that the level at which

---

[44]  Battelle Survey at 27  (trial exh. 1562) (emphasis added).

[45]  *Id.* at 65.  Defendants' documents also suggest that the manganese content in welding fumes can be as much as 10 times greater than the manganese content in the welding consumable, itself.  *See also* trial tr. at 627 (Feb. 11, 2008) (testimony of Lincoln representative agreeing that "manganese in welding rod . . . actually increases by five or six-fold when it goes from rod to fume").

[46]  Lincoln Powerpoint presentation at 12 (2004) (trial exh. 6112).

[47]   AWS Safety & Health Committee Meeting minutes at 5 (May 20, 1981) (trial exh. 1647).  Without exception, all of the meeting minutes and other documents that were sent to or from trade organizations (such as the American Welding Society ("AWS") and National Electrical Manufacturers Association "(NEMA") that are cited in this opinion were also received or sent by defendants' managerial employees, who were and are members of those organizations.

manganese exposure becomes unsafe is not known for certain;[48] and plaintiffs' expert Kahane testified

there is at least one report of a documented case of Manganese-Induced Parkinsonism – a welder who was

also employed at Ingalls – that occurred with exposure levels below the current TLV of 0.2 mg/m$^3$.[49]

In 1994, members of the American Welding Society ("AWS") met to discuss the then-proposed

reduction of the manganese exposure TLV from 1.0 to 0.2 mg/m$^3$.  The AWS meeting minutes state that

defendant Lincoln Electric "estimated that if the TLV is lowered to 0.2 milligrams per cubic meter, then

the overall welding fume limit . . . would be exceeded in most workplace atmospheres."[50]  As noted above,

-----

[48] *See* trial tr. at 1188-91 (Feb. 14, 2008) (review of testimony of Lincoln representatives Marie Quintana and Kenneth Brown that there is no known safe level of exposure to manganese in welding fume, and/or that the level at which exposure becomes unsafe is not known); *see* AWS Fumes and Gases Committee Meeting Minutes at 2 (Oct. 24, 2001) (noting that the United Kingdom had recently issued "a Chemical Hazard Alert Notice for manganese that eliminated the occupational exposure limit because they do not believe a safe level is known") (trial exh. 81).

[49] Trial tr. at 1192-96 (Feb. 14, 2008).  Evidence was presented showing that defendants have been aware for decades that welding fume exposure could cause Manganese-Induced Parkinsonism ("MIP"). In 1979, for example, a widely-distributed AWS literature review noted that "[p]otential exposure to manganese occurs whenever this metal is used in electrode coatings or in electrode wire," and that manganese is "poisonous to the nervous system."  American Welding Society, *"Effects of Welding on Health,"* at xix (1979) (trial exh. 2940).  This literature review went on to state that the "observation that manganism resembles Parkinson's disease deserves emphasis.  Although no data on the prevalence of parkinsonism in welders are available, there is a concern that some cases of manganese poisoning could be mistakenly diagnosed as Parkinson's disease.  Further investigations may be warranted." *Id.* at 29.  In 1980, commenting on another welding fume lawsuit that was widely discussed within the industry, one manufacturer wrote the following summary: "[the plaintiffs] complained of the fumes for 3 weeks, then came down with symptoms of manganese poisoning.  They have severe neurological damage which . . . is doubtless due to the welding in a confined area with the Hadfield Manganese rods.  The damage is irreversible – these guys are impaired for life."  Teledyne memorandum from D. Kotecki to W.T. Delong at 1 (Mar. 4, 1980) (trial exh. 498).  In 1992, an internal ESAB memorandum also acknowledged the same hazard, stating: "Once [welding rods] are used in an electric arc, they can liberate respirable manganese fumes.  * * *  Manganese fumes are of serious concern.  The irreversible neurological damaged produced by chronic overexposure to manganese fume is tragic.  You are wise to be concerned."  ESAB memorandum from George Barnes to William Esch (Feb. 24, 1992) (trial exh. 260).  Other such evidence is referred to throughout the rest of this opinion.

[50] AWS Fumes and Gases Committee meeting minutes at 3 (Oct. 17, 1994) (trial exh. 920).

the reduction of the TLV to 0.2 mg/m³ did, in fact, occur.[51]

In addition to setting manganese exposure limits, OSHA agents travel to various worksites around the country to audit whether employees, including welders, are experiencing exposures in excess of the legal limits.   These measurements are collected in an OSHA database.   OSHA's measurements of manganese exposures endured by welders include all types of circumstances: indoor and outdoor welding, use of high- and low-manganese welding rods, well- and poorly-ventilated conditions, and so on.   Analysis of the OSHA database – which includes thousands of measurements taken over the last 20 years – shows that: (1) about 30% of the welders were, at the time of measurement, experiencing manganese exposure in excess of OSHA's current time-weighted-average TLV of 0.2 mg/m³; (2) about 5% of the welders were, at the time of measurement, experiencing manganese exposure in excess of the ACGIH's current TLV-C "ceiling limit" of 1.0 mg/m³; (3) welders were about five times as likely to be experiencing manganese exposure in excess of OSHA's current TLV as were non-welders; and (4) these statistics have held fairly constant over the duration of the 20-year measurement period.[52]

Beyond these generalized observations regarding welding fume exposures experienced by the "typical" or "average" welder, Mr. Kahane testified about Mr. Jowers' own welding experiences and the air sample monitoring data kept by Ingalls.   Mr. Kahane found that Ingalls' own data revealed "many,

---

[51]   *See also Jowers* trial tr. at 1203-06 (Feb. 14, 2008) (testimony regarding trial exh. 33, a 1995 letter written by Caterpillar, Inc. to the Ferroalloys Association arguing against reduction of the TLV, because "approximately 50% [of Caterpillar welders] would be over exposed to manganese at [a TLV] of 0.2") (same exhibit also discussed at *In re Welding Fume Prods. Liab. Litig.*, 526 F.Supp.2d 775, 790 (N.D. Ohio 2007)).

[52]   *See* trial tr. at 1199-1204, 1218-26 (Feb. 14, 2008) (testimony of Mr. Kahane regarding the OSHA database).

many" instances where workers at Ingalls suffered exposures above the TLV of 0.2 mg/m³.[53]  Mr. Kahane

further testified that, based on his review of the data and his discussions with Mr. Jowers regarding Mr.

Jowers' own welding activity (summarized above) and the industrial hygiene practices in his workplace:

(1) Mr. Jowers was routinely overexposed above the 0.2 mg/m³ TLV during his 30-year career at Ingalls,

and (2) these overexposures occurred more frequently during the first seven years of Mr. Jowers' career,

when he was not a supervisor, before wire consumables predominated.[54]

Finally, the jury was presented with evidence that: (1) excessive exposure to manganese can cause

a disease known as Manganism, or Manganese-Induced Parkinsonism ("MIP"); (2) the symptoms of MIP

are similar to those of Idiopathic Parkinson's Disease (which is what defendants maintain Mr. Jowers

has[55]); and (3) individual susceptibility to the adverse effects of manganese varies considerably.  Indeed,

defendants' own experts and documents concede each of these points.  For example, ESAB's warning

labels now state: "Overexposure to manganese and manganese compounds above safe exposure limits can

cause irreversible damage to the central nervous system, including the brain."[56]   Lincoln has

acknowledged, in a letter to one of its customers, that "[m]edical studies link welding fume exposure to

---

[53]  Trial tr. at 1197 (Feb. 14, 2008).

[54]  *Id.* at 1198, 1207-08.  Indeed, Lincoln's representative testified at trial that he "wouldn't be surprised at all if welders responsibly using [mild steel welding rods] during the '70s, '80s and early '90s were exposed to over 0.2 milligrams per cubic meter of manganese."  Trial tr. at 728 (Feb. 12, 2008).

[55]  *Id.* at 2966 (Feb. 27, 2008).

[56]  *See* trial tr. at 1996-97 (Feb. 21, 2008); ESAB Atom Arc 7018 Warning Label and Dual Shield 7100 Ultra Warning Label (trial exh. 9221).  Similarly, the 1987 Material Safety Data Sheet that accompanied Hobart's welding rods stated: "Long term overexposure to manganese compounds may affect the central nervous system.  Symptoms include muscular weakness, tremors similar to Parkinson's disease. Behavioral changes and changes in handwriting may also appear.  Employees exposed to manganese compounds should get quarterly medical examinations for early detection of manganese poisoning."  Trial exh. 3228 at 2.

neurological conditions resembling Parkinson's disease.  * * *  Manganese welding is identified as one of the more dangerous types of welding with regard to fume exposure."[57]  Dr. Anthony Lang, a defense expert neurologist specializing in movement disorders, agrees that welders can get Manganese-Induced Parkinsonism from welding fume exposure.[58]  And defense expert Dr. Howard Hurtig agrees that susceptibility to the adverse effects of manganese varies from individual to individual.[59]

The sum of this evidence, along with fair inferences, allowed a reasonable jury to reach two relevant conclusions.  First, Mr. Jowers' exposure to manganese did not exceed safe levels only at a single point in time, when he was using a particular welding consumable; rather, the jury could (and apparently

---

[57]  Letter from Tom Griffiths (Lincoln) to Brady Cisco (Vulcan Materials) at 1 (March 25, 1996) (trial exh. 344).  The entire first paragraph of the letter reads: "Medical studies link welding fume exposure to neurological conditions resembling Parkinson's disease.  Exposure to welding fumes in confined or poorly ventilated spaces is especially dangerous.  These diseases can occur when certain toxins attack the central nervous system.  Welding fumes contain one such toxin known to cause these symptoms.  Manganese welding is identified as one of the more dangerous types of welding with regard to fume exposure."  The letter also states: "As reported in A.W.S. publications and Lincoln literature, and MSDS's, overexposure to manganese can cause a neurological problem called manganism, which has some symptoms similar to Parkinson's disease.  Some manufacturers now recommend quarterly medical monitoring for persons exposed to welding fumes."  *Id.* at 2.

[58]  Trial tr. at 1769-70 (Feb. 20, 2008); *id.* at 588-89 (Feb. 11, 2008).  The Court does not recite in this opinion all of the evidence supporting the proposition that exposure to manganese in welding fumes can, at least in some circumstances, cause Manganese-Induced Parkinsonism – a proposition the defendants conceded in this trial.  The Court examined much of this evidence in great depth in the context of assessing its admissibility under the standards set out in *Daubert*.  *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 (N.D. Ohio Aug. 8, 2005).

[59]  Trial tr. at 2473 (Feb. 25, 2008); *see also* Roy S. Anderson, "Health Hazard Determination. Health Effects from Use of Welding Electrodes" at 21 (1985) (trial exh. 253) (report to various welding consumable manufacturers regarding the hazards of their products, stating: "Among workers, there is a very marked variation in individual susceptibility to manganese.  Some workers have worked in very heavy exposure for a lifetime and have shown no signs of the disease; others have developed manganese intoxication with as little as 49 days exposure.").  *See also* "Environmental Health Criteria for Manganese," World Health Organization at 13 (1981) (trial exh. 1547) ("[i]ndividual susceptibility to the adverse effects of manganese varies considerably"); *Daubert* hearing tr. at 1995 (July 26, 2005) (defense expert Dr. Warren Olanow agreeing that susceptibility to the adverse effects of manganese varies from individual to individual).

did) conclude there were innumerable instances during his career when the manganese he inhaled from welding fumes exceeded the TLV of 0.2 mg/m³.  As stated by Lincoln in 1994, this TLV, which is an 8-hour-per-day, 40-hour-per-week time-weighted average, is probably "exceeded in most workplace atmospheres."  Thus, there was substantial evidence to support a jury determination that, during the course of his 30-year career at Ingalls, Mr. Jowers suffered overexposure to manganese due to inhaling fumes from products manufactured by *every* substantial supplier of welding consumables to Ingalls – both defendants and non-defendants.[60]

Second, the effects of exposure to manganese are cumulative.[61]  The jury could conclude that each and every overexposure that Mr. Jowers suffered added to the damage of that portion of Mr. Jowers' brain which governs voluntary movement.  There was substantial evidence to support a jury determination that the many overexposures Mr. Jowers suffered combined to cause a single, indivisible injury, a type of brain damage diagnosed by his treating neurologist as Manganese-Induced Parkinsonism.  No single exposure and no single welding consumable was, alone, the cause of Mr. Jowers' injury.

[60]  The American Welding Society has created a standardized numbering identification system applicable to all welding consumables.  For the most part, a given type of rod is fungible – the "E-7018" welding rods that Mr. Jowers used at Ingalls, for example, came from a variety of manufacturers, and the manganese content was essentially the same in each manufacturer's rod.  Thus, when Mr. Jowers welded with a particular type of rod, the likelihood of overexposure to manganese did not vary by manufacturer.  And, as noted, there is no question but that each of the manufacturer-defendants in this case supplied a substantial amount of the welding rods that Jowers used during his career.

[61]  *See* trial tr. at 619-20 (Feb. 11, 2008) (defense expert neurologist Dr. Howard Hurtig agreeing that "manganese from welding fume accumulates, can accumulate in the part of the brain that controls movement" and "can cause Manganese-Induced Parkinsonism"); *id.* at 2279-80 (Feb. 22, 2008) (defense expert neuro-radiologist Dr. Gordon Sze agreeing that "it has been proven that manganese in welding fume can accumulate in the brain" and "that manganese can cause Parkinsonism"); *id.* at 2942 (Feb. 27, 2008) (Lincoln representative agreeing that manganese "does not dissipate quickly and has a cumulative effect"); *id.* at 302-03 (Feb. 8, 2008) (counsel for plaintiffs stating, during opening statement: "The evidence will show that manganese exposure is cumulative.  The damage takes place over years and years and years. * * * The manganese, the evidence will show, accumulates and damages the brain over time, and it is not until . . .  a certain amount of damage occurs that the symptoms manifest.").

While defendants argue it is theoretically conceivable that "the one and only cause of Mr. Jowers' injury is his exposure to *non-defendants'* products,"[62] defendants had every opportunity to make this argument to the jury and had the benefit of instructions requiring the jury to find each defendant, individually, was a proximate cause of harm to Mr. Jowers.[63]  More important, the jury had the benefit of both direct and circumstantial evidence – including expert opinions and sufficient facts upon which those opinions could be reasonably and reliably based – from which it could conclude that the possibility defendants posit did not actually occur.[64]  To the contrary, the evidence sufficed to allow a reasonable jury to infer and conclude that Mr. Jowers was regularly overexposed to manganese contained in fumes given off by welding consumables manufactured, in substantial part, by each defendant, and that the sum of those

---

[62]  Reply brief at 6 (docket no. 452) (emphasis added).

[63]  Jury Instructions (docket no. 433) at 29 ("To be a proximate cause, the acts or omissions of the defendants, or any one of them, must be a substantial factor in producing the injury Mr. Jowers claims to have suffered.  There may be more than one proximate cause. When the acts or omissions of two or more defendants or other persons work together as proximate causes of damage to another person, each of those defendants may be found liable.").  *See also id.* at 18 ("the fact that, on a given claim, you may find either for or against a certain defendant should not in any way control your verdict as to another defendant").

[64]  Regarding defendants' argument that the opinions expressed by plaintiff's expert industrial hygienist, Mr. Kahane, were unsupported, this Court borrows a comment from another court that was presented with a similar argument: "In our view, however, [plaintiff's expert] drew a reasonable inference rather than make an unwarranted assumption of fact.  Apparently the jury agreed."  *Kritser v. Beech Aircraft Corp.*, 479 F.2d 1089, 1095 (5th Cir. 1973) (citing *Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 109-10 (1959)).

overexposures was a proximate cause of his injuries.[65]

Significantly, the fact that Mr. Jowers was also exposed (or overexposed) to fumes from welding consumables manufactured by two *non-defendants* does not affect the legitimacy of the jury's verdict. That is, there is no factual or legal requirement that, in order to recover at trial, the harm caused to Mr. Jowers by his exposure to welding fumes be caused only – or even mostly – by the products manufactured by defendants BOC, ESAB, and Lincoln.   Mississippi common law recognizes that: (1) a plaintiff's injuries may have been proximately caused by more than one defendant, and (2) the plaintiff may pursue fewer than all defendants who proximately caused his injury.   In *Hall v. Hilbun*,[66] for example, the plaintiff's executor sued the decedent's doctor, but not the decedent's nurses.  The Mississippi Supreme

---

[65]   The defendants' theory would be more plausible if, for example, Mr. Jowers had been overexposed only two times, and half of the time he used non-defendants' products.  (Although, even in such a case, the strict probability that Mr. Jowers would suffer at least *one* overexposure while using a defendant's product would still be three out of four.)  Here, however, there was substantial evidence to support the conclusion that Mr. Jowers was overexposed regularly over a period of 30 years, during all of which time he used and was exposed to defendants' products.  Defendants argue that "[i]t may be that [both defendants and non-defendants] contributed to Mr. Jowers's injury; but it may also be that only one did – and that the one contributing manufacturer was not a defendant at trial.  There was simply no basis in the evidence for the jury to do more than speculate one way or the other . . . ."  Reply brief at 2.  Given the evidence adduced at trial, however, the odds are quite low that Mr. Jowers suffered overexposure caused by *only* a non-defendant's product; it is ultimately the defendants' argument that is speculative.

*See also Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1094 (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974) ("In the instant case, it is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel.  It is undisputed, however, that Borel contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all the defendants on many occasions.  It was also established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury.  We think, therefore, that on the basis of strong circumstantial evidence the jury could find that each defendant was the cause in fact of some injury to Borel.").

Regarding other aspects of the *Borel* holding, this Court agrees with defendants and is *not* citing *Borel* for the proposition that "the burden is on defendants to prove whose welding fumes are at fault."  Reply brief at 8-9 (docket no. 452).   Rather, the Court cites *Borel* only for the proposition that circumstantial evidence and reasonable inferences gave the jury a valid basis upon which to conclude the defendants' products were each *a* proximate cause of an indivisible injury to Mr. Jowers.

[66]   466 So.2d 856 (Miss. 1985).

Court observed that defendant "Dr. Hilbun's failures in the area of post-operative care were not so substantial as the nurses' failures.  Under established law, however, if Dr. Hilbun breached the duty of care he owed to Mrs. Hall and if such breach, if any, was a proximate cause of Mrs. Hall's death, plaintiff may recover full damages of and from Dr. Hilbun, notwithstanding that others may have been more at fault and that their fault was the more substantial factor causing Mrs. Hall's death."[67]

Similarly, in *Brake v. Speed*,[68] the Mississippi Supreme Court examined the common law applicable to several defendants who combined to cause a plaintiff an indivisible injury.  The *Brake* court discussed a case it had decided earlier, known as *Collier*, where a commercial catfish farm sued "several [farmer] defendants for damages resulting from killing or contaminating fish in the [plaintiff's] ponds through the use of poisonous agricultural chemicals applied by the farmers and their crop duster agents."[69]

The *Collier* court reasoned that

> the damage and injury to [the catfish farm] was a gradual process over a period of several weeks . . . .  Probably . . .  the application of the poison by any one [farmer] would not have been sufficient to contaminate the fish, but the combined applications of two, three or more [farmers] were sufficient to cause the resulting damage.  The [farmers] knew, or by the exercise of reasonable care should have known of [the plaintiff's] catfish operations, the toxic effect of the application of agricultural poison on the fish and that all the [farmers] were or had been, making the applications of poison.[70]

Thus, the *Collier* court held that the "separate, concurrent, and successive negligent acts of the [farmers] which combined to proximately produce the single, indivisible injury to [plaintiff's] property . . . rendered

---

[67] *Id.* at 879 n.15; *see Monroe County Elec. Power Ass'n v. Pace*, 461 So.2d 739, 751(Miss. 1984) (stating, in the context of denying a Rule 50 motion, that "an accident may have more than one proximate cause").

[68] 605 So.2d 28 (Miss. 1992).

[69] *Id.* at 33 (citing *D&W Jones, Inc. v. Collier*, 372 So.2d 288 (Miss.1979)).

