# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
FILED
August 26, 2010

Lyle W. Cayce
Clerk




No. 09-60396

ROBERT E. JOWERS; DONNA A. JOWERS

Plaintiffs - Appellees

v.

LINCOLN ELECTRIC COMPANY; BOC GROUP; ESAB GROUP, INC.

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Mississippi

Before BARKSDALE, GARZA, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The BOC Group, Inc., the ESAB Group, Inc. ("ESAB"), and the Lincoln Electric Company ("Lincoln") (collectively, the "Manufacturers") appeal the jury verdict and judgment in favor of Robert and Donna Jowers (collectively, "Jowers") on Jowers' failure-to-warn claim under Mississippi law. Specifically, the Manufacturers argue the district court improperly instructed the jury on their government contractor affirmative defense; improperly admitted certain pieces of historical evidence at trial; and erred in refusing to permit any apportionment of fault to Robert Jowers' employer. Finally, the Manufacturers argue the district court erred in denying their FED. R. CIV. P. 50(b) motion for judgment as a matter of law on punitive damages.

I

From 1972 through 2005, Jowers worked as a shipfitter and, later, as a supervisor and foreman for Ingalls, a U.S. Navy shipbuilding contractor. Though he was never a full-time production welder, one of Jowers' primary tasks was mild-steel welding. He used "stick" and "wire" welding consumables during his career, both of which emit fumes containing manganese in the welding process. Manganese is a known neurotoxin, and inhalation of welding fumes that contain manganese could result in serious neurological disease, such as manganese-induced Parkinsonism ("MIP" or "manganism"). Jowers was exposed to welding fumes from his own and others' work for approximately six to seven hours each day. Jowers testified that he had no knowledge during his career that manganese in welding fumes could cause neurological injury, though the Manufacturers presented evidence that they had conformed with the required warning labels for manganese consumables during the duration of Jowers' career and had provided both him and Ingalls with material safety data sheets that detailed specific chemical risks. Prior to bringing suit against the Manufacturers, two neurologists diagnosed Jowers with MIP. His symptoms include a tremor, affected speech, bradykinesia (slow movements), rigidity, and poor balance. This disease is incurable, permanent, and progressive.

Based on the large number of welding fume cases in district courts, the Judicial Panel on Multidistrict Litigation ("JPML") created a multi-district litigation ("MDL") before Judge Kathleen M. O'Malley in the Northern District of Ohio to coordinate welding fume cases for pre-trial proceedings. *See In re Welding Rod Prods. Liab. Litig.*, 269 F. Supp. 2d 1365 (J.P.M.L. 2003). Jowers' suit against the Manufacturers, alleging a failure to warn regarding the dangers of manganese neurotoxicity and manganism, is one of the MDL's "bellwether trials." However, despite an earlier concession that venue in Ohio was proper, Jowers requested remand of the case to his home district prior to trial. Judge

O'Malley agreed, and the JPML remanded the case to the Southern District of Mississippi, but Judge O'Malley continued to preside over the case by designation.

Prior to trial, the district court denied the Manufacturers' motion to exclude historical documents that they alleged had no connection to Jowers' claim. Jowers moved for summary judgment on the Manufacturers' joint tortfeasor defense, which the district court granted, finding that apportionment of fault to Jowers' employer, Ingalls, was barred as a matter of law. At the close of evidence, the district court rejected the Manufacturers' proposed jury instruction on its government contractor defense. The district court also denied the Manufacturers' motion for judgment as a matter of law on punitive damages.

The jury found in favor of Jowers on his failure-to-warn claim and awarded him $1,200,000 in compensatory damages and $1,700,000 in punitive damages. The jury apportioned 40% of the fault to Jowers, thereby reducing the compensatory award to $720,000. The district court denied the Manufacturers' post-trial motions asking the court to set aside the compensatory and punitive damages verdicts. The Manufacturers now appeal on four grounds: (1) the district court erroneously instructed the jury on their government contractor defense; (2) the district court improperly admitted evidence of historical documents; (3) the district court erred by not permitting the jury to apportion fault to Ingalls; and (4) the punitive damages verdict is insupportable.