[70] *Id.* (quoting *Collier*, 372 So.2d at 294).

23

[farmers] jointly and severally liable."[71]  The *Brake* court reaffirmed this analysis, adding: "Additionally, for all intents and purposes, the successive applications of the poison, were concurrent and there was no way to apportion the damage."[72]

Currently, Mississippi does not provide for joint and several liability except in cases of deliberate tortious conduct.  Specifically, Miss. Code §85-5-7(2) states that, "in any civil action based on fault [including claims for strict liability and failure to warn], the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault."  But this apportionment statute continues to recognize the concept of a "joint tort-feasor," where two or more persons may concurrently engage in "an act or omission of a person which is a proximate cause of injury or death to another person."[73]  And the statute also continues to recognize that not *all* joint tortfeasors – indeed, not even those with the majority of fault – need be named as defendants by the plaintiff.  So long as the actions of a defendant were a "substantial factor" in causing harm to the plaintiff, that defendant may be held liable.[74]

In this case, while defendants BOC, ESAB, and Lincoln did argue to the jury that the presence of

---

[71]  *Id.*

[72]  *Id.*  Analogizing the instant case to *Collier*, the repeatedly-ingested, multiple-source toxin is manganese instead of pesticides, and the neurological damage is to Mr. Jowers instead of catfish.

[73]  Miss. Code §85-5-7(1, 2).

[74]  *See Davis v. Christian Bros. Homes of Jackson, Miss., Inc.*, 957 So.2d 390, 404 (Miss. Ct. App. 2007)  ("Cause in fact means that the act or omission was a *substantial factor* in bringing about the injury, and without it the harm would not have occurred.") (emphasis added); *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1094 (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974) ("Whether the defendant's conduct was a *substantial factor* is a question for the jury, unless the court determines that reasonable men could not differ.") (emphasis added).

non-defendants' welding products in the workplace was relevant to causation, defendants never asked the Court to instruct the jury to allocate fault to other, absent welding consumable manufacturers, such as Hobart and Select Arc.[75]  Indeed, BOC, ESAB, and Lincoln agreed that the jury need not allocate percentages of fault even amongst the three of them when determining compensatory damages.[76] Whatever their reasons for not seeking allocation of fault against other, non-defendant manufacturers of welding consumables used by Mr. Jowers, there was sufficient evidence that each of the three defendants at trial was a proximate cause of harm to Mr. Jowers.  That other defendants may have also proximately caused those same indivisible injuries is not a valid basis for granting judgment notwithstanding the verdict.

Finally, the Court does not perceive that the jury's verdict is against the great weight of the evidence.  Accordingly, the defendants' motion for new trial, premised on the assertion that the jury must have speculated about whether it was defendants' welding consumables that proximately caused harm to Mr. Jowers, must also be denied.

---

[75]  Defendants certainly knew how to ask for such an allocation, as they cited Miss. Code §85-5-7 and asked the Court to allocate fault to Ingalls.  *See* defendants' response brief at 17-19 (docket no. 235) (opposing plaintiffs' motion for summary judgment on defendants' twelfth affirmative defense of apportionment); Order at 23-25 (docket no. 457) (concluding Ingalls could not be apportioned any fault, as a matter of law).

[76]  *See* trial tr. at 3124-25 (March 2, 2008).  At defendants' request, the Verdict Form did not provide for entry of individualized, defendant-specific compensatory damage amounts.  *See* docket no. 438 at 3 (Verdict Form).  This has been defendants' consistent preference in all MDL bellwether trials, presumably because, well before the inception of the *Welding Fumes* MDL, the defendants (and other welding consumable manufacturers) had entered into a judgment-sharing agreement.  *See Tamraz v. BOC Group, Inc.,* 2008 WL 2796726 at *25 (N.D. Ohio July 18, 2008) (in another *Welding Fume* trial, noting that the defendants had "agreed that any allocation of an award of compensatory damages was a purely internal matter," probably because they had already entered into a judgment-sharing agreement).  At the defendants' request, the *Jowers* Verdict Form did, however, direct the jury to allocate punitive damages amongst the three defendants.  *See* docket no. 438 at 5 (Verdict Form awarding punitive damages in the amounts of $750,000 against Lincoln, $750,000 against ESAB, and $200,000 against BOC).

B.     **Punitive Damages**.

With their second post-judgment motion, defendants seek judgment as a matter of law on Mr. Jowers' claim for punitive damages.  Before trial, the Court denied defendants' motion for summary judgment on the punitive damages claim;[77] during trial, the Court also denied two Rule 50 motions directed at the same claim.[78]  Defendants now renew their motion for judgment as a matter of law on the question of punitive damages, arguing that plaintiffs failed to carry their evidentiary burden of proving that any defendant engaged in the type of conduct for which Mississippi law allows punishment by imposition of exemplary damages.

In Mississippi, statutory law provides that punitive damages may be awarded only if the plaintiff proves "by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud."[79]  In light of the Court's grant of defendants' Rule 50 motion directed at plaintiffs' claim for conscious misrepresentation,[80] the parties and the Court agreed to excise from the jury instructions the statutory references to actual malice and to fraud.[81]  Accordingly, to obtain punitive damages, Mr. Jowers was required to show at trial, by clear and convincing evidence, that

---

[77]  *See* pretrial tr. at 217 (Jan. 23, 2008) (orally denying, before trial, defendants' motion for summary judgment on punitive damages claim); docket no. 457 at 20-21 (written Order confirming this earlier oral ruling).

[78]  *See* trial tr. at 1419-53 (Feb. 15, 2008) (denying motion made after close of plaintiffs' case); trial tr. at 3024-33 (Mar. 2, 2008) (denying motion made after close of defendants' case).  The latter motion was supported by a written memorandum, *see* docket no. 420.

[79]  Miss. Code 11-1-65(1)(a).

[80]  *See* trial tr. at 1447-53 (Feb. 15, 2008).

[81]  *See* trial tr. at 3117-21 (Mar. 2, 2008).

defendants acted with "gross negligence which evidences a willful, wanton or reckless disregard for the safety of others."

The Mississippi Supreme Court has explained that "there is no right to an award of punitive damages and such damages are to be awarded only in extreme cases."[82]  Putting it differently, the same court has stated that punitive damages "are not favored in the law and are to be allowed only with caution and within narrow limits."[83]  Accordingly, "[i]n order to warrant the recovery of punitive damages, there must enter into the injuries some element of aggression or some coloring of insult, . . . or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule."[84]  "In regards to gross negligence, 'punitive damages are ordinarily recoverable only in cases where the negligence is so gross as to indicate reckless or wanton disregard of the safety of others.'"[85]  Ultimately,

---

[82] *South Central Bell v. Epps*, 509 So.2d 886, 892 (Miss. 1987).

[83] *Tideway Oil Programs, Inc. v. Serio*, 431 So.2d 454, 460 n.1 (Miss. 1983).

[84] *Epps*, 509 So.2d at 892-93.  The *Epps* court added: "the trial judge initially determines whether to submit the issue of punitive damages to the jury.  He is required to review all of the evidence presented and determine whether the facts of the case and the conduct of the defendant was such that 'the jury should be called upon to decide the justification and amount of punitive damages . . . .'  However, such a decision cannot come from precise formula, but rather must come from the trial judge's life experience."  *Id.* at 893 (citation omitted).

[85] *Beta Beta Chapter of Beta Theta Pi Fraternity v. May*, 611 So.2d 889, 894 (Miss. 1992) (quoting *Belk v. Rosamond*, 57 So.2d 461, 468 (Miss. 1952)); *Bryant v. Alpha Entertainment Corp.*, 508 So.2d 1094, 1098 (Miss. 1987)*; Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1316 (5th Cir. 1995), *cert. denied.*, 516 U.S. 1045 (1996).

it is the combination of misconduct with a negative *mens rea* that justifies punitive damages.[86]

In this case, the defendants offer three arguments why no reasonable jury could find they displayed a reckless disregard for the safety of welders: (1) "manufacturers cannot be liable for punitive damages where they make some effort to warn about possible hazards associated with the use of their products;" (2) "a defendant cannot be held liable for punitive damages when there is scientific debate regarding the validity of the plaintiffs' allegations;" and (3) "defendants' warnings complied with OSHA and industry standards – as well as military specifications."[87]  The essence of all of three of these arguments is that, even if defendants failed to warn welders that inhaling welding fumes can cause permanent brain damage, the context surrounding this failure shows it was not so egregious that it warrants punishment through exemplary damages.  The Jowerses respond that, to the contrary, they presented sufficient evidence upon which a jury could reasonably conclude that "the defendants had knowledge of the debilitating dangers of their products, but time and time again they recklessly disregarded the safety of welders in order to protect their own pecuniary interests."[88]  The Court first recapitulates below the evidence presented at trial pertinent to all three of these arguments and to the question of punitive damages, viewed in a light most

---

[86] *See* D. Dobbs, *Handbook on the Law of Remedies* §3.9 at 204-05, 208 (1976) ("Courts have developed a large vocabulary to describe the kind of mental state required – the defendant must be 'malicious', 'reckless', 'oppressive', 'evil', 'wicked', or guilty of 'wanton misconduct,' or 'morally culpable' conduct . . . .   [A]lmost any term that describes misconduct coupled with a bad state of mind will describe the case for a punitive award.") (quoted with approval in *Andrew Jackson Life Ins. Co. v. Williams*, 566 So.2d 1172, 1188 (Miss. 1990)).

[87] Motion at 1-2 (docket no. 445).

[88] Response brief at 3-4 (docket no. 451) (footnote omitted).

favorable to Mr. Jowers.[89]  Following its review of the evidence, the Court analyzes each of defendants'

three arguments separately.


1.        <strong>Defendants' Knowledge of and Warnings about Welding Fume Toxicity.</strong>

The defendants first obtained knowledge of the toxicity of welding fumes over 75 years ago.

Specifically, in 1932, Dr. Erich Beintker published a report titled "The Effect of Manganese During Arc

Welding."  Although written in German, the report was translated and came to the attention of the welding

rod industry in America.  Dr. Beintker was one of the first persons to suggest that exposure to manganese

in welding fumes could be neurologically hazardous.  The Metropolitan Life Insurance Company, in a

1937 Booklet titled "Health Protection of Welders," summarized Dr. Beintker's report as follows:

> Two cases of poisoning in a mild form, by manganese oxide fumes given off from
> the electrodes in arc welding of tanks and boilers, have been reported from Germany.  The
> electrode used contained 0.2 percent manganese.  It is stated that protective filter
> respirators or air helmets are necessary in tank and boiler work, although in open rooms
> it is improbable that these precautions will be needed.[90]

The Booklet went on to explain the symptoms of manganese poisoning:

> *Manganese* is an important poison from the point of view of its effects rather than
> from frequency of exposure to it.  Manganese has a selective action on some of the nerve
> centers of the brain.  It causes a disease similar to paralysis agitans, which in chronic cases
> is seldom fatal, but which, owing to the fact that no satisfactory treatment is known, is
> always disabling.  Prevention, therefore, is the measure to be stressed when the possibility
> of manganese dioxide fumes or dust is present.[91]

---

[89]  Rather than refer back to earlier language, a portion of the evidence and analysis recited in this section of the opinion is simply repeated from the Court's causation discussion in section II.A of this opinion.

[90]  Metropolitan Life Insurance Company, *"Health Protection of Welders" Booklet* at 24 (1937) (trial exh. 936).

[91]  *Id.* at 23.  "Paralysis agitans" is now more commonly known as Parkinson's Disease.

29

Industry trade group documents, as well as defendants' internal memoranda, show that the MetLife Booklet and its conclusions regarding the toxicity of manganese in welding fumes were widely discussed when they appeared.[92]

Despite defendants' having obtained this knowledge, there are documents showing that, over the course of the following three decades, certain defendants in this case decided, both individually and jointly, *not* to supply warnings with their welding rods, and, in some cases, to explicitly discount any threat of welding fume health hazards.  A few examples include:

- In a 1949 internal BOC memorandum, the history of the product manufacturers' use of warnings was summarized as follows: "the arc welding industry at one time desired to take every precaution to guard against injury, and the [National Electrical Manufacturers Association "(NEMA")] decided to incorporate a warning clause on all electrode box labels.  It turned out, however, that some of the manufacturers did not do this and as a result immediately capitalized on the advantage of being able to sell an electrode which did not have to be marked 'poison.'  As a result, one by one all of the various manufacturers took this information off the label and all were very glad to get it off."  The memo added that "My own personal feeling is that we would lose at least from 10% to 30% of our business if we were the only ones to [put a warning on our welding rods,] and from correspondence I have had with over half a dozen other manufacturers I am sure none of them would consider such a clause on their labels under any circumstance whatever.  In discussing this 10% to 30% possible loss, Mr. Tinnon, of Metal & Thermit Corporation, told me he was sure such percentages were low, and Mr. Lincoln of the Lincoln Electric Company said that if his company did anything like that it would put him out of business."[93]

- In 1950, an employee of defendant BOC, writing to another BOC employee regarding welding rod instruction sheets, stated: "the fumes are far worse than I had any reason to suspect," and observed "there are no caution notices in any of the instruction sheets issued by Amsco."  Nonetheless, the employee took the position that, "[i]f the other members of the Committee are agreed that the instruction sheets should go through without a caution notice, I have no intention of holding up approval."[94]

---

[92]   *See, e.g.,* National Electric Manufacturers Association, Electric Welding Section meeting minutes at 135, discussing MetLife Booklet (Jan. 20, 1938) (trial exh. 140); BOC internal memorandum, quoting MetLife Booklet (trial exh. 197).

[93]   Airco/BOC memorandum from I. Yates to F. Saacke at 1 (Oct. 25, 1949) (trial exh. 220).

[94]   Airco/BOC memorandum from John J. Crowe to E.H. Roper (Sept. 5, 1950) (trial exh. 223).

- Later in 1950, a BOC memorandum discloses that "the Safety Engineer recommends that [BOC's] instruction sheets [that are] distributed with the subject electrode be amended to contain the following caution notice:

  'Arc-welding of manganese steels may create manganese fumes in toxic concentrations.  All such welding operations should be provided with adequate ventilation or fume removal facilities.  Where such ventilation or fume removal facilities cannot readily be provided, an approved respirator should be used.'

  "This recommendation is made despite the possible loss of electrode sales, since it is believed that the recent development of data indicating the degree of hazard involved in arc-welding high manganese steels might subject the Company to possible claims for damages that could far exceed any loss of sales that a frank Warning Label might create."[95]  BOC did not, however, follow this recommendation: a subsequent internal memorandum discloses that "The safe practices committee, at their meeting on Thursday, December 7, 1950, decided that the use of a manganese fume caution in the subject electrode instruction sheet should be avoided for the time being since other industrial manufacturers and vendors of similar high manganese and nickel manganese steel electrodes do not use fume cautions."[96]

- In 1955, defendant Lincoln Electric published a booklet for use by welders, "Procedure Handbook of Arc Welding," which stated that "[m]uch research has been done which has proven that the fumes and smoke obtained when welding steel and the ferrous alloys *are not harmful*."[97]  The research cited in the Handbook to support this contention, however, did not at all prove that the fumes were not harmful; further, Lincoln itself had a hand in rewriting the research articles.[98]

- In 1965, in response to a request for information from a NASA industrial hygienist, Lincoln Electric wrote that it knew "of no difficulties from [use of its JetWeld rods] from a health point of view where adequate ventilation is provided," and enclosed an article titled "Welding 'Hazards': Our Modern Day Mythology," which ridiculed those who associated welding with any health risk, while stating that "toxic gases are not produced by electrode coatings," and that "[l]ead poisoning is the only chronic ailment that can be caused by welding fumes; *other illnesses attributable to*

---

[95]  Airco/BOC memorandum from F. Saacke to members of Safe Practices Committee (Dec. 7, 1950) (trial exh. 407).

[96]  Airco/BOC memorandum from J. Crowe to E. Cosden (Dec. 7, 1950) (trial exh. 6081).

[97]  Lincoln Electric, "*Procedure Handbook of Arc Welding,*" at 1-27 (11th ed. 1957) (trial exh. 487) (emphasis added).  Lincoln first made this statement in an earlier edition of the handbook and reiterated it in subsequent editions for at least the next 16 years.  *See* trial tr. at 656-58 (Feb. 11, 2008); *id.* at 1313 (Feb. 14, 2008).

[98]  *See* trial tr. at 1315-19 (Feb. 14, 2008) (discussion of documents showing that the animals used in the cited research had about a 10% death rate and 50% injury rate; and that Mr. Lincoln had parts of the research article rewritten).

31

*fumes dissipate quickly and have no cumulative effect.*"[99]

While defendants contend there are explanations for the statements in these documents that rebut the point, these materials did constitute substantial evidence from which a jury could reasonably conclude that, while the defendants (and the welding consumable industry generally) were acknowledging privately during this period that welding fumes could cause permanent neurological injury, the defendants were not being candid about this hazard with the general public for fear of how candor might affect sales.

In the late 1960s, practices regarding warnings on welding rod products changed. Specifically, in 1966, prompted by the tobacco industry's use of a warning for cigarettes, the American Welding Society's ("AWS's") Committee on Filler Metal – which had members employed by the defendants in this case – addressed the question of whether there should be mandatory warning labels for welding rods.[100] Eventually, in April of 1967, the AWS did adopt a mandatory warning label. The warning label, however, did not make any mention of the hazard of permanent brain damage. It read:

> Caution. Welding may produce fumes and gases hazardous to health. Avoid breathing these fumes and gases. Use adequate ventilation. See USAS Z49.1, 'Safety in Welding & Cutting" published by the American Welding Society.

The various versions of the cited Z49.1 publication, in turn, have also never mentioned the risk of

---

[99] *See* trial tr. at 2937-48 (Feb. 27, 2008) (discussing Lincoln's use of this article); trial exh. 230 (article) (emphasis added).

[100] *See* J. Caprarola, *et al.*, "Welding Industry to Use Caution Label on Filler Metal Packages," *Welding Journal* (August 1967) (trial exh. 890) ("Precautionary statements such as the one being employed by the welding industry are now appearing on packages of cigarettes, household cleaners, pharmaceutical products, and even on such seemingly innocuous products as children's toys and wearing apparel.").

neurological injury from manganese in welding fumes.[101]

Further, after this mandatory warning was adopted, the defendants took actions that plaintiffs claim were designed to mitigate the force of the new warning. For example, shortly after the warning was adopted, Lincoln Electric wrote a letter to the AWS Committee on Filler Metal, stating its policy would be to place this warning "on all its cartons" but not "on the product which is inside the carton."[102] Lincoln Electric recognized what the effect of this policy would be: "Obviously, many welders using the electrode will never see the container and will therefore never see the warning label."[103] Also, once it became apparent that a majority of the welding rod manufacturers were going to agree to adopt the mandatory warning label, the AWS Committee on Filler Metal appointed a task force "to prepare an article slanted toward reassuring the users that the health hazards are minimal and thus allaying suspicions of some new evidence or change in the extent of hazards, as a result of the appearance of these warning labels."[104] When this "slanted article" was published, it stated, among other things: "Over the years, the number of welders who have shown any effects from these fumes has been extremely small, *and their disability temporary*, usually less than 24 [hours]," and "The appearance of the precautionary label should not be

---

[101] *See, e.g.,* trial exh. 2845 (ANSI Z49.1-**1967**), trial exh. 2847 (ANSI Z49.1-**1983**), trial exh. 6057 (ANSI Z49.1-**1994**); *see* trial tr. at 2953 (Feb. 27, 2008) (Lincoln representative agreeing that "none of the editions" of ANSI Z49.1 "say anything about the risk of neurological injury from manganese in welding fume"). *See also* footnote 147, *infra* (discussing ANSI Z49.1).

[102] Letter from R. Shutt to P. Shepard at 1 (June 7, 1967) (trial exh. 233).