**II**

The Manufacturers first contend the district court erred in instructing the jury regarding the government contractor defense, which, if proven, would immunize the Manufacturers from suit. We review a district court's jury instructions for abuse of discretion. *Waco Int'l, Inc. v. KHK Scaffolding Houston, Inc.*, 278 F.3d 523, 528 (5th Cir. 2002). "We afford trial judges wide latitude in fashioning jury instructions and ignore technical imperfections." *Bender v.*

*Brumley*, 1 F.3d 271, 276 (5th Cir. 1993). However, "[r]eversal is . . . appropriate whenever the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations" and "the challenged instruction . . . affected the outcome of the case." *Id.* at 276–77 (internal quotation marks and citation omitted).

The government contractor defense preempts state law and provides a total bar to liability in a failure-to-warn case if a defendant establishes three elements: (1) the federal government exercised discretion and approved warnings for the product; (2) the warnings the defendant provided about the product conformed to the federal government specification; and (3) the defendant warned the federal government about dangers known to the defendant but not the government. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).

The Manufacturers argue that the district court improperly added another element to this defense in its jury instruction. Specifically, the district court instructed the jury that for the government contractor defense to apply, the Manufacturers must establish that "the United States Government had an identifiable Federal interest or policy in the existence or methods of warnings on welding products" and that "there was a significant conflict between this Federal interest or policy and the requirements of Mississippi law regarding the provision of adequate warnings." The Manufacturers contend that this added element erroneously required them to show physical impossibility to comply with both the state law standard of care and the federal government's specifications in order to prevail on the government contractor defense.

The Supreme Court first recognized the government contractor defense in *Boyle*, holding that federal law preempted state law to immunize government contractors despite the absence of legislation specifically immunizing these contractors from liability. 487 U.S. at 507. The *Boyle* court noted that without a statutory mandate to do so, preemption of state law by federal law "will occur

only where, as we have variously described, a 'significant conflict' exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation." *Id.* (internal quotation marks and citations omitted). The Manufacturers acknowledge in their brief that a tension between state and federal interests must exist for preemption to occur (making a government contractor defense viable), but contend the *Boyle* court found that demonstrating the first two elements of the defense would establish this conflict as a matter of law. Indeed, after detailing the three-element test for determining whether immunity applies in a government contractor defense, the Supreme Court stated:

> The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated—*i.e.*, they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability.

*Id.* at 512. If a plaintiff brings a failure-to-warn case alleging a failure to conform to state law requirements, and the defendant subsequently establishes that the federal government was involved in the decision to give (or not to give) a warning and that the defendant complied with the federal government's provisions, there necessarily exists a conflict between state law and federal policy in this area. *See id.* at 511–12; *see also Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 438 (5th Cir. 2000) (citing *In re Air Disaster at Ramstein Air Base*, 81 F.3d 570, 576 (5th Cir. 1996)). Thus, an additional instruction that the jury find a "significant conflict" between federal interests and Mississippi law in the instant matter is superfluous and forces the jury to construe an issue of law, which is outside its purview as fact-finder.

Jowers distinguishes *Boyle* on the grounds that it concerns a design defect claim and not a failure-to-warn claim, but in this court's decision in *Kerstetter*, we applied the three elements of *Boyle* to a failure-to-warn claim without also requiring a separate finding of "significant conflict" between state law and federal policy. *Kerstetter*, 210 F.3d at 438 (finding "[s]tate law is displaced" if the three *Boyle* elements are proven in a failure-to-warn claim). Jowers argues that *Kerstetter* is inapposite because it involved a failure-to-warn claim that was "part" of a design defect theory of liability. Regardless of the interplay between the claims, *Kerstetter* analyzed the design defect and failure-to-warn claims independently. The *Kerstetter* court did not require a separate finding of "significant conflict" between federal interests and state law in its analysis of the three *Boyle* elements under the failure-to-warn claim. Thus, based on the holdings in *Boyle* and *Kerstetter*, neither of which require a "significant conflict" element in the analysis of a government contractor defense, the district court erred in instructing the jury on this issue.

However, this error is only reversible if "the challenged instruction . . . affected the outcome of the case." *Bender*, 1 F.3d at 277. Jowers argues that the verdict need not be vacated because there was insufficient evidence to establish that the Manufacturers met their burden of proving each of the three *Boyle* elements. For the first *Boyle* element to apply, the federal government must have "exercised discretion" by meaningfully participating in the drafting of the warning. *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1479–81 (5th Cir. 1989). The government must not have merely "rubber stamped" the contractor's decisions; rather, there must be evidence in the record that the government actually chose a warning through its discretion. *Id.* at 1480.