[103] *Id.*

[104] Internal memo to file from Arcos Corp.'s R.D. Thomas (Jan. 30, 1967) (trial exh. 232) (emphasis added). *See also* Letter from AWS Technical Director Edward Fenton to AWS Secretary D.S. Duvall at 1 (Oct. 11, 1967) (trial exh. 1700) (explaining that it "was the intention of the Task Group that prepared this article that reprints of it could be distributed to the [welders] within a company to alleviate any reaction to the appearance of the label").

interpreted as an indication of any change in the potential health hazard from welding fumes."[105]   As described further below, plaintiffs' experts have referred to this type of communication, meant to mitigate the force and effect of a warning, as an "anti-warning."

Plaintiffs adduced evidence at trial that, subsequently, the defendants continued to acknowledge that welding fumes could cause permanent neurological injury, yet also continued not to include any warning to this effect with their products.  In 1970, the AWS commissioned the Battelle Memorial Institute to produce a report entitled "Survey of Welding Fumes and Gases."  The Survey, which was widely distributed within AWS and the welding consumables manufacturing industry, reported that manganese in welding fumes could cause welders to suffer brain damage.  Specifically, the study stated:

> The fumes from manganese are highly toxic, and *they can produce total disablement even after exposures as short as a few months to high-fume concentrations* . . . .  Exposure to manganese dioxide may cause a neurological lesion involving the basal ganglia, the frontal cortex, and occasionally the pyramidal system.  *Symptoms are similar to Parkinson's syndrome* and include 'weakness of the legs,' difficulty in walking downhill, instability, and weakness while doing heavy work.[106]

The Survey also reported on research done in 1966 to "determine the concentration of selected toxic components" in  fumes generated from "commercially available" welding rods.[107]   According to the Survey, this research showed that "several" welding rods "produced manganese and vanadium fumes that

---

[105]   J. Caprarola, *et al.*, "Welding Industry to Use Caution Label on Filler Metal Packages," *Welding Journal* (August 1967) (trial exh. 890).

[106]   Battelle Survey at 27 (emphasis added) (trial exh. 236).

[107]   *Id.* at 60.

exceeded recommended [Threshold Limit Values, or 'TLVs']."[108]  As the Survey acknowledged, the then-applicable manganese TLV was 5.0 mg/m[3].[109]  Thus, as of the time that Mr. Jowers started welding in 1972, defendants knew the AWS was reporting that overexposure to manganese in welding fumes could cause permanent neurological damage – even "total disablement . . . after exposures as short as a few months to high-fume concentrations" – and that commonly-used welding rods could generate fumes so copious that worker exposure would exceed healthy limits established by industrial hygienists.  By this time, foreign researchers had also reached the same conclusion.[110]

Other documents show that, from 1972 forwards, the neurotoxicity of welding fumes was a recurring topic amongst the defendants.  For example, in 1979, a widely-distributed AWS literature review noted that "[p]otential exposure to manganese occurs whenever this metal is used in electrode coatings or in electrode wire," and that manganese is "poisonous to the nervous system."[111]  This literature review went on to state that the "observation that manganism resembles Parkinson's disease deserves emphasis.

---

[108]  *Id.* at 65. As noted earlier: over time, as knowledge of the toxicity of manganese has increased, the TLV for manganese has dropped.  In 1948, the TLV was an 8-hour time-weighted average of 6.0 mg/m[3]; it was dropped to 5.0 mg/m[3] in 1960, and dropped again to 1.0 mg/m[3] in 1979; and the current TLV for manganese, set in 1995, is an 8-hour time-weighted average of 0.2 mg/m[3].  In 2003, the ACGIH issued a "notice of intended change (NIC)" to lower the TLV for respirable manganese to 0.03 mg/m[3], but this change was never ratified.  In October of 2008, the ACGIH issued a draft NIC to lower the TLV for respirable manganese to 0.02 mg/m[3], and this change is pending.

[109]  *Id.* at 27.

[110]  *See* trial tr. at 2931-32 (Feb. 27, 2008) (quoting a Russian article – Eyso, *Clinical Aspects of Manganese Intoxication in Electric Welders* (1966) – as stating: "Just ten years ago [1955], the question of the possibility of chronic manganese intoxication in electric welders was the subject of heated discussion.  Now such a possibility is already generally accepted.").

[111]  American Welding Society, *"Effects of Welding on Health,"* at xix (1979) (trial exh. 190). The Franklin Research Center prepared this literature review for the AWS Safety & Health Committee, and the review was overseen by the AWS Research Committee and Research Finance Committee.  Employees of defendants were members of these committees.

Although no data on the prevalence of parkinsonism in welders are available, there is a concern that some cases of manganese poisoning could be mistakenly diagnosed as Parkinson's disease.   Further investigations may be warranted."[112]

In 1979, largely in response to two lawsuits, the AWS adopted a new, mandatory, industry-wide warning label, which stated, in pertinent part:

> **FUMES AND GASES** can be dangerous to your health.
> •      Keep your head out of fumes.
> •      Use enough ventilation or exhaust at the arc or both.
> •      Keep fumes and gases from your breathing zone and general area.
> * * *
> See American National Standard Z49.1, "Safety in Welding and Cutting,"
> published by the American Welding Society.

As before, this warning contained no language specifically addressing: (1) the danger of *permanent neurological harm* from manganese in welding fumes; or (2) under what circumstances the "ventilation or exhaust at the arc" was "enough."   Indeed, although the AWS considered including some language regarding the possible consequences of inhaling welding fumes, this language was rejected.[113]

In 1980, commenting on another welding fume lawsuit that was widely discussed within the industry, one manufacturer wrote the following summary: "[the plaintiffs] complained of the fumes for 3 weeks, then came down with symptoms of manganese poisoning.   They have severe neurological damage which . . . is doubtless due to the welding in a confined area with the Hadfield Manganese rods.

---

[112] *Id.* at 29.

[113] *See* trial tr. at 2006-12 (Feb. 21, 2008) (noting that the AWS considered including the warning language that "Breathing excessive amounts of welding fumes and gases can harm your health and may lead to disability," but did not do so because various manufacturers objected strongly to the last four words).

The damage is irreversible – these guys are impaired for life."[114]  Addressing this and other lawsuits, the AWS Safety & Health Committee, in 1981, "discussed the fact that some cases of manganism have been documented at levels below 5 milligrams per cubic meter and that this was the reason that the current [TLV] was lowered to 1 milligram per cubic meter."[115]

In 1985, the Secretary of Labor promulgated the Hazard Communication Standard ("HazCom Standard"), which, among other things, directed product manufacturers to "ensure that each container of hazardous chemicals leaving the workplace is labeled, tagged or marked with . . . [the] [i]dentity of the hazardous chemical(s); [and] [a]ppropriate hazard warnings."[116]  The Secretary further defined an "appropriate hazard warning" as one that "convey[ed] the specific physical and health hazard(s), including target organ effects, of the chemical(s) in the container(s)."[117]  The AWS's Safety & Health Committee met and discussed the HazCom standard shortly after it was issued.  Lincoln Electric's representative explained to the Committee the new HazCom requirements as follows: "Hazard Communication – Additional Warning Label Requirements: Ken Brown called attention to the added OSHA requirement to include hazard notification on the Label, as well as the MSDS, for certain chemicals.  In addition, target

---

[114]  Teledyne memorandum from D. Kotecki to W.T. Delong at 1 (Mar. 4, 1980) (trial exh. 498). The memorandum added that "Hadfield manganese electrodes and wires should carry an extra warning of the dangers of this type of welding."  *Id.*

[115]  AWS Safety & Health Committee meeting minutes at 5 (May 20, 1981) (trial exh 1647).  *See also* letter from Damien Kotecki (employee of manufacturer TDY and later Lincoln) to the AWS at 2 (Apr. 1, 1980) (trial exh. 60) ("[m]anganese fumes have been shown to cause severe neurological damage"). In 1992, an internal ESAB memorandum also acknowledged the same hazard, stating: "Once [welding rods] are used in an electric arc, they can liberate respirable manganese fumes.  * * *  Manganese fumes are of serious concern.  The irreversible neurological damaged produced by chronic overexposure to manganese fume is tragic.  You are wise to be concerned."  ESAB memorandum from George Barnes to William Esch (Feb. 24, 1992) (trial exh. 260).

[116]  29 C.F.R. §1910.1200(f)(1).

[117]  *Id.* §1910.1200(c).

organ information if known should be put on the label (e.g., manganese can cause nervous system damage.)."[118]  In the wake of the new federal HazCom Standard, however, no defendant added this known target organ information to their warning labels.

As noted above in footnote 108, the TLV for manganese promulgated by the ACGIH has dropped over time.  When first published in 1948, the TLV was an 8-hour time-weighted average of 6.0 mg/m$^3$; it was dropped in 1960 to 5.0 mg/m$^3$; dropped again in 1979 to 1.0 mg/m$^3$; and then dropped again in 1995 to 0.2 mg/m$^3$.  These reductions in the manganese TLV reflect a consensus among industrial hygienists that the more that is known regarding the toxicity of manganese, the lower the exposure limits must be set to ensure "no adverse health effects," and particularly to protect against brain damage.[119]  Of course, the lower the TLV of a given substance, the more difficult – and expensive – it becomes to ensure workers' exposures do not exceed it.

In 1994, members of the American Welding Society ("AWS") met to discuss the then-proposed reduction of the manganese exposure TLV from 1.0 to 0.2 mg/m$^3$.  The AWS meeting minutes state that defendant Lincoln "estimated that if the TLV is lowered to 0.2 milligrams per cubic meter, then the overall welding fume limit . . . would be exceeded in most workplace atmospheres."[120]  Similarly, AWS-member Caterpillar wrote a letter to the Ferroalloys Association in 1995 arguing against reduction of the TLV, because "approximately 50% [of Caterpillar welders] would be over exposed to manganese at [a TLV] of

---

[118]  AWS Health & Safety Committee Meeting Minutes at 4 (June 17, 1987) ( (trial exh. 567).

[119]  When the ACGIH lowered the manganese exposure TLV to 0.2 mg/m$^3$ in 1994, it explained to defendant Lincoln that "the available data indicate that a TLV of 0.2 mg/m$^3$ is needed to prevent progressive neurological changes in workers exposed to manganese."  Letter from ACGIH's Ronald Ratney to Lincoln's Kenneth Brown at 1 (Jan. 3, 1995) (trial exh. 215).  As explained in footnote 43 above, each time the ACGIH lowered the 8-hour time weighted average TLV for manganese, it also lowered the "ceiling amount" TLV-C for manganese by the same ratio.

[120]  AWS Fumes and Gases Committee meeting minutes at 3 (Oct. 4, 1994) (trial exh. 920).

0.2."[121]  Caterpillar noted that, if the TLV was lowered to 0.2 mg/m³, the only way to ensure its workers were not subjected to excessive manganese levels would be to provide welding fume extraction systems and/or respirators, which would come at substantial expense.[122]  On behalf of the AWS, Lincoln wrote to the ACGIH objecting to the proposed reduction of the TLV to 0.2 mg/m³.[123]

Despite the fact that the ACGIH did, in fact, later reduce the manganese TLV to 0.2 mg/m³, none of the defendants changed their warning language.  After the reduction of the TLV, the AWS Committee on Fumes and Gases explicitly recognized, once again, that the new limit will "be exceeded in most workplace atmospheres."[124]  But neither Caterpillar nor the "entire welding industry" has ever warned or required welders to wear respirators as a matter of routine.

The evidence adduced at trial showed that, to at least some extent, the defendants (and the trade organizations to which they belong) continue today to refrain from warning explicitly about the danger of permanent brain damage.  Even though virtually all of AWS's more recent health and safety publications touch upon the harmful effects of manganese fume exposure, many do not mention the degree to which manganism can be debilitating.  For example, a 2003 AWS welding safety publication entitled

---

[121]  Letter from H.K. Thompson to Edward Kinghorn at 1 (Feb. 17, 1995) (trial exh. 33). Caterpillar's statement that about half of its workers would be overexposed if the TLV was lowered to 0.2 mg/m³ was based on "over 2400 personal samples taken in the breathing zone of [Caterpillar] welder[s]." *Id.*

[122]  *Id.*  "Fume extraction" involves a mechanism to capture fumes at their source, using vacuum suction near the weld itself.  In comparison, general room ventilation exhausts fumes only to the same extent as the air turn-over of the ambient environment.

[123]  *See* Letter from Ken Brown (Lincoln/AWS) to Ronald Ratney (ACGIH) (Dec. 16, 1994) (trial exh. 31); Letter from Ronald Ratney to Kenneth L. Brown (Jan. 3, 1995) (trial exh. 215).

[124]  AWS Project Committee on Fumes and Gases Meeting Minutes at 2 (Oct. 18, 1995) (trial exh. 1023).

"Fumes and Gases" has a section addressing "Possible Effects of Overexposure."[125]  This section states that "manganese overexposure can affect the central nervous system resulting in impaired speech and movement."[126]  The Fact Sheet does not make mention of the information contained in the 1970 Battelle survey, that "fumes from manganese are highly toxic, and they can produce total disablement even after exposures as short as a few months to high-fume concentrations."  Nor does the Fact Sheet state that symptoms of this disablement are "similar to Parkinson's syndrome," get worse with time, can be permanent, and may be commonly mis-diagnosed.

More to the point, most of the warnings affixed today by the defendants to their welding consumables also continue not to disclose the risk of permanent brain damage.  The only defendant that has strengthened its warnings to reflect this information is ESAB.  Specifically, in 2006, ESAB began including the following language in the warnings attached to some of its welding consumables: "Overexposure to manganese and manganese compounds above safe exposure limits can cause irreversible damage to the central nervous system, including the brain."[127]  This warning appeared about five years after Mr. Jowers began experiencing his first symptoms of neurological disease.

---

[125]  AWS Safety & Health Fact Sheet No. 1 (2003) (trial exh. 84).

[126]  *Id.* at 1.

[127]  *See* trial tr. at 2921-22 (Feb. 27, 2008) (reading this warning).

40

**2.      Scientific Studies of Welding Fume Toxicity.**

The evidence at trial showed it is no coincidence that, over the past 75 years, the number of studies and articles published in the medical and scientific literature regarding welding fume toxicity mirrors the number of welding fume lawsuits that have been filed around the country.  Thus, until about 10 years ago, a literature review reveals only a few scientific studies and articles directed specifically at welding fume neurotoxicity and the biological mechanisms involved in transporting manganese through the human body.  In contrast, since the 2003 inception of this MDL, there have been published dozens, if not hundreds, of such papers.  And many of the authors of these papers have received funding from the parties, especially from the defendants.

There is no evidence that the defendants or the welding consumable manufacturing industry ever considered, much less undertook, a medico-scientific study of the effects of welding fumes on welders before the late 1970s.  In 1978, however, the defendants, acting through their trade group, broached the subject of doing formal research on the toxicity of welding fumes.  Specifically, in 1978, the AWS Safety & Health Committee discussed undertaking a prospective epidemiological study of mild steel welding.[128] The AWS envisioned that this prospective epidemiological study would examine welders' risks of suffering chronic lung disease, cancer, and eye injuries; there was no mention initially of examining the risk of neurological injury.  In a follow-up meeting in 1979, however, an AWS member commented on the then-existing draft of AWS's request for proposal ("RFP") to the Franklin Institute, as follows:

> Mr. Kinser observed that in mild steel welding a significant amount of manganese appears in the fume.  In view of the several court cases alleging manganese poisoning, it would seem appropriate to include some kind of neurological examination to indicate the

---

[128]   *See* trial tr. at 1953 *et seq.* (Feb. 21, 2008) (testimony of AWS representative regarding this prospective study).

possible connection with manganese exposure in the epidemiological study.[129]

Ultimately, "the proposed epidemiological study [was] shelfed [sic] because of lack of funds for this project."[130]

More recently, both the plaintiffs and the defendants have funded a number of scientific papers and medical and epidemiological studies addressing the bioavailability and toxicity of welding fumes, and the question of whether welders suffer disproportionately from movement disorders.  In 2005, the Court cited a number of such papers and studies in a *Daubert* opinion that addressed the question, among others, of whether "the sum of the epidemiological and other evidence proffered by the parties [is] sufficiently reliable to support the assertion that exposure to welding fumes can cause, contribute to, or accelerate a parkinsonian syndrome that some doctors will diagnose as [Parkinson's Disease]?"[131]   (The Court concluded that, "at least in the abstract as the question is presented here, the answer is yes.")[132]  Subsequently, the Court relied on these same studies to conclude that "[t]he evidence so far presented is sufficiently reliable to support the assertion that exposure to *low-manganese* welding fumes can cause, contribute to, or accelerate *a movement disorder*, including a parkinsonian syndrome that some doctors will diagnose as [Parkinson's Disease]."[133]  And, in the few years since the Court issued these opinions, a large number of additional studies and articles examining the relationship between welding fume

---

[129]  AWS Safety & Health Committee meeting minutes at 4 (March 19, 1979) (trial exh. 10).

[130]   AWS Subcommittee on Fumes and Gases meeting minutes at 2 (Mar.  2, 1982) (trial exh. 1648).  Dr. Ward also testified that the study did not take place due to lack of available funding.  Ward depo. at 276 (June 15, 2005).

[131]  *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *36 (N.D. Ohio Aug. 8, 2006).

[132]  *Id.*

[133]  *Ruth v. Lincoln Elec. Co.*, case no. 04-CV-18912, docket no. 183 at 30-31 ( N.D. Ohio Feb. 7, 2006) (emphasis added).

exposure and development of movement disorders have appeared.

Indeed, a great number of these articles and studies have been produced by authors who received funding from the defendants.  The full extent to which defendants have provided such funding was revealed only recently, during the course of Mr. Jowers' trial; in response to a Discovery Order, the defendants furnished charts showing payments to several dozen "authors of authoritative articles and studies used during trial" totaling about $13 million.[134]  Plaintiffs' counsel produced a chart showing they made similar payments to a dozen authors totaling about a half million dollars.

At trial, the parties' expert witnesses discussed many of these papers and characterized the state of the scientific research.  For example, defense expert neurologist Dr. Anthony Schapira testified that "the vast majority of [the epidemiological] studies have shown that people exposed to manganese are not at an increased risk for developing neurological injury."[135]  Similarly, defense expert toxicologist Dr. Brent Furbee quoted and agreed with a study that concluded: "there is an absence of reliable exposure and epidemiology studies to support a causal association between clinical neurotoxicity and exposure to manganese during welding."[136]  And plaintiffs' public health expert Dr. David Burns conceded that "there is some epidemiologic work from other countries and a study in the U.S. that looks at medical records, and those medical records don't show an increased frequency of movement disorder in welders."[137]

In opposition, however, Dr. Burns further testified that both the U.S. Public Health Service ("US-PHS") and the United Nations World Health Organization ("UN-WHO") have drafted "consensus

---

[134]  *In re Welding Fume Prods. Liab. Litig.,* 534 F.Supp.2d 761, 762 (N.D. Ohio 2008).

[135]  Trial tr. at 2336 (Feb. 25, 2008).

[136]  *Id.* at 1713 (Feb. 20, 2008).

[137]  *Id.* at 522  (Feb. 11, 2008).

documents" regarding the toxicity of manganese and welding fumes; the US-PHS concluded that "manganism, which is the disease, the toxicity produced by overexposure to manganese, damaging neurologic illnesses caused by manganese, has been documented in welders," while the UN-WHO concluded in 1981 that "[c]hronic manganese poisoning is a hazard in the mining and processing of manganese ores, in the manganese alloy and dry-cell battery industries, and in welding."[138]  Further, defense expert Dr. Schapira conceded that, despite what the epidemiological studies have concluded, "manganese exposure can cause parkinsonism" and he was "aware of reports of manganism in welders."[139] Two other defense expert neurologists, Dr. Howard Hurtig and Dr. Anthony Lang, believe it has been proven that manganese in welding fumes can enter a welder's blood stream, accumulate in his brain, and cause brain damage leading to Manganese-Induced Parkinsonism.[140]  Medical treatises on neuro-degenerative disease state as a simple, accepted fact that "chronic industrial low-level exposure [to manganese] causes the development of manganism, which is characterized by tremor, bradykinesia, and dystonia,"[141] and also that "[e]pidemiological investigations and experiments with *in vitro* models suggest that adverse effects may occur following exposure to very low manganese concentrations."[142]

---

[138] *Id.* at 500-07 (Dr. Burns summarizing the US-PHS study and quoting the UN-WHO study); *see* trial exh. 1547 (UN-WHO study); *see also* trial tr. at 582 (quoting from page 50 of the US-PHS study: ""Manganism has been documented in welders and in workers exposed to high levels of manganese dust or fumes in mine and foundries.").