Jowers argues that the Manufacturers presented no evidence of a "continuous back and forth review process" between the government and the contractor, and that this demonstrates a lack of discretion on the part of the

government. *See Tate v. Boeing Helicopters*, 55 F.3d 1150, 1154 (6th Cir. 1995). Separate evidence of a dialogue between the government and the contractor is needed when the government approves rather than prepares a warning because the government's mere acceptance of a manufacturer's warning does not establish its interest in that particular warning. *Kerstetter*, 210 F.3d at 435. Jowers presented evidence at trial that the national consensus standard for manganese fume warnings was developed by the Manufacturers as members of the American Welding Society ("AWS") and later adopted by the Secretary of Labor under the Occupational Safety and Health Act ("OSHA").[1] This warning did not mention the serious neurological hazards known to some of the Manufacturers in the '60s when the warning was first promulgated—and, in fact, the Secretary of Labor has not issued an updated regulation to change the mandatory "minimum" warning language. Likewise, the warning issued by the United States Navy agency NAVSEA in 1981[2] is substantially similar to the language the entire welding consumable manufacturing industry had voluntarily adopted as their own in 1979.[3] Compliance with a minimum standard which the Manufacturers themselves initially drafted does not indicate that the government exercised discretion and meaningfully participated in crafting the warning.

---

[1] This warning states, in pertinent part: "CAUTION Welding may produce fumes and gases hazardous to health. Avoid breathing these fumes and gases. Use adequate ventilation."

[2] This warning states, in pertinent part: "WARNING: Protect yourselves and others. Read and understand this label. FUMES AND GASES can be dangerous to your health. . . . Keep your head out of the fumes. Use enough general ventilation or exhaust at the arc or both to keep fumes and gases form your breathing zone and the general area." MIL-spec MIL-E-24403A(SH), § 5.3.1 (Dec. 21, 1981).

[3] This warning states, in pertinent part: "**FUMES AND GASES** can be dangerous to your health. Keep your head out of fumes. Use enough ventilation or exhaust at the arc or both. Keep fumes and gases from your breathing zone and general area."

With regard to the second *Boyle* element, the Manufacturers are required to provide warnings about the dangers of mild-steel manganese weld fumes that conform to federal government specifications. *Kerstetter*, 210 F.3d at 438. However, for a period of time the Manufacturers added language about avoidance of "excessive" fumes and "concentrations" of fumes that weakened the warnings, causing them to fall below the government-required minimum warning. Jowers' warning expert testified that these words weakened the effect of the warning, suggesting that a welder might be able to breathe more fumes, or even any fumes, and still avoid negative health effects. Thus, the Manufacturers' warnings did not wholly conform to federal government specifications.

As to the third *Boyle* element, Jowers argues that there is no evidence that the Manufacturers shared with the government their own internal admissions about the real risks of welding, nor that the government was aware of such risks. However, the Manufacturers offered testimony showing that the Navy was "sophisticated" and had "state-of-the-art knowledge" regarding the hazards posed by welding fumes and how to protect against them. The Manufacturers also point out that the government has, in the past, funded large-scale studies of welders assessing the potential risk of neurological injury. While the studies the Manufacturers cite date to 1941 and the aftermath of World War II, these studies at the very least indicate some government awareness of the possibility of neurological hazards from welding. In short, the Manufacturers contend there were no welding dangers known to them but not to the government, and that therefore there was no need to convey any additional information about the dangers of manganese welding fumes.

This argument is unpersuasive. While the jury may have concluded that the government knew everything the defendants did, the Manufacturers have not presented testimony that they shared any of their internal information

regarding welding fume hazards with the government, much of which demonstrated a deeper knowledge of potential harms from manganese inhalation than the approved warnings encompassed.

Accordingly, we find the district court failed to properly instruct the jury on the elements of the government contractor defense, but as the Manufacturers failed to elucidate a factual basis for the defense, this error was harmless.

**III**

The Manufacturers contend that the district court erred by allowing Jowers to introduce evidence of documents and testimony related to conduct that had nothing to do with the actual warnings Jowers and his employer received. These internal documents, one of which dates back to 1949, related to hazards associated with fluorides and high-manganese consumables, substances which the Manufacturers argued were not at issue in this case and therefore made the documents irrelevant to the instant litigation. Nevertheless, the district court denied the Manufacturers' motion in limine because it believed that historical documents in general were relevant to "show knowledge that existed in the industry and that would have carried over to that later point in time." The Manufacturers argue that Jowers only admitted these documents to suggest that *any* prior misconduct is evidence that, more than twenty years later, the Manufacturers continued to engage in misconduct affecting Jowers.