[139] *Id.* at 2242 (Feb. 25, 2008).

[140] *Id.* at 620-21 (Feb. 11, 2008).  Dr. Hurtig added that he has seen such cases himself.

[141] *See* trial tr. at 2929-30 (Feb. 27, 2008) (quoting Clark & Trojanowski, *Neurodegenerative Diseases* at 10 (2000)).  "Bradykinesia" means slowness of movement, while "dystonia" refers to involuntary, sustained muscle contractions, which result in abnormal postures and twisting motions.

[142] *Id.* at 2931 (quoting Smargiasi & Mutti, "Peripheral Biomarkers and Exposure to Manganese," 20 *Neurotoxicology* 401, 401 (1999)).

### 3.    Government and Industry Standards.

The trial evidence of government and industry standards applicable to warnings about welding fumes was as follows.  The federal government, acting in two different roles, has issued requirements regarding the warnings that are attached to welding consumables.  First, acting in the role of protecting the health and welfare of the Nation's workers, the Secretary of Labor has promulgated regulations requiring manufacturers to include certain minimum warnings about welding consumables.  Second, acting in the role of purchaser of materials to build ships for the United States Navy, the Naval Sea Systems Command ("NAVSEA") has issued specifications describing the warnings that must be attached to welding consumables.

Regarding the first role: In 1970, Congress enacted the Occupational Safety and Health Act ("OSH Act").[143]  The purpose of the OSH Act was "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources."[144]  Among other mechanisms to achieve this purpose, Congress "authoriz[ed] the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce."[145]  On June 27, 1974, the Secretary used this authority to promulgate safety regulations governing "welding, cutting, and brazing."[146]  In particular, the Secretary put forth the following mandate: "suppliers of welding materials shall determine the hazard, if any, associated with the use of their materials in welding, cutting,

---

[143]  29 U.S.C. §651 *et seq.*

[144]  29 U.S.C. §651(b).

[145]  *Id.* §651(b)(3).

[146]  *See* 39 Fed. Reg. 23502, 23738-50 (June 27, 1974) (promulgating 29 C.F.R. §1910.252).

etc." The Secretary further ordered: "All filler metals and fusible granular materials shall carry the following notice, as a minimum, on tags, boxes, or other containers:

> CAUTION
> Welding may produce fumes and gases hazardous to health. Avoid breathing these fumes and gases. Use adequate ventilation. See ANSI Z49.1-1967 Safety in Welding and Cutting published by the American Welding Society.[147]

This language, of course, was the exact same warning that the entire welding consumable manufacturing industry, including defendants, had voluntarily adopted as their own mandatory warning in 1967. Although, as discussed above, the entire industry later adopted a new, longer warning in 1979, the Secretary of Labor has not issued an updated regulation to change the mandatory "minimum" warning language.[148]

Regarding the second role: The government agency responsible for designing, engineering, building, and supporting the United States Navy's fleet of ships, submarines, and related combat systems is NAVSEA. This responsibility includes issuance of military specifications, or "MIL-specs," that govern the materials used to build these naval structures. At trial, the parties introduced a number of MIL-specs applicable to various types of welding consumables. Section 5 of each MIL-spec addressed "Packaging," and contained a subsection mandating that packages be "marked or labeled" with certain warnings. As an example, one MIL-spec issued in 1981 stated:

> Shipment marking information for electrodes shall be provided on interior packages in accordance with the manufacturer's commercial practice. * * * In addition, each coil with liner, spool, or drum shall have the following warning label, or equivalent, permanently

---

[147]  *Id.* at 23748 (promulgating 29 C.F.R. §1910.252(f)(1)(v)(a)). The 1967 version of ANSI Standard Z49.1 is 67 pages long, not including table of contents or appendices. "ANSI" refers to the American National Standards Institute, and "Z49.1-1967" refers to the 1967 version of their "Standard Z49.1," entitled "Safety in Welding, Cutting, and Allied Processes."

[148]  Due to re-numbering of subsections over the years, the current regulation is at 29 C.F.R. §1910.252(c)(1)(iv)(A) (2008).

affixed . . . in a prominent position and in legible type. * * * :

WARNING: Protect yourself and others.  Read and understand this label.

FUMES AND GASES can be dangerous to your health.  * * *
- Keep your head out of the fumes.
- Use enough general ventilation or exhaust at the arc or both to keep fumes and gases from your breathing zone and the general area.

* * *

See American National Standard Z49.1, "Safety in Welding and Cutting," published by the American Welding Society.  * * *[149]

This warning language was virtually the same as the language the entire welding consumable manufacturing industry, including defendants, had voluntarily adopted as their own mandatory warning in 1979.  Thus, as with the Secretary of Labor's regulations, NAVSEA's MIL-specs simply mandated that welding consumable manufacturers use the warning language they had already adopted as an industry standard.

---

[149]  MIL-spec MIL-E-24403A(SH), §5.3.1 (Dec. 21, 1981) (trial exh. 2065 at 13).

C.      Analysis of Defendants' Arguments.

Having set forth the relevant evidence, the Court now returns to defendants' three arguments as to why they are entitled to judgment as a matter of law on Mr. Jowers' claim for punitive damages.

1.      Defendants Made "Some Effort" to Warn.

The argument defendants assert most strongly is that "manufacturers cannot be liable for punitive damages where they make some effort to warn about possible hazards associated with the use of their products."[150]  Defendants insist, essentially, that because they provided *some* warning, they cannot be liable for punitive damages as a matter of law, even if the jury determines that the warning they did provide was inadequate.

Defendants cite several cases where the court held that, because the defendant-manufacturer provided some warning of the hazard that injured the plaintiff, an award of punitive damages was inappropriate as a matter of law.  In *General Motors Corp. v. Sanchez*,[151] for example, the plaintiff was killed after his parked, idling truck "mis-shifted" into reverse and pinned him.  The truck manufacturer had specifically warned that "It can be dangerous to get out of your vehicle if . . . your shift lever is not fully in "P" (Park) . . . .  Your vehicle can roll.  If you have left the engine running, the vehicle can move suddenly."[152]  The manufacturer had also given five separate precautions in the owner's manual on how to avoid gear migration.  The Texas Supreme Court noted that "[i]t is not necessary to know the specific engineering facts about hydraulic neutral to appreciate that a vehicle can be shifted into something less

---

[150]  Motion at 1 (docket no. 445).

[151]  997 S.W.2d 584 (Tex. 1999).

[152]  *Id.* at 597.

than full Park," and held that the defendant was not required to "use[] the best warning imaginable."[153] The court then reversed the jury's punitive damage award because "the evidence of conscious indifference is not legally sufficient to support the gross negligence finding."[154]

Similarly, in *Richards v. Michelin Tire Corp.*, the plaintiff sued "for injuries sustained from the explosion of a 16-inch Michelin tire that [he] was attempting to mount onto a 16.5-inch rim."[155] The sidewall of the tire contained the warning: "Mount only on approved 16-inch rims."[156] The appellate court observed that, "[w]hile it may be difficult to define the exact point at which the probability of harm is sufficient to support a jury's finding of wantonness, courts and juries must attempt to discern that line in light of the fact that wantonness is distinct from negligence and punitive damages are meant 'to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future.'"[157] The court concluded that, "while more could have been said or done, [defendant's] conduct cannot be seen as wanton."[158] Accordingly, the court reversed a jury award of punitive damages, stating it had "repeatedly held that the issue of punitive damages should not go to the jury when a manufacturer takes steps to warn the plaintiff of the potential danger that injured him; such acts bar a finding of

---

[153] *Id.* at 597-98.

[154] *Id.* at 598.

[155] 21 F.3d 1048, 1050 (11th Cir. 1994), *cert. denied*, 513 U.S. 1111 (1995).

[156] *Id.* at 1051.

[157] *Id.* at 1058-59 (quoting *Salter v. Westra*, 904 F.2d 1517, 1526 (11th Cir. 1990)).

[158] *Id.* at 1058 n.20.

wantonness."[159]  The *Richards* court repeatedly cited *Toole v. McClintock*, a breast implant case where the punitive damages award was reversed because: "[1] the warning describe[d] the main harms that [the plaintiff] . . . actually suffered . . . and [2] the warning forecasted the way she came to suffer these harms."[160]

Finally, defendants cite *Dudley v. Bungee Int'l Mfg. Corp.*,[161] where the plaintiff used a bungee cord to attach a tarp to a trailer; when the plaintiff stretched the cord taut, the hook holding the tarp straightened and released, the cord snapped back, and the hook struck the plaintiff in the eye.  The jury returned a verdict awarding the plaintiff compensatory and punitive damages, and the court affirmed the former but reversed the latter, reasoning as follows:

> The warning that Bungee placed on the bag shows that it exercised some care for the safety of others.  Bungee's warning was as follows:
>> 1. CORD IS STRETCHED TOO FAR.  Do not use BUNGEE when stretch will be greater than Seventy Five (75%) Percent of its stretchable length.  Stress on anchor points is increased many times as the cord approaches its maximum stretch limit, possibly resulting in failure of either fastener and dangerous rebound.
> This warning, at least in general terms, warned others of the dangers of stretching the cord too far.  It is undisputed that Dudley had to stretch the cord over seventy-five percent of its stretchable length before the cord's hook would bend. Thus, since Bungee warned of the potential danger that injured Dudley, it exhibited some care for his safety.  Because Bungee exercised some care for the safety of others, an award of punitive damages was not

---

[159]  *Id.* at 1059.  *See also Kritser v. Beech Aircraft Corp.*, 479 F.2d 1089, 1097 (5th Cir. 1973) (affirming a trial court's refusal to submit the issue of punitive damages to the jury because the defendant had warned that a certain flight maneuver could be dangerous "in some circumstances," but did not define them; given that "the company took [some] steps to inform [plaintiff] of [the] potential danger" *of that flight maneuver* ("prolonged operation in a slip or skid attitude under low fuel conditions"), "there [was] no evidence that [the defendant] committed any wilful act or omission").

[160]  999 F.2d 1430, 1436 (11th Cir. 1993).

[161]  1996 WL 36977 (4th Cir. Jan. 31, 1996).

warranted under a failure to warn theory.[162]

The *Bungee* court explicitly distinguished another case it had recently decided*, Benedi v. McNeil-P.P.C., Inc.*,[163] where "the plaintiff's liver was injured by acetaminophen toxicity, which is caused by combining acetaminophen with alcohol."[164]  The *Bungee* court observed that, in *Benedi*, "[a]lthough the defendant had placed a warning on its product (Tylenol), the warning failed to warn, even in general terms, of the danger of combining alcohol and acetaminophen. Thus, unlike this case, the defendant showed no concern for the safety of those in the plaintiff's position."[165]

The general rule that may be derived from these cases is that giving "some warning" that a product may be hazardous *generally* – as did the *Benedi* defendant – is not the same as giving "some warning" about the *particular, known hazard* that injured the plaintiff – as did the *Sanchez*, *Richards*, and *Dudley* defendants.  In *Benedi*, the defendant gave some warning that the product could be hazardous, but gave no warning about the *particular* hazard that injured the plaintiff.  In contrast, in *Sanchez*, *Richards*, and *Dudley*, the defendants warned the plaintiff about the *particular* hazard that actually injured him.  In the latter three cases, even though the particular hazard was identified for the user, the warning was found inadequate; but because the particular hazard was identified, this inadequacy could not support a finding of a wanton or reckless disregard for the safety of others.  If a warning *fails completely to mention a known*

---

[162]  *Id.* at *3.

[163]  66 F.3d 1378, 1383 (4th Cir. 1995).

[164]  *Bungee*, 1996 WL 36977 at *3 n.8.

[165]  *Id.*

*hazard*, however, a jury may reasonably award punitive damages.[166]

In this case, the defendants did not give any warning at all about the particular danger that Mr. Jowers actually met – brain damage.  For the first seven years of Mr. Jowers' career, the defendants warned only that welding could "produce fumes and gases hazardous to health," urged him to "[a]void excessive breathing of these fumes and gases," and told him to "[u]se adequate ventilation."[167]  This warning made no mention at all of "the main harm[] that [Mr. Jowers] . . . actually suffered."[168]  The same is equally true of the defendants' 1979 warning, which again stated in only the most generic terms that "fumes and gases can be dangerous to your health."  There was sufficient evidence for a jury to conclude that defendants knew inhaling welding fumes could cause neurological injury, but made no mention of it.

Importantly, when the defendants issued their warnings, it was common knowledge among welders that inhaling welding fumes could sometimes cause "metal fume fever," a temporary illness characterized by "chills, fever, upset stomach, vomiting, irritation of the throat, and aching of body," recovery from

---

[166] The same analysis applies to *Kritser*, 479 F.2d at 1097, discussed briefly in footnote 159, above, where the defendant supplied "some warning" about the particular, known hazard that injured the plaintiff – "prolonged operation in a slip or skid attitude under low fuel conditions."  Two other cases cited by defendants (in a brief addressing punitive damage claims in another MDL case) are distinguishable or inapposite, offering at best only comments-in-passing in dicta.  *Messer v. Amway Corp.*, 210 F.Supp.2d 1217 (D. Kan. 2002), *affirmed*, 2004 WL 1776004 at *9 (10th Cir. 2004) (summary judgment granted to defendant on punitive damage claim but only after summary judgment granted on all underlying warnings claims); *Myerhoff v. Michelin Tire Corp.*, 852 F. Supp. 933, 942 (D. Kan. 1994), *affirmed*, 70 F.3d 1175, (10th Cir. 1995) (court granted defense motion for j.n.o.v on underlying warnings claim and did not allow question of punitive damages to go to jury).

[167] Although the standard industry warning adopted in 1967 by the American Welding Society used the phrase "avoid breathing these fumes and gases," defendant Airco/BOC's labels stated "avoid *excessive* breathing of these fumes and gases," while defendant Lincoln's labels stated "avoid breathing *concentrations* of these fumes and gases."  *See* trial exhs. 5487, 2055 (emphasis added).

[168] *Toole*, 999 F.2d at 1436.

which "is generally complete within 48 hours of the overexposure."[169]  In contrast to this common

knowledge, many of defendants' *own witnesses* (including welding instructors) testified they did not know

that welding fumes could cause permanent brain damage, and defendants' warnings gave no hint that the

health danger caused by "fumes and gases" could be egregiously worse than simply the symptoms of metal

fume fever.  As plaintiffs' expert witnesses testified, and as common sense suggests, a warning that

inhaling fumes can cause permanent brain damage is more likely to change the product-user's behavior

than would a generic warning that the fumes are hazardous to health – especially when the user has reason

to believe that the principal health risk of inhaling the fumes is just temporary lung irritation, fever, and

headaches.  Given the substantial evidence discussed above that defendants knew of the risk that inhaling

welding fumes could cause brain damage, the jury was not unreasonable when it concluded that defendants

were reckless for failing to warn of it.  Like the Tylenol warning in *Benedi*, defendants' warnings in this

case provided some warning of some hazard, but did not mention the specific, known danger that actually

injured the plaintiff.

　　Furthermore, the evidence at trial was sufficient to permit reasonable jurors to conclude that

defendants' warnings did not give explicit precautions on *how* to avoid the dangers of welding fumes –

including, even, how to avoid metal fume fever.  Plaintiffs' experts testified that, although the warnings

direct the welder to obtain "adequate" ventilation and to avoid "excessive" fumes and "concentrations"

of fumes, the warnings do not define these terms, do not explain how to ensure that ventilation is

"adequate," do not quantify when fume levels are "excessive" or "concentrated."  As plaintiffs pointed out

---

[169]  Hobart MSDS No. TRTW for Tubular Arc Welding Electrodes at 4 (July 1999) (trial exh. 2048); *see* Lincoln Electric MSDS No. US-M349 for AWS E11018M electrodes at 2 (Mar. 15, 1993) (trial exh. 2059) (noting that "short term (acute) overexposure to welding fumes may result in discomfort such as metal fume fever").

during trial, a widely-used, authoritative treatise on warnings – Wogalter's *Handbook of Warnings* –

condemns the very language used by defendants as a textbook example of how *not* to warn.[170]

Specifically, the Handbook states:

> *Instructions*. Warnings should instruct people about what to do or not do. Like the
> other statements, the instructions should be specific, telling exactly what should be done
> or avoided. A classic nonexplicit warning statement is "Use with adequate ventilation."
> Unfortunately, this common statement in warnings is inadequate to apprise people of what
> they should do. Does this statement mean open a window, two windows, use a fan, or
> something more technical in terms of volume of air flow per unit [of] time? Without more
> information, users are left making inferences that may be partly or wholly incorrect.
>
> *Consequences*. Consequences information concerns what could result. * * *
>
> A common shortcoming of warnings is that consequences information is not
> explicit, that is, it is lacking important specific details. The statement "May be hazardous
> to your health" in the context of a toxic vapor hazard is insufficient by itself as
> consequence information because it does not tell whether it results in minor throat irritation
> and coughing or something more severe (e.g. permanent lung damage). . . . [A]wareness
> of severe consequences can also be a factor in motivating compliance behavior.[171]

Again, there was substantial evidence presented to the jury that the defendants *knew the importance*

*of including explicit directions on how to avoid a hazard*, and of including consequence information in

a warning, but chose not to do so. Industry documents discussing the content of the defendants' warnings

acknowledged precisely these points. For example, in 1979, the American Welding Society's Task Group

on Warning Labels noted that a warning must identify clearly the products' hazards, "how to avoid" the

hazards, and the "consequences" of a failure to avoid.[172]  Similarly, in 1979, the National Electric

Manufacturers Association's Ad Hoc Committee on Warning Labels observed that "[a]n adequate warning

must motivate a reasonable user to observe its terms by putting the user on notice of the possible

---

[170] Defendants' own warnings expert, Dr, Eric Shaver, co-wrote a chapter in Michael S. Wogalter,
*Handbook of Warnings* (2006), and described the *Handbook* as the "main resource" in the field.

[171] Wogalter's *Handbook of Warnings* at 56 (2006) (trial exh. 5433c).

[172] AWS A5 Task Group on Warning Labels Meeting Minutes at 3 ( Mar. 7, 1979) (trial exh. 128).

consequences of disregarding the warning."[173]  In 1985, the AWS Safety and Health Committee received

a letter from one if its own members asserting that "[t]he current labeling practice . . . does not address the

'appropriate hazard warning' as required by OSHA 29 C.F.R. § 1910.1200.  The current label says 'Fumes

and Gases can be dangerous to your health.'  This statement is too vague to be a meaningful warning."[174]

Even as late as 2002, defendant ESAB acknowledged that its MSDS, under the heading "Effects of

Chronic  (Long-Term) Overexposure," "fails to highlight the 'irreversible' nature of the symptoms;

therefore, it is not a complete statement of the potential damage."[175]

Despite this internal recognition of the importance of explicit avoidance instructions and

consequence information, defendants did not include any such language in their warnings.  Accordingly,

there was ample evidence upon which a jury could conclude that the defendants failed to provide even

"some warning" about the critical, known hazard of brain damage that Mr. Jowers actually suffered.

In addition, there was ample evidence upon which a jury could conclude – clearly and convincingly

– that the defendants' failure exhibited a willful, wanton, or reckless disregard for the safety of others,

because the defendants knew that exposure to welding fumes can cause brain damage.  As summarized

above, many documents reflect defendants' own knowledge, dating back several decades, that: (1) welding

---

[173]  NEMA Ad Hoc Committee on Warning Labels Meeting Minutes at 5 (Jan. 11, 1979) (trial exh. 123).