We review a district court's evidentiary rulings for abuse of discretion. *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 992 (5th Cir. 2008). Any error in the admission or exclusion of evidence "should not be the basis for setting aside the judgment" unless "the substantial rights of the parties were affected." *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1093 (citing FED. R. CIV. P. 61). Moreover, where the trial judge "has conducted, on the record, a carefully detailed analysis of the evidentiary issues and the court's own ruling, appellate courts are chary about finding an abuse of discretion." *Kelly v. Boeing Petroleum*

*Servs., Inc.*, 61 F.3d 350, 356 (5th Cir. 1995). Here, the district court judge has been reviewing these documents since 2005, when she conducted over two days of document-admissibility hearings, culminating in an extensive written opinion. *See Ruth v. A.O. Smith Corp.*, 615 F. Supp. 2d 648, 650–51 (N.D. Ohio 2005). Accordingly, we give the district court's judgment on these evidentiary issues considerable deference. *See Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000) ("The considerable deference accorded to the judgment of the district court is heightened where the trial judge's experience has imparted to the judge a particularly high degree of knowledge.").

Federal Rule of Evidence 402 excludes from admission any evidence that is not relevant. Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The pertinent portion of the Mississippi Products Liability Act ("MPLA") governing Jowers' failure-to-warn claim states that a claimant must prove

> by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.

MISS. CODE ANN. § 11-1-63(c)(i) (2004). Per the MPLA's plain language, critical to the court's inquiry into a failure-to-warn claim is the question of what the Manufacturers knew and what knowledge was reasonably available to them. As knowledge accumulates over time, prior knowledge of harm that predates Jowers' employment is relevant to a question of current knowledge. *See, e.g.*, *Noah v. Gen. Motors Corp.*, 882 So. 2d 235, 237–39 (Miss. Ct. App. 2004) ("[E]vidence of prior accidents has long been admissible in state courts for . . .

the purpose of showing the existence of a dangerous condition." (citations omitted)).

The Manufacturers argue that the documents, dated up to two decades prior to Jowers' employment, are too remote in time to be relevant to the knowledge the Manufacturers had about the dangers of manganese fumes. This court has previously rejected such an argument in *Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1317–19 (5th Cir. 1985). The *Jackson* defendants sought to exclude documents as irrelevant in a failure-to-warn case regarding asbestos because the documents were written twenty years prior to the plaintiff's commencement of work. The court was not persuaded by this argument, noting that "[e]vidence that the defendants had such knowledge in 1935 clearly makes [the plaintiff's] allegation that the dangers of the asbestos products were foreseeable in 1953 more probable than it would have been without such evidence." *Id.* at 1319. The same argument supports admission of the instant documents: they are relevant to knowledge of the danger of welding fumes in the industry in the twenty years prior to Jowers' employment.

The Manufacturers also argue that the substances (fluorides and high-manganese consumables) discussed in the documents are too far removed from the mild-steel welding substances at issue in the instant matter for the documents to be relevant. However, these documents go to the Manufacturers' knowledge of the dangers of working with *all* potentially hazardous types of welding products and the fumes these products create. In *Jackson*, the defendants argued that the documents they sought to exclude had "no probative value" because they referred only to workers who were exposed to raw asbestos, whereas the plaintiff "worked solely with finished asbestos products." *Id.* at 1318. This court concluded that the documents were admissible because they were "at least suggestive of the fact that other groups of workers who were also exposed to asbestos fibers face similar dangers." *Id.* Following *Jackson*, we

likewise conclude that whether knowledge of the harms from the consumables at issue in the instant documents is probative of the Manufacturers' failure to warn Jowers of the harms involved in his mild-steel welding work goes to the *weight* of the evidence, not its admissibility. *See id.*

Alternatively, the Manufacturers argue that these documents are extremely prejudicial and thus should have been excluded under Federal Rule of Evidence 403, which permits exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. "Relevant evidence is inherently prejudicial; but it is only [u]nfair prejudice, [s]ubstantially outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979). The Manufacturers contend that these documents generally, and the 1949 fluoride memorandum in particular, were introduced for the sole purpose of arguing that at least one manufacturer put profits ahead of safety, despite the fact that this company included warnings on its products prior to Jowers' joining the welding workforce.