[174]  Letter Ballot from Marv Kennebeck to AWS Safety and Health Executive Committee (Jan. 4, 1985) (trial exh. 207).

[175]  Internal ESAB memorandum from Mario Amata to Stan Ferree (Nov. 18, 2002) (trial exh. 274). The MSDSs used by the other defendants also gave little or no hint that the symptoms of overexposure to manganese were more than transient.  *See, e.g.,* ESAB/Alloy Rods Atom Arc MSDS (1993) (trial exh. 3318) ("Short-term (acute) overexposure to welding fumes may result in discomfort such as: dizziness, nausea, or dryness or irritation of nose, throat, or eyes"); Airco/BOC 11018M MSDS (1979) (same); Lincoln E7018 MSDS (1999) (trial exh. 3109) ("Manganese overexposure can affect the central nervous system resulting in impaired speech and movement").

fumes can be neurotoxic, (2) welders often experience fume exposures above levels identified by national associations of industrial hygienists as safe; (3) welders can and have suffered permanent brain damage due to welding fume exposure, and (4) this brain damage can be mis-diagnosed as Parkinson's Disease. This knowledge is reflected in early 20th century industrial hygiene publications; in the widely-distributed 1970 Battelle Survey, which was sponsored by industry trade group AWS; in defendants' own, more-recent internal memoranda; and in numerous letters written by and to defendants and to AWS and NEMA committees of which they were members.

Further, there is evidence upon which a jury could reasonably conclude that defendants chose to hide or minimize the danger of welding fume neurotoxicity, rather than give welders notice. As an example, after the defendants first began using the 1967 warning, the AWS appointed a "task force . . . to prepare an article slanted toward reassuring the users that the health hazards are minimal and thus allaying suspicions of some new evidence or change in the extent of hazards, as a result of the appearance of these warning labels." Defendant Lincoln adopted a policy of placing the warning on the container, knowing that "many welders using the electrode will never see the container and will therefore never see the warning label."[176] And defendants and their trade group undertook similar efforts after the Battelle Survey reported that overexposure to manganese in commonly-used welding fumes could cause permanent neurological damage.

Plaintiffs' warnings expert, Dr. Robert Cunitz, discussed these efforts and, citing Wogalter's *Handbook of Warnings*, called them "anti-warnings." The *Handbook* explains:

---

[176] As plaintiffs pointed out at trial, the small size of the print on the defendants' warnings, and their placement on the bottom of the containers, may also be seen as evidence of efforts to "soften the impact" of the warning. *See* trial tr. at 838 (Feb. 12, 2008) (Robert Jowers testifying that "[w]e used to laugh at [the warning label] because it was so small.").

> Several case studies are presented that show that some industries have used two strategies to soften the feared impact of adequate warnings on product sales.  The first is to warn inadequately.  This can be done through not warning at all, voluntarily adopting a weak warning, influencing the content of industrywide voluntary warnings (such as American National Standards Institute standards), or lobbying government and regulators to mandate warnings that misrepresent true product risk.  The second strategy is to produce media that deliberately misrepresent dangerous products as safe in order to contradict or eviscerate true warnings.  These can include, for example, training materials, advertisements, or promotional materials that project an image of safety for what is in actuality a dangerous product or material.  We call these *anti-warnings.*[177]

A jury could reasonably conclude that defendants did, in fact, engage in the strategy of employing anti-warnings – that is, "deliberately misrepresent[ing] dangerous products as safe in order to contradict or eviscerate true warnings" – and that this strategy amounted to a willful, wanton or reckless disregard for the safety of others.

In *Henley v. Philip Morris Inc.*,[178] the defendant did provide to the plaintiff "some warning" that use of its product could be hazardous, starting in 1966 with the well-known "Caution: Cigarette Smoking May Be Hazardous to Your Health," and then the stronger 1970 and 1984 Surgeon General's warnings.[179] Despite the defendant's having given the plaintiff "some warning," the jury awarded punitive damages. The appellate court affirmed, concluding there was clear and convincing evidence that the defendant "conceal[ed] and suppress[ed] information known to it concerning the addictive and harmful properties

---

[177] Michael S. Wogalter, *Handbook of Warnings* 635 (2006) (emphasis in original) (trial exh. 5433c).  Dr. Cunitz also characterized "anti-warnings" as a type of "spin control."  Trial tr. at 1310 (Feb. 14, 2008).  Thus, an "anti-warning" is not itself a warning at all, but a communication meant to mitigate the force and effect of a separate, already-existing warning.

[178] 9 Cal.Rptr.3d 29 (Cal. Ct. App. 2004), *review dismissed*, 97 P.3d 814 (Cal. 2004), *cert. denied*, 544 U.S. 920 (2005).

[179] *See Pennington v. Vistron Corp.*, 876 F.2d 414, 418 (5th Cir. 1989) (reciting the history of warnings on cigarette packages).

of its product."[180]  Even though the *Henley* defendant had given *some* warning regarding *some* hazards of

using its product, it had given *no* warning about other, *known* hazards, and the jury reasonably concluded

this failure showed a reckless disregard for the plaintiff's safety.[181]  The same circumstances adhere in this

case.  Accordingly, defendants' argument that they are entitled to judgment as a matter of law on Jowers'

claim for punitive damages, because "they [made] some effort to warn about possible hazards associated

with the use of their products," is not well-taken.[182]


## 2.    Scientific Debate Regarding the Neurotoxicity of Welding Fumes.

Defendants assert "there is strong disagreement in the scientific community with plaintiff's claims

that welding fumes can cause neurological injury;" therefore, plaintiffs "did not prove that defendants

acted with the requisite . . . 'gross negligence' necessary for punitive damages."[183]  Defendants support

this contention by citing, among other cases, *Satcher v. Honda Motor Co.*, in which the Fifth Circuit Court

of Appeals reversed a Mississippi jury's punitive damages award in a motorcycle design defect case

because, among other things, "*there is a genuine dispute in the scientific community* as to whether leg

guards do more harm than good."[184]  Essentially, defendants argue that, if they have a good faith

disagreement regarding whether their products are hazardous, no jury can reasonably conclude they had

---

[180]  *Henley*, 9 Cal.Rptr.3d at 68.  In particular, the defendant did not warn of "the extreme difficulty [that smokers] were likely to encounter in any future attempt to stop smoking."  *Id.* at 69.

[181]  *See also Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 601-03 (8th Cir. 2005) (affirming punitive damages award where defendant used the same cigarette warnings).

[182]  Motion at 1 (docket no. 445).

[183]  *Id.* at 19.

[184]  52 F.3d 1311, 1317 (5th Cir. 1995), *cert. denied.*, 516 U.S. 1045 (1996) (emphasis added).

a reckless disregard for the safety of others.

The weakness with this argument is that, given the evidence adduced at trial, it does not appear to the Court – and apparently it did not appear to the jury – that there actually *is* "strong disagreement in the scientific community" that welding fumes can cause neurological injury.  As discussed above, defendants' own expert neurologists agree that manganese in welding fumes can accumulate in the brain and cause Manganese-Induced Parkinsonism.  This knowledge is not new: the first scientific report of MIP in welders dates to 1937, and treatises on industrial hygiene in the first half of the 20th century explain that welders can suffer brain damage from excessive manganese exposure.  Further, defendants' own internal documents – as opposed to the publications they wrote for welding journals – have for decades acknowledged the existence of welders who suffered neurological injury due to welding fume exposure.

It is more accurate to say there is strong disagreement in the scientific community regarding *how often* welders actually suffer the hazard of MIP, and to what degree they are injured.  It is generally agreed that, like other toxin-related injuries, whether a welder will ever suffer MIP (and the degree of his impairment) depends on: (1) individual susceptibility, and (2) the "dose," meaning how much manganese he is exposed to (both cumulative and episodic).  The parties and their experts disagree vehemently, however, on how these factors combine to disclose the frequency with which welders *actually* suffer MIP, and the extent of their physical injuries.  Defendants say MIP in welders is exceedingly rare, caused only by repeated and extremely high exposures to welding fumes, and is marked by obvious and extreme physical disability, such as spastic gait and facial grimacing.  Plaintiffs say MIP in welders is highly under-diagnosed and mis-diagnosed; can manifest through more subtle symptoms, such as tremors and balance problems; and can occur even when exposures do not exceed OSHA limits.  Plaintiffs also insist defendants actually conceded this last contention at one point, but are now admitting to the possibility of

only the most high-exposure cases of MIP.[185]

The Court agrees with defendants that the existence of this type of dispute – that is, how often a known hazard occurs and its severity – is *one factor* that should inform a jury's finding of whether a defendant acted with reckless disregard for the safety of others.  The Court disagrees with defendants' argument, however, that, under Mississippi law, the very existence of this type of dispute immunizes them from punitive damages altogether.  It is true that, the less frequently a known hazard occurs, the less reckless a defendant reasonably may be deemed for failing to warn about it.  But it is also true that the more *serious* a known hazard is, the more reckless a defendant may be deemed for failing to warn about it, even if the hazard occurs only rarely.[186]

Defendants were entitled to, and did, present evidence to the jury that there is a serious scientific dispute regarding the frequency with which welders suffer MIP.  The jury weighed this evidence, along with other evidence regarding the severity of the harm posed by the hazard, the defendants' level of knowledge of the hazard, the defendants' public and private conduct, the extent to which the scientific

---

[185]  Plaintiffs point to the MDL case of *Ruth v. A.O. Smith Corp.*, case no. 04-CV-18912.  In that case, which settled on the eve of trial, defense expert Daniel Chute opined before trial that plaintiff Ruth's welding fume exposures were all *below* the current TLV of 0.2 mg/m$^3$.  Despite this opinion, defendants and their experts now concede that Ruth does, in fact, have MIP.  *See* Jowers trial tr. at 623-37 (Feb. 11, 2008) (discussing Ruth's fume exposures and diagnosis); *id.* at 1782-86 (Feb. 20, 2008) (same).  Thus, plaintiffs, contend, defendants have conceded that a welder exposed only to mild steel welding fumes below OSHA limits can suffer disabling MIP.

[186]  Thus, if a manufacturer knows but fails to warn that *every* user of its product will suffer a single migraine headache, the defendant might reasonably be held liable for punitive damages based on a reckless disregard for the safety of others – even though the degree of injury is low, it is highly frequent.  Conversely, if a defendant knows but fails to warn that its product will cause injury to a very small percentage of its users, but the injury is death, the defendant might again reasonably be held liable for punitive damages – even though the likelihood of injury is small, it is extremely serious.  The failure to warn of a known hazard that is neither frequent nor serious, on the other hand, is less likely to be reckless, as a matter of law.

research was funded by the parties,[187] and the defendants' *mens rea* connected with their decision on whether and to what extent to warn.  The Court's review of all of this evidence leaves it with the conclusion that a reasonable jury could find the plaintiffs carried their heightened burden of showing that defendants engaged in "misconduct coupled with a bad state of mind."[188]  Because there is "substantial evidence in the record raising a relevant fact issue for determination by the jury, the decision of that issue may neither be taken from the jury nor its decision of that issue reversed by the [undersigned]."[189]

The cases cited by defendants do not mandate a different outcome.  *Satcher* was a design defect case  where there was "no definitive conclusion" on whether motorcycle leg guards might "do more harm than good."[190]  Here, the quarrel is over how often the known, serious injury of MIP occurs, and thus how wanton a failure it is not to warn of it.  While the *Satcher* court held that the nature and existence of the dispute regarding a *design* defect precluded a finding of gross negligence, the nature of the parties' dispute in this case regarding the frequency and severity of a *known* harm and whether to *warn* about it is the very evidence the jury must weigh in finding gross negligence *vel non*.  Other cases are also distinguishable.

---

[187]  Defendants argued at trial that many articles and studies show there exists a scientific debate surrounding the neurotoxicity of welding fumes.  Plaintiffs responded that many of the articles and studies cited by defendants were biased, because the authors were funded by the defendants.  The Court did not exclude these party-funded studies, concluding that the funding source did not mean the studies were "bad science" as a matter of law.  The jury, however, was certainly entitled to give these articles and studies less than conclusive weight.  *See Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605, 2626 n.17 (2008) ("The Court is aware of a body of literature . . . examining the predictability of punitive awards . . . . * * * Because this research was funded in part by Exxon, we decline to rely on it."); *In re Welding Fume Prods. Liab. Litig.*, 534 F.Supp.2d 761, 765 (N.D. Ohio 2008) (noting there is a strong basis for questioning "the assumption underlying the learned treatise exception that the author has 'no bias in a particular case'" when the author has received funding from a party) (quoting 2 *McCormick on Evidence* §321 (6th ed. 2006)).

[188]  D. Dobbs, *Handbook on the Law of Remedies* §3.9 at 204-05, 208 (1976).

[189]  *Eyre*, 755 F.2d at 420.

[190]  *Satcher*, 52 F.3d at 1317.

61

For example, *Hillrichs v. Avco Corp.*[191] was a design defect case, not a warnings case; further, unlike in this case, there was no evidence to "support an inference that the manufacturer took the position it did for its own economic advantage."[192]   In *Burke v. Deere & Co.*, another design defect case, there was no evidence of "the type of 'calculated decision-making' required to justify an award of punitive damages," unlike the evidence presented in this case of strategic anti-warnings and of weighing the cost of warnings against the benefit of sales.[193]   And in *Clark v. Chrysler Corp.*, even though there was "a good-faith dispute over whether B-pillar testing is necessary," the court *affirmed* a punitive damages award in connection with a defectively-designed truck.[194]   The nature of the evidence presented to the jury in this case distinguishes these other cases, so that the legal authority cited by defendants does not support their position.

In sum, defendants' argument that they are entitled to judgment as a matter of law on Mr. Jowers' claim for punitive damages, because there is a scientific debate regarding the neurotoxicity of welding fumes, is not well-taken.

### 3.   Compliance with Government and Industry Standards.

Defendants' final argument why they are entitled to judgment on Mr. Jowers' punitive damages claim, notwithstanding the jury's verdict, is that their warnings complied with the minimum legal requirements established by OSHA; with industry standards such as those reflected by ANSI Z49.1; and

---

[191]   514 N.W.2d 94 (Iowa 1994).

[192]   *Id.* at 100.

[193]   6 F.3d 497, 512 (8th Cir. 1993), *cert. denied*, 510 U.S. 1115 (1994).

[194]   436 F.3d 594, 602 (6th Cir. 2006).   The *Clark* court did, however, point to the existence of this dispute as a basis for granting remittitur of the punitive damages award.

with military specifications.  This argument, however, is not supported by the facts or the law.

Regarding the facts, plaintiffs adduced evidence at trial that defendants' warnings did not comply with OSHA requirements in at least three different ways.  First, certain defendants added words to the early mandated language, and plaintiffs' expert opined that these additions had the effect of weakening the warning.  In 1967, the American Welding Society mandated that the standard warning should state: "Avoid breathing these fumes and gases."  Defendant Airco/BOC's labels, however, warned welders to "avoid *excessive* breathing of these fumes and gases," while defendant Lincoln's labels warned welders to "avoid breathing *concentrations* of these fumes and gases."[195]  At trial, plaintiffs' warning expert explained how these words weakened the warning, implying that breathing some vaguely-defined lesser amount of fumes was not hazardous.[196]  Lincoln's corporate representative agreed that, by adding the words "excessive" and "concentrations," the meaning of the defendants' warnings was changed in a way that suggested a welder could breath more fumes.[197]  It was up to the jury to weigh this evidence of possible non-compliance.

Second, as noted above, the 1985 HazCom Standard required manufacturers to include in their

---

[195]  *See* trial exhs. 5487, 2055 (emphasis added).

[196]  Trial tr. at 1289-94 (Feb. 14, 2008) (testimony of plaintiff's expert Dr. Robert Cunitz). Plaintiffs in all five MDL bellwether trials have listed Dr. Cunitz as an expert, and he has been called to testify in four of those trials (*Solis*, *Tamraz*, *Jowers*, and *Byers*; not called in *Goforth*).  In each trial, the Court has ruled on motions by defendants to restrict the scope of Dr. Cunitz's testimony, granting each motion in part.  In addition, early in this MDL, the Court held a multi-day *Daubert* hearing on the admissibility of the testimony of various experts, including Dr. Cunitz, and issued an Order limiting the scope of his testimony in every MDL proceeding.  *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *6-8 (N.D. Ohio Aug. 8, 2005).  Defendants have been assiduous during each trial in raising objections to police the testimonial lines the Court has drawn, and in reminding the Court they believe the lines should be more restrictive.

[197]  Trial tr. at 671-77 (Feb. 11, 2008) (testimony of Lincoln corporate representative agreeing that "if you avoid breathing 'concentrations,' that does not mean you are going to 'avoid breathing fumes;'" and testifying that when "the air is not visibly clear, then that becomes a concentration").

warning labels the identity of any hazardous chemicals and their "target organ effects." At a 1985 AWS meeting discussing this new requirement, Lincoln's representative explained to the other members that "target organ information if known should be put on the label (e.g., manganese can cause nervous system damage)." It is undisputed that none of the defendants included any such language in their warning labels for many years.[198] Thus, it is arguable whether defendants were in complete compliance with OSHA requirements regarding warnings of possible damage to target organs.[199]

And third, OSHA's legal requirements, ANSI's industry standards, and NAVSEA's Mil-specs *all* make clear that the standardized warning language they recite was only a "minimum." The precise language of the OSHA requirement pertaining to warning labels is as follows:

> *Precautionary labels.* A number of potentially hazardous materials are employed in fluxes, coatings, coverings, and filler metals used in welding and cutting or are released to the atmosphere during welding and cutting. * * * The suppliers of welding materials shall determine the hazard, if any, associated with the use of their materials in welding, cutting, etc.
>> (A) All filler metals and fusible granular materials shall carry the following notice, **as a minimum**, on tags, boxes, or other containers:
>> CAUTION

---

[198] Eleven years later, in 1996, Lincoln began using a label on some products acknowledging that manganese caused neurological damage: "Manganese present in the fumes from this product may affect the central nervous system resulting in poor coordination, difficulty in speaking, and tremor of arms or legs. This condition is considered irreversible." *See* trial tr. at 648, 665-66 (Feb. 11, 2008). In 2002, ESAB began using a label on some products that included the statement: "Overexposure to manganese compounds can affect the central nervous system, symptoms of which are languor, sleepiness, muscular weakness, emotional disturbances, and spastic gait. The effect of manganese on the nervous system is irreversible. Manganese . . . [has] low OSHA Permissible Exposure Limits and ACGIH Threshold Limit Values that easily may be exceeded." *See* trial tr. at 715-16 (Feb. 12, 2008); trial exhs. 274, 2116. Before these dates, Lincoln and ESAB had not included any target organ information on their labels.

[199] Defendants suggested at trial that the HazCom Standard did not require them to include target organ information regarding the effect of manganese on the brain unless there was "existing . . . statistically accurate scientific studies that supported that." Trial tr. at 436 (Feb. 8, 2008) (testimony of ESAB representative). As noted, however, when the HazCom Standard was first promulgated, the AWS Safety & Health Committee immediately suggested a necessary warning amendment might include the language "manganese can cause nervous system damage."

> Welding may produce fumes and gases hazardous to health.  Avoid breathing these fumes and gases. Use adequate ventilation.  See ANSI Z49.1 - 1967 Safety in Welding and Cutting published by the American Welding Society.[200]

While this regulation sets out what a warning must include "*as a minimum,*" it does not proscribe additional warnings. Defendants recognized this point at trial.[201] Similarly, ANSI, which sets out industry standards, also makes clear that the suggested warning is a "minimum," as do NAVSEA's Mil-specs.[202]

Further, in the Occupational Safety and Health Act, Congress authorized the Secretary of Labor to "promulgate as an occupational safety or health standard any national consensus standard."[203]  The warning recited in OSHA's regulation was adopted voluntarily by members of the American Welding Society in 1966, well before the HazCom Standard was promulgated.  Thus, the regulation simply ordained a preexisting, minimum "national consensus standard."