However, the Manufacturers' arguments that they gave sufficient warnings regarding the potential harms of their products open the door to an examination of the quality of their welding fume warnings more generally, including warnings about substances (such as fluorides or high-manganese consumables) not directly implicated in this action. The motivations for deciding not to include a warning regarding welding fumes of any kind are directly relevant to the instant matter and not unduly prejudicial. For instance, the Manufacturers' expert witness, Dr. Jane Welch, testified that the warnings on welding products in 1967 were state-of-the-art and "cutting edge," in part, because "manufacturers were not anticipating putting warnings on their products" at that time. Evidence that some members of the welding industry had warnings on their products as far back as the 1940s, which were later

removed due to concerns about the financial implications of such warnings, is directly relevant to rebut this testimony. Accordingly, given the relevance of these documents to Jowers' failure-to-warn claim under Mississippi law, the district court did not abuse its discretion in admitting them over the Manufacturers' objection.

## IV

The Manufacturers contend that the district court erred in refusing to permit the jury to apportion fault to Jowers' employer, Ingalls, and that therefore the compensatory verdict must be vacated. Specifically, the Manufacturers argue that the district court erred in finding that Jowers' eligibility for benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 *et seq.*, precluded the ordinary operation of Mississippi's joint tortfeasor law.[4] We review *de novo* the legal issue of whether the district court properly ruled that the Manufacturers' joint-tortfeasor defense was foreclosed. *Fontenot v. Dual Drilling Co.*, 179 F.3d 969, 972 (5th Cir. 1999).

LHWCA guarantees workers' compensation for qualified beneficiaries, like Jowers, who are injured while assisting in the construction of large ships on or near federal navigable waters. Accordingly, a person who receives LHWCA benefits may not sue his employer under state law for any additional compensatory damages related to his on-the-job injury. *See* 33 U.S.C. §§ 905(a),

---

[4] As a threshold matter, Jowers contends that the Manufacturers have waived this argument by failing to present it to the district court in response to Jowers' motion for summary judgment on this issue. Jowers points to *Ruth*, in which the district court initially ruled that Mississippi law precluded the allocation of fault to that plaintiff's employer because he was covered by LHWCA. Jowers argues that the Manufacturers have never previously contended, as they do now, that the *Ruth* court's ruling was erroneous.

However, the district court expressly incorporated its *Ruth* rulings into the instant record, which includes all rulings in earlier cases. The Manufacturers' argument here is the same argument it advanced in *Ruth*: that Mississippi's apportionment rule, which permits allocation of fault to immune joint tortfeasors, applies notwithstanding LHWCA's proscription against suing the beneficiary's employer for damages. Accordingly, the Manufacturers have preserved this argument for appeal.

933(i); *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 818 (2001) (LHWCA "provides nonseaman maritime workers . . . with no-fault workers' compensation claims" and "expressly pre-empts all other claims."). Though an injured LHWCA beneficiary cannot sue his employer for damages related to his injury, the statute permits the employee to sue a third party that contributed to his injury. At issue in *Ruth*, a prior case in the MDL whose rulings were incorporated into the instant matter, was whether any verdict against such a third-party defendant can be reduced by the amount of fault attributable to the immune employer. 416 F. Supp. 2d at 587.

The Manufacturers argue that the district court erred in its interpretation of federal and Mississippi law by determining that LHWCA prevented the jury from apportioning any of the fault to Ingalls. The district court analyzed three key cases to come to this conclusion: *Fontenot*; *Accu-Fab & Construction v. Ladner*, 778 So. 2d 766 (Miss. 2001); and *Mack Trucks, Inc. v. Tackett*, 841 So. 2d 1107 (Miss. 2003), which overruled *Accu-Fab* in part.

In *Fontenot*, this court held that allocation of fault between an employer and a third-party defendant under LHWCA depends on "whether the third party . . . is a vessel or is a non-maritime entity." 179 F.3d at 974. If the third party is a "vessel," then LHWCA provides that the employee may bring a "third-party cause of action against [the] vessel based on negligence." *Id.* at 975. In such a case, "the employer shall not be liable to the vessel for such damages directly or indirectly." *Id.* at 974 (quoting 33 U.S.C. § 905(b)). However, if the third-party defendant is a "non-maritime entity" (anything other than a "vessel"), LHWCA is silent on the question of allocation of fault and the employee's claim against a non-maritime entity necessarily depends on the relevant state law's allocation of fault. *Id.* at 976. In the instant matter, because the third-party defendant—Ingalls—is not a vessel, we must look to Mississippi law to determine whether the court may allocate fault to Ingalls.