That the defendants complied with OSHA's minimum standard by using their pre-existing warnings, of course, does not mean they met the entirety of their broader, OSHA-imposed obligation to provide an "appropriate hazard warning."  This is especially true when there is evidence supporting plaintiffs' contention that the pre-existing "national consensus standard" adopted by OSHA, ANSI, and NAVSEA was a warning that did not mention serious hazards known to the very defendants who helped

---

[200]  29 C.F.R. §1910.252(c)(1)(iv) (emphasis added).

[201]  *See* trial. tr. at 677-78 (Feb. 11, 2008) (Lincoln representative testifying: "It says 'as a minimum.'  We did use that [language] as a minimum and we added to it [when we added the word 'concentrations']").

[202]  *See* trial exh. 2845 at 52 (ANSI Z49.1-1967, stating that welding rods "shall carry the following notice **as a minimum**" (emphasis added) and setting out the 1967 warning); trial exh. 2070a at 13 (MIL-spec MIL-E-0022200/1F, §5.3.1.1 (July 13, 1981)) ("all unit packages shall be marked or labeled with the following precautionary information, **as a minimum** and prominently displayed," and setting out the AWS standard 1979 warning language) (emphasis added).

[203]  29 U.S.C. §655(a).

create the standard.  In other words, the defendants' compliance with a minimum standard they had already created, which was then adopted by OSHA, does not mean *ipso facto* that they complied with OSHA's more-global requirement of providing an appropriate warning about all known hazards.[204]

Regarding the law, defendants are correct that, "[u]nder Mississippi law, conformity with established industry standards is relevant to whether a product is reasonably safe."[205]  But the very case that defendants cite in support of this proposition further makes clear that "[c]onformity with established industry standards, while evidence of whether a product is reasonably safe, *may never be conclusive on the point*."[206]  This is because "a whole calling may have unduly lagged in the adoption of new and available [safety feature] devices," or in the adoption of appropriate warnings.[207]  If there is clear and convincing evidence to support a conclusion by a jury that: (1) a defendant has, in fact lagged unduly in fulfilling its obligation to warn of known hazards, and (2) the circumstances surrounding this failure to warn manifests a willful, wanton or reckless disregard for the safety of others; then the defendants' compliance with "minimum" governmental or industry regulations is not controlling on the question of whether a jury may award punitive damages.

In this case, the jury was presented with evidence regarding: (1) what the defendants knew about

---

[204]  The HazCom Standard does not define what makes a hazard warning sufficient or "appropriate," except that it must "convey the specific physical and health hazards, including target organ effects," of the chemicals.  29 C.F.R. §1200(g); *see id.* §1910.1200(f)(5)(iii) (warnings must provide "specific information regarding the physical and health hazards of the hazardous chemical").

[205]  Motion at 27 (docket no. 445).

[206]  *Hall v. Mississippi Chem. Express, Inc.*, 528 So.2d. 796, 799 (Miss. 1988) (emphasis added).

[207]  *The T.J. Hooper*, 60 F.2d 737, 740 (2nd Cir. 1932) (cited with approval in *Hall*, 528 So.2d. at 799).  *See also Buell-Wilson v. Ford Motor Co.*, 73 Cal.Rptr.3d 277, 314 (Cal. Ct. App. 2008), *review granted and opinion superseded*, 187 P.3d 887 (Cal. 2008) ("Compliance with a law or safety regulation in itself does not establish that a product is not defective or that a defendant who sells or rents the product for use by the public has exercised due care.").

the hazard of brain damage caused by manganese toxicity from welding fume exposure; (2) when they knew it; (3) what they did and did not do to investigate it; (5) what actions they took and language they used to warn about it, and when; (4) what the ongoing state of scientific knowledge was about it; and (5) what standards were set by government and industry.  All of these factors were relevant to the question of punitive damages, and the evidence presented shows that none of these factors was so weighty that it immunized defendants from a jury finding that they acted with a willful, wanton or reckless disregard for the safety of others.  Considering all of the evidence in the light and with all reasonable inferences most favorable to Mr. Jowers, a reasonable jury could conclude there was sufficient evidence to support an award of punitive damages.  Accordingly, the motion for judgment notwithstanding the verdict must be denied.

Finally, the Court does not perceive that the jury's punitive damages verdict is against the great weight of the evidence.  A jury could reasonably find that defendants did *not* act egregiously or with the requisite *mens rea*, and so were not grossly negligent to support an award of punitive damages.  Indeed, defendants' counsel argued vigorously that this is what the jury *should* do, and counsel had strong reasons to support this argument.  But a jury could also reasonably find, as it did, by clear and convincing evidence, that the defendants' actions manifested a willful, wanton or reckless disregard for the safety of others.  Accordingly, the defendants' motion for new trial, premised on the assertion that neither the law nor the facts allowed the jury to find in Mr. Jowers' favor on his claim for punitive damages, is also denied.

III.    **Plaintiffs' Motions.**

A.      **Loss of Consortium.**

As noted, the jury found in favor of Mr. Jowers on his claim for failure to warn and awarded him $1.2 million in compensatory damages.  This verdict necessarily entailed conclusions by the jury that Mr. Jowers' inhalation of the fumes emitted by defendants' welding consumables caused him neurological injury, and that this injury impaired his ability to engage in various activities.  At trial, both Mr. and Mrs. Jowers testified that Mr. Jowers' impairments also included increasing limitations on his ability to be a husband and companion to Mrs. Jowers.  Despite this testimony, the jury found against Mrs. Jowers on her claim for loss of consortium.

With their first post-judgment motion, the Jowerses assert the Court should enter judgment in Mrs. Jowers' favor on her lost consortium claim, notwithstanding the jury's verdict.  The Jowerses argue that, "[u]nder the law of Mississippi, a spouse has a 'right' of recovery for lost consortium, and a jury *must* award such damages when there is unrebutted evidence of such a loss."[208]  The Jowerses insist the "jury's failure to award damages to Mrs. Jowers in this case, where liability was established and her injuries were unrebutted, is a 'manifest error of law,' making Rule 59 relief appropriate."[209]  The relief Mrs. Jowers seeks is: (1) entry of judgment in her favor on liability; and (2) a new trial on the question of damages.  Mrs. Jowers further offers to stipulate to $250,000 in damages on her lost consortium claim, noting a new trial would become unnecessary if the parties can reach a stipulation.

---

[208]  Motion at 1 (docket no. 442) (emphasis added).

[209]  *Id.*

1.    **Legal Standard.**

Mississippi statutory law provides that a "married woman shall have a cause of action for loss of consortium through negligent injury of her husband."[210]  The Mississippi Supreme Court has explained the claim of loss of consortium as follows:

> A wife "is entitled to society, companionship, love, affection, aid, services, support, sexual relations and the comfort of her husband as special rights and duties growing out of the marriage covenant.  To these may be added the right to live together in the same house, to eat at the same table, and to participate together in the activities, duties and responsibilities necessary to make a home.  All of these are included in the broad term, 'conjugal rights.'  The loss of consortium is the loss of any or all of these rights . . . .
>      Consortium does not consist alone of intangible mental and emotional elements, but may include services performed by the husband for the wife which have a monetary value."[211]

On the other hand, a wife claiming loss of consortium cannot obtain recovery for "loss of financial support by the husband, recovery for nursing services, and recovery for pain and suffering of the husband, because these are items that he may recover in a suit by him."[212]

Often, when a jury concludes that the actions of a defendant have caused physical incapacity to a husband, the jury will also conclude the defendant has violated the conjugal rights of his wife.  But Mississippi courts are clear that a jury is permitted to find for the husband on his claim and against a wife on her derivative claim: "a loss of consortium claim is a separate and distinct claim from the central

---

[210]  Miss. Code. §93-3-1.

[211]  *Tribble v. Gregory*, 288 So.2d 13, 16-17 (Miss. 1974).  Another court has summarized this passage from *Tribble* to mean that a spouse's right of recovery for loss of consortium "is limited to loss of society and companionship, interference with conjugal rights, and providing previously unnecessary physical assistance."  *American Nat'l Ins. Co. v. Hogue*, 749 So.2d 1254, 1262 (Miss. Ct. App. 2000).

[212]  *Id.* at 17.

personal injury claim and must stand on its own before a trier of fact."[213]

In *Williams v. Gamble*,[214] for example, the jury awarded the husband $10,000 after his doctors left a hemostat in his body during surgery, but denied the wife's lost consortium claim. The appellate court affirmed, noting the plaintiffs presented no evidence that the wife "suffered any loss related to the presence of the hemostat."[215]  During the short time that the couple was aware the hemostat was still inside the husband, he "was recovering from open heart surgery," so the presence of the hemostat did not add appreciably to his existing inability to provide services to his wife.[216]  This included even sexual services, as the evidence showed the husband had erectile dysfunction before the surgery.[217]  The court held that, absent particularized evidence of loss of specific conjugal rights, the jury was not unreasonable in finding against the wife on her consortium claim.

Similarly, in *Coho Resources, Inc. v. McCarthy*,[218] the jury awarded the husband $1.5 million for injuries related to a drilling accident, and also awarded his wife $10,000 for loss of consortium. The defendants appealed, seeking (among other things) judgment notwithstanding the verdict on the wife's lost consortium award. The appellate court noted the husband's own doctor had testified the husband's injuries did *not* prevent him from helping around the house or providing sexual services, and the husband testified

---

[213] *Henson v. Riggenbach*, 982 So.2d 432, 441 (Miss. Ct. App. 2007) (Irving, J., dissenting) (citing *Coho Resources, Inc. v. McCarthy*, 829 So.2d 1, 22 (Miss. 2002), and *Alldread v. Bailey*, 626 So.2d 99, 102 (Miss. 1993)).

[214] 912 So.2d 1053 (Miss. Ct. App. 2005).

[215] *Id.* at 1059.

[216] *Id.*

[217] *Id.*

[218] 829 So.2d 1 (Miss. 2002).

only that his sons now had to do the lawn work instead of him.  Further, the wife did not testify at all.  The court reversed the judgment for the wife, observing there was simply "no testimony from either [spouse] as to how [the husband's] injury has adversely affected his relationship with his wife."[219]

In both *Gamble* and *McCarthy*, the wife obtained no recovery for loss of consortium because there was simply no evidence to support her claim.  It may also occur, however, that the couple presents evidence on point and the jury still finds against the spouse on the derivative claim.  In *Alldread v. Bailey*,[220] the wife suffered injuries in an automobile accident.  She testified that, after the accident, her husband was forced to do housework she had formerly done; she could no longer play racquetball with her husband and engage in other social activities with him; and their sexual frequency fell from about ten times a month to one or less.  The husband substantiated this testimony, further noting his wife was less helpful with child-rearing and had suffered a dramatic personality change.  Despite this evidence, the jury found against the husband on his lost consortium claim.  The husband appealed, insisting this verdict was against the weight of the evidence.

The Mississippi Supreme Court affirmed the jury's verdict, noting that cross-examination had provided a basis for the jury to disbelieve both the husband and wife.  For example, the jury "heard testimony of some serious disagreements between the [husband and wife] over the years," undercutting the couple's testimony regarding the state of their relationship before the accident.[221]  Also, on the question of the wife's compensatory damages, the jury rejected her and her chiropractor's testimony about the extent of her injuries and awarded only 13% of the amount she alleged at trial, "barely cover[ing] her

---

[219]  *Id.* at 22-23 (stating "the evidence was insufficient to even draw inferences to support [the wife's] personal claim for loss of consortium").

[220]  626 So.2d 99 (Miss. 1993)).

[221]  *Id.* at 103.

actual damages in medical and chiropractic bills;" this suggested the jury was skeptical of the wife generally and had reason to disbelieve some or all of her consortium-related testimony, as well.[222]  Thus, the court affirmed the verdict "because the evidence in this case was not uncontradicted" and, "[a]s to damages, Mrs. Alldread's case was weak, but Mr. Alldread's case was extremely weak."[223]

The more difficult question occurs when there is evidence to support the wife's claim for loss of consortium *and it is uncontradicted*.  While there was no evidence at all of lost conjugal rights in *Gamble* and *McCarthy*, and the evidence was "weak" and controverted in *Alldread*, there are also Mississippi cases where the evidence of the spouse's lost consortium was neither weak nor contradicted, but the jury still found against the spouse.  This circumstance occurred in *American Nat'l Ins. Co. v. Hogue*.[224]

In *Hogue*, the wife was assaulted and kidnaped in a shopping mall parking lot; she sued the mall owner for failing to keep the premises safe for invitees, and her husband sued for loss of consortium.  Regarding the couple's relationship, the husband testified that, after the assault, his wife had become extremely fearful and could not be left alone; he had to do the grocery shopping, because his wife no longer could bear to go to the store; and they could no longer do things together that placed her in unfamiliar situations.  The husband was not cross-examined, and there was no other evidence tending to impeach him.  The jury awarded the wife $30,000 in damages, but awarded the husband zero damages.  The trial court then granted the husband's post-trial motion for additur and awarded him $10,000, which

---

[222]  *Id.* at 102.

[223]  *Id.* at 103, 102.  *See also Van Bumble v. Wal-Mart Stores*, 407 F.3d 823, 827 (7th Cir. 2005) (affirming jury's verdict against husband on his loss of consortium claim despite verdict in favor of wife on her negligence claim, because the husband "was impeached several times at trial regarding who performed the housework before [his wife's] injury and the extent of [her] pain issues prior to her fall") (applying Indiana law).

[224]  749 So.2d 1254 (Miss. Ct. App. 2000).  See also cases cited below in footnote 230.

the defendant appealed.

Reviewing the evidence, the appellate court noted the tension between two pronouncements made by the Mississippi Supreme Court.  First, speaking to "a jury's duty with regard to 'undisputed evidence,'" the Mississippi Supreme Court had stated in *Lucedale Veneer Co. v. Rogers*:

> Uncontradicted or undisputed evidence should ordinarily be taken as true by the triers of facts.  More precisely, evidence which is not contradicted by positive testimony or circumstances, and is not inherently improbable, incredible or unreasonable cannot be arbitrarily or capriciously discredited, disregarded, or rejected even though the witness is a party interested; and unless shown to be untrustworthy, is to be taken as conclusive, and binding on the triers of fact.[225]

On the other hand, the  Mississippi Supreme Court had separately stated in *Alldread* that "even when '[t]here is no evidence on the issue of consortium damages except the testimony of [the spouse] herself,' . . . the 'jury was free to disbelieve her.'"[226]

The interplay between these Mississippi Supreme Court statements was highlighted in *Hogue* because the husband's testimony regarding his loss of conjugal rights was not cross-examined, nor disputed, nor impeached.  The question thus became "whether based on the evidence presented the jury *had* to award damages for a loss of consortium."[227]  The *Hogue* court concluded:

> the core claim of consortium damage was proven by positive and unimpeached evidence. Under the quoted standard [expressed in *Lucedale*,] it had to be accepted.  It is true that the *Alldread* court in *dicta* stated that a jury was free just to disbelieve a witness.  Without a clearer and controlling statement, we read that in the context of there needing to be a *basis* to disbelieve, even if only some inherent implausibility.[228]

---

[225]  *Id.* at 1263 (quoting *Lucedale Veneer Co. v. Rogers*, 53 So.2d 69, 75 (Miss. 1951)).

[226]  *Id.* (quoting *Alldread*, 626 So.2d at 102, which was itself quoting *Anderson v. Mutert*, 619 S.W.2d 941, 945 (Mo. Ct. App. 1981)).

[227]  *Id.* at 1262 (emphasis added).

[228]  *Id.* at 1263 (citation omitted, emphasis added).

73

Because the jury obtained absolutely no basis to "disbelieve, discredit, disregard or reject" the husband's testimony, the *Hogue* court affirmed the trial court's judgment notwithstanding the verdict.[229]  This was true even though "[t]here is [always] heightened potential both for self-serving and for uncontradicted testimony on consortium damages."[230]

### 2.    Analysis.

At trial, both Mr. and Mrs. Jowers testified regarding Mrs. Jowers' loss of conjugal rights.  Mrs. Jowers testified that, before Mr. Jowers' neurological symptoms began manifesting in 2001, they spent time together enjoying horseback riding, boating, and traveling to attend NASCAR events.  Mr. Jowers also enjoyed fishing and woodworking.  He was a hard worker who spent substantial time maintaining and repairing his automobiles and his property.  Mr. Jowers was sociable and had a quick wit, and he was also devoted to playing with his grandchildren.

Mrs. Jowers claimed, however, that in the seven years since his illness appeared, Mr. Jowers' personality and activity level changed.  He now becomes upset very easily and avoids most social activity, including interaction with his own grandchildren.  Mrs. Jowers stated she now avoids confiding in him and

---

[229]  *Id.* at 1263.

[230]  *Id.*  Some Mississippi trial courts have entered judgments in favor of spouses notwithstanding the verdict where: (1) the jury found in favor of the injured plaintiff, but against the plaintiff's spouse on a loss of consortium claim, and (2) the evidence at trial was uncontroverted that the spouse had lost some conjugal rights.  *See Henson v. Riggenbach*, 982 So.2d 432, 441 (Miss. Ct. App. 2007) (Irving, J., dissenting) (the trial judge granted additur or new trial on consortium damages after the jury "failed to consider the uncontriverted [sic] evidence as to the effect [the husband's] injuries had on him and their relationship as husband and wife" and entered a verdict against the spouse; the appellate court denied the appeal for lack of jurisdiction); *Dedeaux v. Pellerin Laundry, Inc.*, 947 So.2d 900 (Miss. 2007) (the trial judge granted additur on consortium damages after the jury entered a verdict against the spouse; on appeal the supreme court ordered a new trial on damages, but did not address the judgment in favor of the spouse).

74

discussing family and household difficulties with him, as she seeks to protect him from any matters that might upset him.  Because of his loss of balance and tremors, Mr. Jowers no longer trusts himself with tools; thus, he cannot maintain his property like he used to.  Because Mr. Jowers is depressed and self-conscious about his appearance, the couple ventures out much less than they used to and Mr. Jowers has simply stayed home when Mrs. Jowers travels.  Mr. Jowers sleeps poorly, so the two now sleep in separate bedrooms, and they are less intimate.  Mrs. Jowers stated their relationship has become more like mother-and-child and less like husband-and-wife.  Defendants did not cross-examine Mrs. Jowers on any of her testimony.[231]

Mr. Jowers' testimony was directed mostly at his work experience and touched only briefly upon how his medical condition has affected his relationship with his wife.[232]  Mr. Jowers stated he has become depressed, emotionally unstable, and gets upset very easily, sometimes crying for no apparent reason.  He said he feels useless and cannot stand much activity; thus, he has become scared to travel even by car, avoids playing with his grandchildren, and generally prefers to stay at home.  He cannot help Mrs. Jowers very much with home maintenance and does not have enough emotional fortitude to help his wife handle routine household difficulties or family problems.  He testified he and his wife no longer sleep in the same bedroom and his "sex life is virtually gone.  * * *  I think [my wife] is scared to have sex with me."  Mr. Jowers was cross-examined on virtually all of his testimony, including his claimed inability to engage in activities with his wife.[233]

The question presented by the Jowerses' motion "is whether based on the evidence presented the

---

[231]  *See* trial tr. at 1396-1411 (Feb. 15, 2008) (direct examination of Donna Jowers).

[232]  *See id.* at 877-91 (Feb. 12, 2008) (direct examination of Robert Jowers).