In so doing, the district court proceeded to analyze the Mississippi Supreme Court case *Accu-Fab*. Despite the *Fontenot* holding that state law allocation of fault should be applied where the third-party defendant is a non-vessel, *Accu-Fab* referred back to LHWCA and federal law to hold that "federal maritime standards govern" even though no vessels were involved in that dispute. *Ruth*, 416 F. Supp. 2d at 589 (quoting *Accu-Fab*, 778 So. 2d at 769–70). This interpretation of LHWCA is incorrect under *Fontenot*. Indeed, the district court noted that this analysis is somewhat circular because it "assume[s] that, if LHWCA benefits are paid, a vessel must be involved, so the trial court should not assess the fault of the employer and should not reduce an award accordingly." *Id.* at 590. Moreover, the *Accu-Fab* court noted in dicta that it "would reach the same conclusion even if [LHWCA] was not implicated," determining that § 85-5-7 would not permit apportionment of fault to immune parties.

However, a subsequent Mississippi Supreme Court case, *Tackett*, reaffirmed that MISS. CODE ANN. § 85-5-7 permits apportionment of liability not only to settling defendants, but also to immune defendants, and consequently overruled *Accu-Fab*'s dicta in pertinent part. 841 So. 2d at 1115. Perplexingly, however, the *Tackett* court found that "[t]he holding in *Accu-Fab* was predicated on the controlling precedents of federal case law, since [the employee] was a beneficiary under [LHWCA]," and that therefore § 85-5-7 was inapplicable in that case. *Id.* at 1115 n.2. The district court below noted that this analysis seemed faulty in light of *Fontenot*, but found that it "cannot correct the Mississippi Supreme Court's reasoning by fiat, nor ignore its reaffirmation in [*Tackett*] of *Accu-Fab*'s result." *Ruth*, 416 F. Supp. 2d at 592. Consequently, the district court held that in Mississippi, "when an employee covered by LHWCA sues a third party for damages, the trial court does *not* apportion fault to the employer." *Id.* (emphasis in original).

Neither party disputes that *Fontenot* controls the instant case. However, the Manufacturers contend that the district court in *Ruth* improperly followed *Accu-Fab* rather than Mississippi law, which states that "[i]n actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault without regard to whether the joint tort-feasor is immune from damages." MISS. CODE ANN. § 85-5-7(5). A 2002 amendment to this statute was a reaction to the Mississippi Supreme Court's holding in *Accu-Fab*, which the legislature found to have misconstrued the "original intent" of the statute. *Tackett*, 841 So. 2d at 1114 n.1. A federal court sitting in diversity is not "bound under *Erie* . . . to defer [to state courts] on issues of federal law," *FPL Energy Me. Hydro LLC v. FERC*, 551 F.3d 58, 63 (1st Cir. 2008), even when the state court is deciding whether its own laws are preempted by federal law. *Osterneck v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 841 F.2d 508, 511 (3d Cir. 1988), *abrogated on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988). In light of *Fontenot* and § 85-5-7(5), Mississippi law supports allocation of fault to immune parties, such as an employer in a non-vessel LHWCA claim, and the district court should not have deferred to the Mississippi Supreme Court's improper LHWCA analysis.

Jowers contends that even if the district court's refusal to permit the jury to apportion fault to Ingalls was incorrect, any error therefrom was harmless. Jowers argues that the Manufacturers' own industrial hygiene expert testified that Ingalls should bear no fault in the litigation. However, this witness simply testified that he did not personally know of evidence that Ingalls failed to adhere to their established policies and procedures. The mere fact that one witness lacked knowledge of Ingalls' potential fault in the litigation does not prove that no such fault existed.