[233]  *See* trial tr. at 900 (Feb. 13, 2008) (counsel explaining he was not going to cross-examine Mr. Jowers regarding medical issues).

jury *had* to award damages for a loss of consortium" – that is, whether his case is controlled by *Hogue*.[234]
Although the Jowerses present a strong argument, the Court concludes that entry of judgment in favor of
Mrs. Jowers notwithstanding the verdict is inappropriate.[235]

As the *Hogue* court recognized, "awards set by the jury are not advisory" and "a jury's verdict
based on proper evidence and instruction occupies an especially exalted position in our court system,"
which this Court should not lightly set aside.  The jury's verdict "must be upheld unless 'there is no legally
sufficient evidentiary basis for a reasonable jury to find' as the jury did."[236]

In this case, defense counsel cross-examined Mr. Jowers regarding his ability to continue pursuing
activities he had enjoyed before the onset of his neurological disease in 2001.  Mr. Jowers testified he went
on a three-day fishing trip to Alabama in April of 2007, and he went on a half-day fishing trip near his
home in June of 2007.[237]  A jury could conclude that this evidence of Mr. Jowers' ability to engage in the
same *leisure* activities he enjoyed before he became sick undercuts his and his wife's assertions that he
cannot engage in the same *conjugal* activities he pursued before he became sick.  Further, Mrs. Jowers
testified that Mr. Jowers retained the ability to cook meals, mow the lawn, and so on.[238]  A jury could
conclude that the history Mrs. Jowers recited could be explained in part by other factors, such as normal
aging, and that Mr. Jowers' activity level had not diminished as gravely as the plaintiffs claimed.  And,

---

[234] *Hogue*, 749 So.2d at 1262 (emphasis added).

[235]  The Jowerses' motion is supported by a careful analysis of applicable case law and also
supporting citations to trial transcript.  Defendants' response cites to no new legal authority and includes
no citations to the trial transcript at all.

[236] *Foradori*, 523 F.3d at 485 (quoting *International Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th
Cir. 2005)); Rule 50(a)(1).

[237] *See* trial tr. at 948-49 (Feb. 13, 2008).

[238] *Id.* at 1408-09 (Feb. 15, 2008).

while Mrs. Jowers pointed to many activities, including conjugal ones, that Mr. Jowers no longer pursues, she did not provide testimony from which the jury could find a baseline with respect to the prior level of most of those activities, or when exactly they began to fade away.

Just as it is the jury's task to weigh the credibility and demeanor of witnesses testifying about the defendants' historical knowledge of the hazards of welding fumes, it is the jury's task to weigh the credibility and demeanor of witnesses testifying about the plaintiffs' history in their marital relationship. This Court is loathe to set aside the jury's decision except in the most clear and egregious of circumstances, and the Court concludes this case does not present such a situation.  The jury's verdict was not so untethered from the testimony adduced at trial (and inferences fairly drawn therefrom) that the Court must conclude the jury "arbitrarily or capriciously discredited, disregarded, or rejected the testimony" presented.[239]  Accordingly, while the question presented is a close one, the Jowerses' motion for judgment in favor of Mrs. Jowers on her claim for loss of consortium, notwithstanding the verdict, must be denied.

---

[239] *Hogue*, 749 So.2d at 1263 (quoting *Rogers*, 53 So.2d at 75).

B.      Costs and Expenses.

With their second post-judgment motion, the Jowerses invoke Fed. R. Civ. P. 54(d) and ask the Court to award them the costs and attorney fees they incurred in litigating their case. The Jowerses contend they are entitled to such an award under Mississippi law and submit they: (1) incurred $469,241.98 in expenses; and (2) had a contingency fee contract with counsel, but would have incurred at least $1,703,943.75 in attorney fees if counsel had billed at their hourly rates. Thus, the Jowerses seek a total award of costs and fees amounting to $2,173,185.73.[240]

In response, the defendants advance four arguments as to why an award of costs and attorneys' fees is inappropriate. First, defendants argue that federal law, not Mississippi law, applies to the question of attorneys' fees, and this Court should follow "the general 'American Rule' that the prevailing party may not recover attorneys' fees or costs or otherwise."[241] Second, defendants argue that, even if Mississippi law does apply, they are entitled to a jury determination of whether they should pay any attorney fees to the Jowerses (and, if so, how much) – the matter cannot be decided by post-judgment motion. "Accordingly, if plaintiffs wanted to obtain reimbursement for attorneys' fees, they needed to present that argument to the jury."[242] Third, defendants argue that, even if state law applies and the matter may be decided by post-judgment motion, the Jowerses are not entitled to an award of attorney fees because, under

---

[240] *See* Plaintiffs' Supplemental Request to Recover Attorneys' Fees and Expenses at 1-2 (docket no. 456).

[241] Response at 6 (docket no. 448) (quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 245 (1975)). In what can only be described as confusing, defendants assert this choice-of-law argument *after* their analysis of whether the Jowerses are entitled to an award of attorney fees under Mississippi law. The question of whether federal or state law applies, of course, must be the first prong of the Court's analysis.

[242] *Id.* at 11.

the applicable Mississippi common law standards, "a fee award [is] inappropriate in this case."[243]  And

fourth, defendants argue that, if their other arguments all fail, the amount requested by the Jowerses "is

unreasonable."[244]  The Court analyzes each of these arguments below.


### 1.    Applicable Law.

Employing a somewhat confusing argument, defendants assert that, "[u]nder *Erie*, the Court should

apply federal rules governing attorneys' fees, which would not provide for fees in this case."[245]  The

argument is confusing because defendants cite the Supreme Court's opinion in *Alyeska Pipeline Service

Co. v. Wilderness Soc'y*,[246] which *explicitly contradicts* the very contention defendants urge upon the

Court.  Defendants focus upon the statement in *Alyeska* that "federal law" follows the "general rule that,

absent statute or enforceable contract, litigants pay their own attorneys' fees."[247] But *Alyeska* quickly adds

that "[a] very different situation is presented when a federal court sits in a diversity case.  '(I)n an ordinary

diversity case where the state law does not run counter to a valid federal statute or rule of court, and

usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects

a substantial policy of the state, should be followed.'"[248] The Supreme Court went on to explain the well-

established history of this rule:

---

[243]  *Id.* at 5.

[244]  *Id.* at 11.

[245]  *Id.* at 5.

[246]  421 U.S. 240 (1975).

[247]  *Id.* at 257.

[248]  *Id.* at 260 n.31 (quoting 6 J. Moore, *Federal Practice* §54.77(2) at 1712-1713 (2nd ed. 1974)).

Prior to the decision in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), this Court held that a state statute requiring an award of attorneys' fees should be applied in a case removed from the state courts to the federal courts: '(I)t is clear that it is the policy of the state to allow plaintiffs to recover an attorney's fee in certain cases, and it has made that policy effective by making the allowance of the fee mandatory on its courts in those cases.  It would be at least anomalous if this policy could be thwarted and the right so plainly given destroyed by removal of the cause to the federal courts.'  * * *  We see nothing after *Erie* requiring a departure from this result.  The same would clearly hold for a judicially created rule, although the question of the proper rule to govern in awarding attorneys' fees in federal diversity cases in the absence of state statutory authorization loses much of its practical significance in light of the fact that most States follow the restrictive American rule.[249]

Defendants characterize this language as *dicta*.  The Fifth Courts of Appeals, however, is not so dismissive; it has cited and quoted *Alyeska* repeatedly and stated: "Our cases have made it clear that in an ordinary diversity case, state rather than federal law governs the issue of the awarding of attorney's fees."[250]  Indeed, as plaintiffs point out, *every federal appellate court agrees* that, "i[n] diversity cases such

---

[249]  *Id.* (citations omitted).

[250]  *Shelak v. White Motor Co.*, 636 F.2d 1069, 1072 (5ᵗʰ Cir. 1981); *Ashland Chemical Inc. v. Barco Inc.*, 123 F.3d 261 (5ᵗʰ Cir. 1997).

as this one, state law governs the award of attorneys' fees."[251]  "Thus, the direct authority granted district

courts by Fed. R. Civ. P. 54(d) to award attorney's fees must be exercised within the bounds of applicable

state law."[252]

Defendants suggest that, because this is a bellwether MDL case, it is not the "ordinary diversity

case" contemplated by *Alyeska*; rather, MDL-specific policy reasons adhere that alter the *Erie* analysis.

Defendants posit that an award of attorneys' fees in this case "would produce a new form of forum-

shopping that would encourage plaintiffs to select bellwether cases based on where a plaintiff resides

rather than his or her fitness for the role.  It is this kind of gamesmanship that *Erie* sought to prevent."[253]

---

[251] *Hobbs v. Alcoa,* 501 F.3d 395, 397 (5th Cir. 2007).  *See  Krewson v. City of Quincy*, 74 F.3d 15, 17 (1st Cir. 1996) ("Where a request for attorneys' fees comprises a substantive part of the state-law remedy for a state-law cause of action, the proper rule of decision governing the award is derived from [state], rather than federal, practice."); *Cotton v. Slone,* 4 F.3d 176, 180 (2nd Cir. 1993) ("Attorney's fees mandated by state statute are available when a federal court sits in diversity") (citing *Alyeska*); *Mitzel v. Westinghouse Elec. Corp.*, 72 F.3d 414, 417 (3rd Cir. 1995) ("Generally, the right of a party or an attorney to recover attorney's fees from another party in a diversity action is a matter of substantive state law") (citing *Alyeska*); *Acwoo Int'l Steel Corp. v. Toko Kaiun Kaish, Ltd.*, 840 F.2d 1284, 1291 (6th Cir. 1988) ("In a diversity case . . . , attorney's fees should be awarded only if authorized under state law"); *Jackman v. WMAC Inv. Corp.*, 809 F.2d 377, 383 (7th Cir. 1987) ("In diversity cases, state law governs the granting of attorney's fees") (citing *Alyeska*); *Burlington Northern R. Co. v. Farmers Union Oil Co. of Rolla*, 207 F.3d 526, 534 (8th Cir. 2000) ("state law governs the availability of attorney fees in diversity cases where no conflicting federal statute or court rule applies"); *Resolution Trust Corp. v. Midwest Federal Sav. Bank of Minot*, 36 F.3d 785, 800 (9th Cir. 1993) ("The court must apply state law [to determine the propriety of awarding attorney fees] unless (1) the claim for fees arose under some federal statute; or (2) the litigated issues involve . . . issues peculiar to [federal law]") (citations and internal quotation marks omitted); *Public Service Co. of Colorado v. Continental Cas. Co.*, 26 F.3d 1508, 1520 (10th Cir. 1994) ("The right to recover attorneys' fees is substantive and therefore determined by state law in diversity cases"); *Tanker Management, Inc. v. Brunson*, 918 F.2d 1524, 1527 (11th Cir. 1990) ("In a diversity action, the court looks to the substantive law which creates the cause of action, in this case Florida law, to determine if costs include attorney's fees."); *Nepera Chemical, Inc. v. Sea-Land Service, Inc.*, 794 F.2d 688, 694-95 (D.C. Cir. 1986) (reversing in part on the question of the recoverability of attorney's fees, noting District of Columbia law applied and quoting *Alyeska*).

[252] *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482 1487 (5th Cir. 1990).

[253] Response at 8 (docket no. 448).

Defendants further warn that "the possibility that attorneys' fees would be available for some candidates and not others would disrupt the administration of MDL litigation by skewing the bellwether trial selection process toward cases in which plaintiffs believe they may earn fees (to the extent that plaintiffs are allowed to choose bellwether cases at all)."[254]

But it is defendants' suggested framework that would encourage forum-shopping.  A *Welding Fume* MDL plaintiff's entitlement to an award of attorney fees under applicable state law should not depend on whether his case is tried in this transferee court, the transferor federal court after remand pursuant to 28 U.S.C. §1407(a), or state court after a remand for lack of federal jurisdiction.  As the *Alyeska* Court observed, "[i]t would be at least anomalous if [state rules regarding attorneys' fee awards] could be thwarted and the right so plainly given destroyed by removal of the cause to the federal courts."[255] This anomaly would exist no less in a federal MDL transferee court.  Defendants point out, correctly, that "[a] bellwether trial designed to achieve its value ascertainment function for settlement purposes or to answer troubling causation or liability issues common to the universe of claimants has as a core element representativeness."[256]   Only by applying *all* of the applicable law of the state from which the representative plaintiff hails will the value ascertainment function of the *Jowers* bellwether trial be fulfilled.

Regarding defendants' concern that following state law on attorneys' fee awards in diversity cases will "disrupt the administration of MDL litigation by skewing the bellwether trial selection process toward cases in which plaintiffs believe they may earn fees," this fear is manufactured and overblown.  As

---

[254]  *Id.*

[255]  421 U.S. at 260 n.31.

[256]  Response at 8 (docket no. 448) (quoting *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997)).

defendants are well aware, this Court has pursued (and intends to continue to pursue) a policy of conducting bellwether trials filed in different states, in order to obtain a sampling of how different state laws may affect verdicts.[257]  There has been and will be no "shopping" by the parties for bellwether cases filed only in jurisdictions where state law is perceived to be favorable regarding punitive damages or anything else.[258]

In sum, it is clear that, under *Erie*, it is Mississippi state law, and not federal common law, that applies in this MDL Court to determine whether plaintiffs are entitled to an award of costs and fees pursuant to Fed. R. Civ. P. 54.

### 2.      Seventh Amendment.

The defendants begin their constitutional argument with a concession that "courts have usually held that '[s]ince there is no common law right to recover attorney fees, the Seventh Amendment does not guarantee a trial by jury to determine the amount of reasonable fees.'"[259]  Both the Fifth Circuit Court of Appeals and the Mississippi Supreme Court have rejected the contention that a defendant "has a constitutional right to a jury trial on any disputed fact question, including [the plaintiff's] claim for

---

[257]  Thus, the first four bellwether trials over which this Court presided involved application of the laws, in order, of: (1) Texas; (2) South Carolina; (3) California; and (4) Mississippi.

[258]  Defendants also suggest that allowing an award of attorneys' fees in this MDL case is unfair because, in earlier MDL cases, defendants were "forced twice to incur substantial trial-preparation costs, only to have the plaintiffs seek to avoid an adjudication after discovery was virtually complete." Response at 5 (docket no. 448) (quoting *Peabody v. Airco, Inc.*, case no. 1:05-CV-17678 (N.D. Ohio July 31, 2006) (O'Malley, J.) Order at 3 (docket no. 26)). Mr. Jowers' individual entitlement to an award of attorneys' fees under applicable state law, however, is independent of actions taken by other MDL plaintiffs.  The Court has already considered whether defendants were entitled to recover fees in those earlier cases, and the two considerations are not properly mingled.

[259]  Response at 9 (docket no. 448) (quoting *Resolution Trust Corp. v. Marshall*, 939 F.2d 274, 279 (5th Cir. 1991).

attorney's fees and costs," and have ruled instead that "the trial court is the appropriate entity to award attorney's fees and costs."[260]    Nonetheless, defendants assert that, "if plaintiffs wanted to obtain reimbursement for attorneys' fees, they needed to present that argument to the jury."[261]    The gist of defendants' argument is that an award of attorneys' fees is "in the nature of additional punitive damages," and the remedy sought (money) is "of a legal rather than equitable nature."[262]    Thus, defendants assert, the Seventh Amendment applies to preserve their right to a trial by jury on the question of an attorney fee award.

The Court finds this argument is not well-taken.    Rule 54(d)(2)(A) states that "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages."    As noted, the Mississippi Supreme Court has stated explicitly that state law does *not* carry this requirement in the context of obtaining fees consequent to a verdict for punitive damages.    Thus, in *Smith v. Dorsey*, even though the state Supreme Court "analogized an allowance of attorneys' fees to the grant of punitive damages," it also stated that "the allowance and the amount of a fee is a matter committed to the sound discretion of the trial judge."[263]    And in *Missala Marine Services, Inc. v. Odom*, the Mississippi Supreme Court rejected the argument that "the

---

[260] *Missala Marine Services, Inc. v. Odom*, 861 So.2d 290, 296 (Miss. 2003) (further stating that "[i]t is proper for the trial court to hold a hearing after the trial of the case to hear evidence on the issue of attorney's fees"); *see Marshall*, 939 F.2d at 279 (repudiating defendant's "claim[] that the district court improperly determined the amount of attorneys fees rather than submitting the question to a jury").

[261] *Id.* at 11.

[262] Response at 10-11 (docket no. 448).

[263] *Smith*, 599 So.2d 529, 550 (Miss. 1992).

trial court erred in awarding attorney's fees by means of a post-trial motion."[264]  While attorneys' fees are

sometimes an element of damages that must be proved at trial, this is not the case under Mississippi law

when attorneys' fees are sought after entry of a plaintiff's verdict on punitive damages.[265]

Put simply, this Court is compelled to follow the dictates of the Fifth Circuit Court of Appeals and

the Mississippi Supreme Court on this question.  Even if the Court found defendants' Seventh Amendment

arguments persuasive – which it does not – the Court must still apply Mississippi law as set out by the state

Supreme Court and must apply Constitutional law as interpreted by the senior federal appellate court.

Both of these courts agree that, under applicable state law, defendants do not have a constitutional right

to a jury trial on the Jowerses' claim for attorney's fees and costs, and the claim was made ripe for this

Court's determination by timely post-judgment motion.

### 3.    Mississippi Law.

Having addressed defendants' first two arguments, both of which were misdirected, the Court now

examines defendants' third argument, which focuses more straightforwardly upon the merits of the

Jowerses' motion.  Defendants assert that "[a]n additional attorney fee award [is] neither proper nor fair

under the[] circumstances [of this case]," and maintain the Jowerses' motion must be denied under the

---

[264]  861 So.2d 290, 296 (Miss. 2003).

[265]  The Seventh Circuit has explained the distinction as follows: "What Rule 54(d)(2)(A) requires is that a party seeking legal fees among the items of damages – for example, fees that were incurred by the plaintiff before the litigation begins, as often happens in insurance, defamation, and malicious prosecution cases – must raise its claim in time for submission to the trier of fact, which means before the trial rather than after.  Fees for work done during the case should be sought after decision, when the prevailing party has been identified and it is possible to quantify the award."  *Rissman v. Rissman*, 229 F.3d 586, 588 (7th Cir. 2000), *cert. dismissed*, 531 U.S. 987 (2000).

applicable state law standards.[266]  More specifically, defendants assert that "plaintiffs must satisfy two requirements before attorneys' fees may be awarded: (1) they must prove that defendants are liable for punitive damages; and (2) they must advance a justification for the award of attorneys' fees."[267]  Defendants further argue the Jowerses have not met the second of these requirements.[268]

In response, the Jowerses contend that defendants are entirely wrong: Mississippi case law does not impose *either* of the two requirements listed by defendants; and, the Jowerses *have* advanced a recognized justification for the award of attorneys' fees.  Having canvassed Mississippi case law, including dozens of cases not cited by the parties, the Court concludes the Jowerses are fully correct.

Under Mississippi law, "attorney's fees may be awarded in two circumstances: (1) where the contract or a statute provides for attorney's fees or (2) where the losing party's conduct was outrageous enough to warrant punitive damages."[269]  Of course, only the second circumstance is pertinent in this case.  And as to that circumstance, the courts are careful to note that attorneys' fees may be awarded when punitive damages are "warranted" – not necessarily actually *awarded*.  Thus, the Mississippi Supreme Court has confirmed: "This Court's holding in *Greenlee* and other cases was that attorney fees may be

---

[266]  Response at 2 (docket no. 448).

[267]  *Id.* at 3.

[268]  In section II.B of this Opinion, the Court overruled the defendants' argument that they are entitled to judgment as a matter of law on the Jowerses' claim for punitive damages notwithstanding the jury's verdict.  No more need be said here regarding the defendants' first requirement.