Jowers also argues that the Manufacturers had the opportunity to present the "sophisticated user" affirmative defense, for which the jury was instructed: "The defendants claim that a warning about the threat of neurological injury was unnecessary because the defendants had reason to believe that [Ingalls] already knew, or had reason to know, about this danger, and would communicate that danger to Mr. Jowers." The jury rejected this defense, which includes the "knew or had reason to know" element that corresponds with the "foreseeability" element in a negligence action and for apportionment of fault. *See Miss. Dep't of Mental Health v. Hall*, 936 So. 2d 917, 924 (Miss. 2006) (discussing foreseeability requirement in the allocation of fault and noting that "to be held negligent, an injury must be 'reasonably foreseeable'" (citation omitted)). Thus, Jowers argues the sophisticated user defense instructed the jury to consider whether Ingalls could foresee Jowers' injuries, a central element in the Manufacturers' negligence theory. Because the jury rejected the sophisticated user defense and its constituent elements, Jowers contends the zero-fault allocation to Ingalls had no effect on the verdict.

However, the jury's rejection of the sophisticated user defense does not necessarily mean that they rejected *any* apportionment of fault to Ingalls. The district court instructed the jury on the three elements of the sophisticated user defense as follows, noting that the Manufacturers had to prove all three elements by a preponderance of the evidence:

> (1) [Ingalls] received adequate warnings and instructions from [the Manufacturers], or had the same level of expertise and knowledge about the dangers of welding fumes as did [the Manufacturers] themselves;
>
> (2) [Ingalls] could be reasonably expected to convey that information to Mr. Jowers; and
>
> (3) at the time [the Manufacturers] were selling to the employers the products that allegedly injured Mr. Jowers, [the Manufacturers] themselves had reason to believe that [Ingalls] had this knowledge

> and expertise about neurological injury and welding fumes, and had reason to believe that [Ingalls] would convey that information to Mr. Jowers.

The jury could have rejected the sophisticated user defense on any one of these elements, not merely the foreseeability element. Thus, the jury readily could have decided that Ingalls was not sufficiently "sophisticated" to absolve defendants of any duty to warn, but had they been instructed on apportionment of fault, the jury may have determined that Ingalls bore *some* responsibility for Jowers' injury. Indeed, the jury found Jowers 40% at fault for his own injuries. It is entirely conceivable that the jury may have found that Ingalls, which was responsible for providing Jowers with a safe workplace, shared some fault as well. Evidence at trial demonstrated that welding fume exposure levels at Ingalls sometimes exceeded regulatory limits, and that Ingalls did not teach welders about the individual chemicals comprising a welding fume, but rather about the fume in general. This evidence might indicate a failure to provide a safe working environment or complete knowledge about the possible dangers of the working environment. Moreover, this court has, in the past, affirmed allocation of fault to an employer despite rejection of the sophisticated user defense. *See In re Incident Aboard the D/B Ocean King*, 813 F.2d 679, 687–89 (5th Cir. 1987) (affirming allocation of 55% fault to employer despite rejection of sophisticated user defense), *amended on other grounds*, 877 F.2d 322 (5th Cir. 1989). Accordingly, the district court's improper refusal to instruct the jury on a joint-tortfeasor defense permitting allocation of fault to Ingalls was not harmless error, and we vacate the compensatory damages verdict.

## V

Finally, the Manufacturers argue that district court erred in denying their motion for judgment as a matter of law on punitive damages. We need not address the merits of this issue because our vacating the compensatory damages

verdict requires that we also vacate the punitive damages verdict. Further, because our ruling in Part IV requires Ingalls' allocation of fault, if any, we remand for retrial on the issues of compensatory and punitive damages, including, but not limited to, the threshold issue, on this new record, of whether the claim for punitive damages should be submitted to the jury.

**VI**

For the foregoing reasons, we affirm the jury's finding of liability against the Manufacturers because the district court's error in instructing the jury on the Manufacturers' government contractor defense was harmless, and the district court properly admitted the historical evidence at trial. However, we vacate both the compensatory and punitive damages awards and remand this case for a new trial on damages that includes a jury instruction permitting allocation of fault to Ingalls. We also vacate Jowers' fees award, which rests exclusively on the punitive damages verdict. *See Pride Oil Co. v. Tommy Brooks Oil Co.*, 761 So. 2d 187, 192 (Miss. 2000) (finding that "fees are not recoverable absent proof of conduct which would permit an award of punitive damages").

Finally, we must admonish Jowers' counsel for alleging in the briefing that the Manufacturers "misrepresented" the record. Misrepresentation of the record is a very serious charge and this court does not take such allegations lightly. This was a highly contested case with compelling evidence supporting both sides' arguments. The Manufacturers were within their right to present evidence in their briefing as persuasively as possible, which in no way constitutes a misrepresentation of the record. We caution Jowers' counsel against making such unfounded claims in the future.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.