[269]  *Sport Page Inc. v. Punzo*, 900 So.2d 1193, 1203 (Miss. Ct. App. 2004) (citations omitted); *see also Central Bank of Mississippi v. Butler*, 517 So.2d 507, 511 (Miss. 1987) ("in the absence of contractual provisions or statutory authority, attorneys' fees may not be awarded as damages in a case unless punitive damages are also proper") (citing *Grisham v. Hinton*, 490 So.2d 1201, 1205 (Miss. 1986); *Gardner v. Jones*, 464 So.2d 1144, 1150 (Miss. 1985); and *Aetna Casualty & Surety Co. v. Steele*, 373 So.2d 797, 801 (Miss. 1979)); *Greenlee v. Mitchell*, 607 So.2d 97 (Miss. 1992) (where "there is no contractual provision or statutory authority providing for attorney fees, they may not be awarded as damages unless punitive damages are also proper").

awarded in cases in which the awarding of punitive damages is *proper*.  This Court did not hold in *Greenlee* that the actual awarding of punitive damages was a prerequisite for the awarding of attorney fees, and we expressly hold here that such an actual awarding of punitive damages is not a prerequisite for the awarding of attorney fees."[270]  Thus, defendants are not accurate when they assert that, before attorneys' fees may be awarded, plaintiffs "must prove that defendants are liable for punitive damages."  Rather, the burden on the Jowers was only to prove that an award of punitive damages would be proper.  In any event, the jury in this case did, in fact, conclude the Jowerses actually proved by clear and convincing evidence that defendants are liable for punitive damages.  Thus, it is clear that "attorneys fees may be awarded."[271]

This leaves defendants' contention that, to obtain a fee award, the Jowerses must "advance a justification for the award of attorneys' fees."  Defendants maintain that, even though the Jowerses carried their heightened burden of proof of entitlement to punitive damages, they must still articulate some *additional* policy or factual circumstance to support a fee award – the award is not "automatic."[272]  This Court's review of many dozens of on-point Mississippi cases, however, reveals only three cases where punitive damages were awarded but attorneys' fees were *not*, and all three cases are clearly

---

[270]  *Aqua-Culture Technologies, Ltd. v. Holly*, 677 So.2d 171, 185 (Miss. 1996) (emphasis in original) (referring to *Greenlee v. Mitchell*, 607 So.2d 97 (Miss. 1992)).  The *Aqua-Culture* court ultimately affirmed an award of attorneys fees while also affirming the denial of punitive damages, explaining the two were not necessarily inconsistent: "A trial judge may validly find that, although the conduct of a defendant in a given case is such that the awarding of punitive damages would be appropriate, the actual awarding of additional monetary damages above the compensatory damages would serve no purpose or otherwise be inappropriate.  Nevertheless, the trial judge may also validly find that the plaintiff should not have to suffer the expense of litigation forced upon it by the defendant's conduct, and therefore determine that attorney fees should be awarded."  *Id.* at 184.  *See also Check Cashers Express, Inc. v. Crowell*, 950 So.2d 1035, 1043 (Miss. Ct. App. 2007) (although no punitive damages were awarded, affirming an award of "attorney's fees in lieu of punitive damages," and citing *Aqua-Culture*).

[271]  *Sport Page Inc.*, 900 So.2d at 1203.

[272]  Response at 2, 4 (docket no. 488)

distinguishable.[273]   Rather, it appears the rule in Mississippi is that the proof necessary to justify a fee award is tantamount to and coextensive with the proof necessary to obtain punitive damages.  A jury award of punitive damages, then, is *itself* the necessary and sufficient justification for an award of attorneys' fees. While a trial judge may retain the discretion to deny a post-judgment motion for an award of attorneys' fees after the jury has awarded punitive damages, Mississippi courts virtually never exercise their discretion in this manner, and defendants have not given this Court any cogent reason why it should vary from standard Mississippi judicial reasoning, custom, and practice.

Over and over, the Mississippi Supreme Court, the lower state appellate courts, and federal courts applying Mississippi law have all stated, quite simply and without more, that an award of attorneys' fees is appropriate when punitive damages were warranted.  Four examples:

- *Valley Forge Ins. Co./CNA Ins. Co. v. Strickland*: An insured sued her insurance company for bad faith failure to pay a claim.  The trial judge in Chancery court awarded the plaintiff $55,000 in compensatory damages, $1 million in punitive damages, and attorneys' fees.  The **Mississippi Supreme Court** affirmed.  The Court's entire analysis of the attorneys' fees issue was as follows: "Attorney fees may be awarded in cases where punitive damages are proper, regardless of the existence of contingent fee arrangements.  Likewise, in the absence of statutory authority, prejudgment interest is also allowable in cases where punitive damages are justified.  As discussed above, punitive damages were proper in this case and consequently the award of attorney fees and

---

[273]   Similarly, cases where courts reversed awards of attorneys' fees were always predicated on reversal of the punitive damages award.  *See, e.g., In re Guardianship of Duckett*, 991 So.2d 1165, 1179 (Miss. 2008) ("the chancery court's award of attorney's fees can only be upheld if its punitive damages award is proper.  Because we conclude that the chancery court's award of punitive damages was in error, its award of attorney's fees was in error as well."); *Defenbaugh and Co. of Leland, Inc. v. Rogers By and Through Thompson*, 543 So.2d 1164 (Miss. 1989); *Aetna Casualty & Surety Co. v. Steele*, 373 So.2d 797 (Miss. 1979) (reversing the punitive damage award and noting that "[a]ttorney's fees are not recoverable as an element of damages unless the infliction of punitive damages is justified").

interest was not error."[274]

- *Gill v. Gipson*: In an action to recover oil and gas royalties on a mineral lease, the trial judge in Chancery court awarded about $100,000 in past royalties, $10,000 in punitive damages, and $10,000 in attorneys' fees. The **Mississippi appellate court** affirmed and addressed the fee award with this brief analysis: "Since we have determined that the record supports an award of punitive damages, we also conclude that an award of attorney's fees was also appropriate."[275]

- *Crook Motor Co., Inc. v. Goolsby*: After learning his used truck had been stolen before he bought it from a dealer, the plaintiff sued the dealer, who then impleaded the original seller. In a bench trial, the **federal district court** concluded that "[p]unitive damages are called for under the facts of this case, given the knowing misrepresentations made by [the original seller] in attempting to pass off the stolen vehicle." Having made this determination, the court's entire analysis regarding an award of attorneys' fees against the original seller was short: "Attorneys' fees are recoverable in the instant case. The standard, in the absence of contractual or statutory liability therefor, is the

---

[274] 620 So.2d 535, 542 (Miss. 1993) (citation omitted), *cert. denied*, 510 U.S. 1024 (1993).

Other Mississippi Supreme Court cases employing a similarly terse analysis include: *United American Ins. Co. v. Merrill*, 978 So.2d 613, 636 (Miss. 2007), *cert. denied*, 128 S.Ct. 1257 (2008) ("[w]here punitive damages are awarded by the jury, attorney's fees are justified") (quoting *Mississippi Power & Light Co. v. Cook*, 832 So.2d 474, 486 (Miss. 2002)); *Missala Marine Services, Inc. v. Odom*, 861 So.2d 290, 296 (Miss. 2003) (affirming after "the trial court found that an award of attorneys' fees was appropriate because it determined that punitive damages were appropriate and because the jury awarded [the plaintiff] punitive damages"); *Richardson v. Canton Farm Eqpt., Inc.*, 608 So.2d 1240, 1255-56 (Miss. 1992) ("[w]e have long recognized . . . that a trial court may award attorneys' fees where the evidence is such that it justifies an award of punitive damages"); *Smith v. Dorsey*, 599 So.2d 529, 549-50 (Miss. 1992) (affirming award of $1 in punitive damages and $25,638 in attorneys' fees, and noting that "attorneys' fees cannot be awarded unless punitive damages are also proper").

[275] 982 So.2d 415, 422 (Miss. Ct. App. 2007).

Other, similar Mississippi appellate court cases include: *Raines v. Bottrell Ins. Agency, Inc.*, 992 So.2d 642, 648 (Miss. Ct. App. 2008) (after concluding the punitive damage award was appropriate, affirming the fee award by stating simply: "Attorneys' fees are available in cases where punitive damages are awarded."); *Check Cashers Express, Inc. v. Crowell*, 950 So.2d 1035 (Miss. Ct. App. 2007) ("The chancellor, as finder of fact, . . . determined that [defendants] acted 'with malice' in their conduct regarding the premises. This finding is sufficient to support the award of attorney's fees in lieu of punitive damages in the case before us."); *Jowett v. Scruggs*, 901 So.2d 638, 648 (Miss. Ct. App. 2004) ("We have upheld the finding that there was no breach of a fiduciary duty. [Thus, t]here was no basis to award punitive damages."); *Smith v. Orman*, 822 So.2d 975, 984 (Miss. Ct. App. 2002) ("Attorney's fees may be awarded where an award of punitive damages is made. [Thus, a]n award of attorney's fees is proper in this case."); *Sudeen v. Castleberry*, 794 So.2d 237, 252 (Miss. Ct. App. 2001) (the entire analysis: "the award of attorney's fees is clearly justified in cases where punitive damages are merited").

existence of such a gross or willful wrong as to justify the infliction of punitive damages."[276]

- *Williams v. Wal-Mart Stores, Inc.*: The plaintiff brought suit in state court for breach of contract and wrongful termination.  Although the plaintiff prayed for only $50,000 in compensatory damages, the defendant removed the case to **this federal district court**, asserting diversity jurisdiction.  Chief Judge Wingate refused to remand, concluding that the amount-in-controversy requirement was met because plaintiff had also prayed for punitive damages and, "under Mississippi law, if punitive damages are awarded, then an award of attorney fees is justified."[277]

Indeed, as noted above, this Court has been able to find only three cases applying Mississippi law where punitive damages were awarded but attorneys fees were not, and all three are distinguishable.  In *Romney v. Barbetta*, the court denied an attorney fee award not because it was undeserved, but because the plaintiff "fail[ed] to present competent evidence to determine attorney's fees."[278]  As discussed below, the Jowerses have presented data and argument supporting their request.

In *Smith v. Flagstar Enterprises, Inc.*, the plaintiff sued a restaurant after the cashier at the drive-through window spilled hot coffee on his lap.  The jury awarded the plaintiff $25,000 in compensatory damages and $1.00 in punitive damages, and the court denied the motion for attorneys' fees.  The Fifth Circuit Court of Appeals affirmed in a one-page, unpublished opinion: "In view of the minimum amount of punitive damages awarded to [plaintiff] by the jury, we find the district court's denial of attorney's fees

---

[276] 703 F. Supp. 511, 524 (N.D. Miss. 1988) (directing the parties to submit additional briefing regarding the proper amount of an attorneys' fee award).

[277] 2005 WL 2365271 (S.D. Miss. Sept. 20, 2005); *see also McFall v. CMH Homes, Inc.*, 2007 WL 2454064 (S.D. Miss. Aug. 23, 2007) (Guirola, J.) (using a similar amount-in-controversy jurisdictional analysis: "if successful, [plaintiff] is entitled to compensatory damages, attorney fees, and separate punitive damages").

[278] 881 So.2d 958, 962 (Miss. Ct. App. 2004); *see id.* at 962-63 (the trial court concluded the plaintiff had "provided appropriate justification of an award of attorney's fees," but "that the award of attorney's fees would be made only after the presentation of proper proof of attorney's fees had occurred." The appellate court concluded that, "[b]ecause there must be a rational basis upon which any award of attorney's fees is made, this Court cannot say that the decision not to enter an actual award was error.").

is not an abuse of its discretion."[279]  In the instant case, in contrast, the jury awarded Mr. Jowers $1.7 million in punitive damages, which was over 40% more than its award of compensatory damages.  This reflects the jury's conclusion that defendants' conduct was truly egregious, as opposed to the trifling punitive damages award in *Smith*.

And in *Wilson v. William Hall Chevrolet, Inc.* – which is the only such case cited by defendants – the court concluded that "the failure to request fees in the pleadings or otherwise prior to the jury's verdict precludes their recovery."[280]  Here, in contrast, the Jowerses' prayer included a clear request for attorneys' fees.[281]  It is true, as defendants note, that the *Wilson* court also stated: "a plaintiff who recovers a verdict for punitive damages is not thereby *entitled* to recover his attorney's fees.  Rather, in the court's opinion, an attorney's fee award, like an award of punitive damages, is discretionary."[282]  The only guidelines suggested by Mississippi case law that would counsel a court to exercise its discretion to deny attorneys' fees when punitive damages are awarded, however, are when: (1) the plaintiff failed to request fees in the complaint; (2) the plaintiff failed to provide sufficient documentation to allow the court to

---

[279]  85 F.3d 622, 1996 WL 255043 at *1 (5th Cir. 1996) (per curiam).  The *Smith* court "determined that [its] opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4," *id.* at *1 n.1; this determination, once again, underlines how infrequently courts conclude that fee awards are not justified when punitive damages are awarded.

[280]  871 F. Supp. 279, 283 (S.D. Miss. 1994), *affirmed in relevant part*, 77 F.3d 479 (5th Cir. 1996).

[281]  Third Amended Complaint at 56 (docket no. 17).

[282]  *Wilson*, 871 F.Supp at 282 (emphasis in original).

determine an appropriate fee award; or (3) the punitive damages award was purely nominal.[283]  None of these guidelines applies in this case.

Ultimately, then, the Jowerses have advanced a valid justification for the award of attorneys' fees that is widely recognized and accepted by courts applying Mississippi law: the defendants acted with "gross negligence which evidences a willful, wanton or reckless disregard for the safety of others."[284]  As discussed above, the proofs presented at trial provided a sufficient basis for a reasonable jury to conclude, by clear and convincing evidence, that defendants were liable for punitive damages.  And, as a general, almost universal, rule, "[w]here punitive damages are awarded by the jury, attorney's fees are justified" under Mississippi law.[285]  Accordingly, the Court exercises its discretion to grant the Jowerses' motion for an attorneys' fee award.  The remaining question is what amount the award should be.

### 4.    Reasonableness of the Fee Request.

As noted earlier, the Jowerses state they: (1) incurred $469,241.98 in expenses; and (2) would have incurred at least $1,703,943.75 in attorney fees if counsel had billed at their hourly rates; accordingly, the Jowerses seek a total award of costs and fees amounting to $2,173,185.73.  To justify this request, plaintiffs' counsel provides a summary of the hours and rates charged by each attorney and paralegal,

---

[283]  The *Wilson* court, itself, cited only the failure to request fees in the complaint as the reason for denying a fee award.  The court did not suggest that, once a jury determines by clear and convincing evidence that punitive damages are warranted, there must be some additional policy or factual circumstance to support a fee award.  *See also United Industries, Inc. v. Simon-Hartley, Ltd.*, 91 F.3d 762, 764-64 (5th Cir. 1996) (citing *Wilson* for the proposition that "our district courts have denied attorneys' fees in the absence of appropriate pleading and we have affirmed on appeal").

[284]  Miss. Code 11-1-65(1)(a).

[285]  *United American Ins. Co. v. Merrill*, 978 So.2d 613, 636 (Miss. 2007), *cert. denied*, 128 S.Ct. 1257 (2008) (quoting *Mississippi Power & Light Co. v. Cook*, 832 So.2d 474, 486 (Miss. 2002)).

explaining these summaries are "conservative and reasonable estimates" of time spent litigating this case.[286]  Counsel also provides a listing of expenses and time-entries underlying these summaries to support their lodestar calculation.  Finally, counsel sets out an analysis of each of the eight "*McKee* factors*," which courts applying Mississippi law should weigh when determining the reasonableness of a fee award.[287]

Defendants respond with one paragraph, stating they have "not examined plaintiffs' claimed hours and expenses line-by-line, [but] it is apparent from the mere fact that their requested fee exceeds the entire

---

[286]  Motion at 6 (docket no. 447).

[287]  As explained by the state Supreme Court in *Mississippi Power & Light Co. v. Cook*, 832 So.2d 474 (Miss. 2002):

> The reasonableness of an attorney's fee award is determined by reference to the factors set forth in Rule 1.5 of the Mississippi Rules of Professional Conduct.  This Rule provides in pertinent part:
>
> (a) A lawyer's fee shall be reasonable.  The factors to be considered in determining the reasonableness of a fee include the following:
>
>> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>> (3) the fee customarily charged in the locality for similar legal services;
>> (4) the amount involved and the results obtained;
>> (5) the time limitations imposed by the client or by the circumstances;
>> (6) the nature and length of the professional relationship with the client;
>> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>> (8) whether the fee is fixed or contingent.
>
> Miss. R. Prof'l Conduct 1.5.  *See also McKee v. McKee*, 418 So.2d 764, 767 (Miss.1982).  These factors are sometimes referred to as the *McKee* factors.  In addition to these factors, the Legislature gives additional guidance to courts in determining the reasonableness of attorney's fees by instructing the court to "make the award based on the information already before it and the court's own opinion based on experience and observation . . . ."  Miss. Code Ann. §9-1-41 (1991).

*Id.* at 486-87 (some citations omitted).

93

jury verdict that the fee is unreasonable."[288]  Defendants add that, if this Court determines a fee award is appropriate, they "reserve the right to challenge the reasonableness of plaintiffs' proposed fee on a line-by-line basis in light of the appropriate legal standard."[289]

In reply, Plaintiffs first observe that defendants are obviously incorrect in their comparison of the jury verdict with the fee request: the total of damages awarded by jury verdict was $2.9 million, while the Jowerses' request for fees and expenses is over $700,000 *less*.  Plaintiffs also argue that defendants' opportunity to contest the reasonableness of the amount of the requested fee award through a line-by-line analysis came with their response brief, defendants missed this opportunity, and defendants should not be permitted "a second chance to litigate this same issue again."[290]

Plaintiffs' assertion that defendants already had their chance to challenge the reasonableness of the amount of requested fees has some merit.  Nonetheless, the Court resolves this issue as follows. Defendants may now choose to either: (1) stipulate that plaintiffs' request for fees and expenses is reasonable in amount; or (2) challenge the amount as unreasonable, with a detailed written submission justifying that challenge.  If defendants choose the first option, they do not waive any right to challenge on appeal the Court's decision to grant the motion for a fee award, but they do waive the right to challenge on appeal the reasonableness of the amount; and the Court will enter an award for costs and attorneys' fees in the requested amount of $2,173,185.73.  If defendants choose the second option, they must provide to the Court and opposing counsel all of their own counsel's hourly rates (and/or any other compensation

---

[288]  Response at 11 (docket no. 448).

[289]  *Id.*

[290]  Reply at 21 (docket no. 454) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 427 (1983) (a "request for attorneys' fees should not result in a second major litigation")).

mechanisms), and also figures disclosing the amount of time that each attorney and paralegal spent litigating this case.  The Court requires this disclosure based on plaintiffs' request therefor and because "a comparison of hours and rates charged by opposing counsel is probative of the reasonableness of a request for attorney fees by prevailing counsel."[291]  Defendants shall file their stipulation or challenge on or before the date 28 days from the date of this Order.

        **IT IS SO ORDERED.**

                       /s/ Kathleen M. O'Malley        
                       **KATHLEEN McDONALD O'MALLEY**
                       **UNITED STATES DISTRICT JUDGE**

**DATED**: April 1, 2009

---

[291] *Heng v. Rotech Medical Corp.*, 720 N.W.2d 54, 65 (N.D. 2006).  *See also People Who Care v. Rockford Bd. of Educ., School Dist. No. 205*, 90 F.3d 1307, 1314 (7th Cir. 1996) (reversing a district court's reduction of compensable hours used to calculate an attorneys' fee award after comparing the number of hours billed by opposing counsel).; *City of Blaine v. Golder Associates, Inc.*, 2006 WL 3000131 at * (W.D. Wash. Oct. 18, 2006) (when "evaluating the reasonableness of a fee award, the Court may consider . . . the hourly rate of opposing counsel"); *In re Charter Communics., Inc., Sec. Litig.*, 2005 WL 4045741 at *17 (E.D. Mo. June 30, 2005) (MDL court assessing the fairness of a class settlement and noting that "it is reasonable for Lead Counsel and the other plaintiffs' firms [to] be as well paid as their adversaries who did not work on a contingency basis"); *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F.Supp. 1226, 1247 (N.D. Ill. 1993) (concluding that plaintiff's counsel's rates were reasonable, as they were comparable to defense counsel's rates).